IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 07-cv-01712-MSK-MEH

PETER GEORGACARAKOS,

      Plaintiff,

v.

WILEY,
CRUZ,
JAVERNICK,
COLLINS,
SUDLOW,
MADISON,
CHURCH,
LT. JOHN DOE,
HEIM,
MARTINEZ,
FENLON,
DENNEY,
NALLEY,
BAXTER,
WATTS,
PUGH,
HOOD,
HERSCHBERGER,
LAPPIN,
BUREAU OF PRISONS,
DEPT. OF JUSTICE, and
UNITED STATES,

      Defendants.[1]

---

[1]The Plaintiff concedes (**# 137**) that claims against certain named Defendants –
specifically "Unknown Executive Panel" – should be dismissed. Accordingly, the claims against
that entity are dismissed and the Court has modified the caption of this action to omit that entity
as a party.

## OPINION AND ORDER GRANTING MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND DENYING REMAINING PENDING MOTIONS

**THIS MATTER** comes before the Court pursuant to the Plaintiff's Objections (**# 160**) to the May 1, 2008 Report and Recommendation (**# 144**) of United States Magistrate Judge Michael E. Hegarty that the Plaintiff's Motion for Preliminary Injunction (**# 16**) be denied; the Plaintiff's Motion for Summary Judgment (**# 84**); the Plaintiff's Motion for Reconsideration (**# 92**) of an order dismissing[2] a prior lawsuit by the Plaintiff, *Georgacarakos v. Watts*, D.C. Colo. Case No. 04-cv-02590-ZLW, on the grounds that the rationale for that order was later abrogated by *Jones v. Bock*, 549 U.S. 199 (2007); Defendants Baxter, Denny, Lappin, Nalley, and Watts' ("the BOP Defendants") Motion to Dismiss (**# 123**) for lack of personal jurisdiction, and the Plaintiff's response (**# 128**[3], **137**); the Defendants' Motion to Dismiss (**# 124,** as amended **# 180-2**), the Plaintiff's response (**# 137**, as amended **# 193**), and the Defendants' reply (**# 216**); the Plaintiff's "Motion for a More Definite Statement" (**# 131**); the Plaintiff's "Motion for a Rule 12 Preliminary Hearing" (**# 157**); the Plaintiff's Motion Requesting the Taking of Judicial Notice (**#194**); the Plaintiff's "Ex Parte Motion for Judgment of Default" (**# 200**), which the Court treats

---

[2] The relief requested by this motion is unclear.  On the one hand, the Plaintiff cites to Fed. R. Civ. P. 60(b)(5), seeking "relief" from the order dismissing the prior case.  On the other hand, the motion requests that this Court "backdat[e] the present [Amended Complaint] *nunc pro tunc* to the date of the originally filed action," apparently to preserve the filing date of the earlier case for statute of limitations purposes.

[3] The Plaintiff has filed a "Motion for Judicial Estoppel of Defense" (**# 128**), which, based on its contents, the Court treats as a supplemental response to the BOP Defendants' personal jurisdiction motion.

as a reply in support of the Plaintiff's Motion for Reconsideration; the Plaintiff's "Pro Se Motion

. . . to Order the Magistrate and AUSA to Cease Mocking His Pleadings and Afford them the

Respect Required" **(# 247)**; and the Plaintiff's "Motion for Judge to Render Decision on

Preliminary Injunction . . . ." **(# 275)**.

## **FACTS**

The *pro se* Amended Complaint **(# 100)** is somewhat discursive, but the basic operative

facts of this case seem to be fairly simple. In 2003, the Plaintiff, an inmate of the U.S. Bureau of

Prisons ("BOP") was involved, with others, in the murder of another inmate. The Plaintiff was

convicted of second degree murder and initially sentenced to life in prison, although subsequent

developments resulted in that sentence being reduced to 30 years imprisonment.

As a result of his involvement with the murder, the Plaintiff was assigned to the United

States Penitentiary, Administrative Maximum ("ADX") in Florence, Colorado, where he was

placed in the highly-restrictive control unit. In or about March 2003, the Plaintiff was released

from the control unit and assigned to a "general population" tier within ADX. The Plaintiff

contends that he is eligible under BOP regulations for assignment to a less-restrictive facility,

that his current conditions of confinement at ADX are unconstitutional, and that various other

discrete acts, discussed more fully below, have violated his constitutional rights.

The Amended Complaint asserts a number of *Bivens*-type[4] claims. In Claim 1, the

Plaintiff alleges that the Defendants conspired to deprive him of rights secured by the First,

---

[4]In *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388
(1971), the Supreme Court recognized a private right of action in favor of victims of
constitutional violations committed by federal agents in the performance of their official duties.
403 U.S. at 396-97; *Van Dinh v. Reno,* 197 F.3d 427, 432 (10th Cir.1999).

Fifth, and Eighth Amendments to the U.S. Constitution. Specifically, the Plaintiff contends that the "general population" unit at ADX is effectively indistinguishable from the control unit, and that according to BOP Regulation 5100.08, he should be classified as a "Medium Custody Prisoner" eligible for transfer to a lower-security institution.

Claim 2 builds somewhat upon Claim 1. It asserts that the Defendants have engaged in religious discrimination by classifying the Plaintiff's religion – Paganism – as "white supremacy" in order to justify keeping the Plaintiff "in solitary confinement" for years although they have released similarly-situated prisoners with more extensive criminal histories who practice other religions

In Claim 3, the Plaintiff alleges that Defendants Martinez, Javernick, Helm, Wiley, Nalley, Watts, the BOP, the U.S. Department of Justice, and the United States "deprived Plaintiff of all his religious property in August 2006," without just cause or due process, and in violation of various BOP regulations. The Amended Complaint describes the property at issue as "thousands of pages of original research, art, and creative writing" that was "deemed unworthy of religious protection."[5]

Claim 4 is also related somewhat to Claim 1. It alleges that Defendants Wiley, Cruz, Javernick, Collins, Sudlow, Madison, Fenlow, Denney, Nalley, Baxter, Watts, Lappin, the BOP, the Department of Justice, and the United States have "created and propagated 'control units' –

---

[5]This claim also alleges that, in an attempt to prevent the destruction of his property, the Plaintiff engaged in a "disruptive protest" for which he was disciplined with a year of solitary confinement. The Plaintiff alleges that Defendants Nalley and Watts destroyed a memorandum punishing him for that disruption. It is not clear whether the Plaintiff purports to assert a separate claim based upon the destruction of that record, or whether he simply offers it was proof of "the conspiracy" alluded to in Claim 1.

i.e. solitary confinement units – but have circumvented all due-process and humanitarian protective guidelines by fraudulently asserting on paper that these units are 'general population.' He asserts that these "general population" units are "24/7 'lock-down' units" that amount to solitary confinement. The Plaintiff contends that "it is unlawful to leave prisoners suffering from clinical depression" (such as himself) in such isolation units. The Plaintiff further alleges that the Defendants have shown deliberate indifference to his medical needs in violation of the Eighth Amendment. He contends that his isolation has caused him to suffer a variety of ailments, but that the Defendants "steadfastly insisted that since his total isolation is called 'general population,' they are not responsible."

Claim 5 relates to Claim 3. It alleges that the Plaintiff was subjected to the use of excessive force in violation of the Fourth, Fifth, and Eighth Amendments to the U.S. Constitution based on an incident in the summer of 2006, when he protested the destruction of his property by engaging in "nonviolent civil disobedience," namely, going "into an open 'common' area during his time to shower and refus[ing] to return to his cell." He alleges that Defendants Church, Wiley, and Doe "engaged two fully-armored and armed riot control squads" and unlawfully used "nonlethal firearms and chemical agents" to return him to his cell. He contends that after being subdued, he was "subjected to two days of physical torture by being 'four-pointed' to a slab of concrete" in violation of various regulations governing the use of restraints.

The same claim also appears to invoke a separate issue in which the Plaintiff was placed on "disciplinary segregation status" for a year in March 2007. He contends that the designation was without due process and exceeded the maximum 60 day period permitted for such

designation.  In addition, he contends that Defendants Church and Doe "used a machine to subject him to 'pepper spray'" which he claims was "outlawed in 1972 by the U.N. Biological Weapons Convention."

Claim 6 appears to be thematically connected to Claims 1 and 4.  It asserts that Defendants Wiley, Nalley, Watts, Hershberger, and Lappin "allowed the removal of radios from cells in solitary confinement, even though they are required" under BOP regulations.  He contends that "at the ADX, a cell without a radio is, by definition, 'disciplinary segregation,'" and that the imposition of such discipline must be pursuant to a determination by a disciplinary hearing officer.  He also contends that "a radio and a television are specifically provided at the ADX because isolation for a prolonged period causes severe mental deterioration," but that Defendant Wiley "removed all t.v./radio sets from [the Special Housing Unit], thus subjecting Plaintiff to disciplinary segregation over and over, when his detention was only Administrative."  He asserts that "the Defendants have recently invented 't.v.-radio restriction,' a nonexistent sanction that effectively enables the imposition of years of disciplinary segregation at a time for any trivial offense."

Finally, Claim 7 asserts that Defendants Wiley, Nalley, Watts, BOP, the Department of Justice, and the United States "have placed arbitrary and capricious restrictions on intellectual material without any required balancing of penological needs and free expression."  He alleges both a prohibition on "paperback and even unbound material" and "a systemic obstruction of his every attempt to prepare and submit manuscripts for publication."  He asserts that he has been deprived of access to a typewriter in violation of BOP regulations, that ADX staff refuse to make photocopies he proposes to pay for, and that the mailroom "reject[s] his own writings [because]

they are 'publications not received by a publisher.'"  He contends that this rendered him "unable

to publish a book from the time it was written in 1998 until just months ago."  He further alleges

that a new policy was recently enacted that prohibits receipt of "every book unless purchased

retail by prisoners," but that such policy lacks any meaningful security justification.  He states

that "research texts are the most expensive," and that "the more intelligent one's pursuits, the

more stifled one's capacity."

The parties have filed a variety of motions, which the Court will address in individual

detail as part of its analysis.

## ANALYSIS

### A.  Standard of review

In considering the Plaintiff's filings, the Court is mindful of his *pro se* status, and

accordingly, reads his pleadings liberally.  *Haines v. Kerner,* 404 U.S. 519, 520-21 (1972).

However, such liberal construction is intended merely to overlook technical formatting errors

and other defects in the Plaintiff's use of legal terminology and proper English.  *Hall v. Bellmon*,

935 F.2d 1106, 1110 (10th Cir. 1991).  *Pro se* status does not relieve the Plaintiff of the duty to

comply with the various rules and procedures governing litigants and counsel or the

requirements of the substantive law, and in these regards, the Court will treat the Plaintiff

according to the same standard as counsel licensed to practice law before the bar of this Court.

*See McNeil v. U.S.*, 508 U.S. 106, 113 (1993); *Ogden v. San Juan County*, 32 F.3d 452, 455

(10th Cir. 1994).

### B. Motions to Dismiss

Because the motions to dismiss implicate both the Court's jurisdiction over certain defendants and the sufficiency of claims in the Amended Complaint, the Court resolves those motions first.

#### 1. Personal jurisdiction

The BOP Defendants – Defendants Baxter, Denny, Lappin, Nalley, and Watts – move to dismiss the claims against them for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2).

In reviewing a Motion to Dismiss pursuant to Rule 12(b)(2), the Plaintiff bears the burden of establishing that personal jurisdiction exists. *Soma Medical Intern. v. Standard Chartered Bank*, 196 F.3d 1292, 1295 (10th Cir. 1999); *Omi Holdings, Inc. v. Royal Ins. of Canada*, 149 F.3d 1086, 1091 (10th Cir. 1998). Where a court chooses not to conduct an evidentiary hearing, the Plaintiff need only make a *prima facie* showing of jurisdiction by showing, through affidavits or otherwise, facts that, if true, would support jurisdiction over the Defendants. *Omi Holdings*, 149 F.3d at 1091 *Soma*, 196 F.3d at 1295. The allegations of a Complaint must be taken as true unless contradicted by the Defendant's affidavits, *Behagen v. Amateur Basketball Ass'n. of U.S.A.*, 744 F.2d 731, 733 (10th Cir.1984), and to the extent that the affidavits contradict allegations in the Complaint or opposing affidavits, all disputes must be resolved in the Plaintiff's favor and the Plaintiff's *prima facie* showing is sufficient. *Id.*

Here, neither party has offered affidavits in support of or in response to the motion, and thus, the Court refers only to the face of the Amended Complaint. The Amended Complaint alleges that Defendant Baxter is the BOP's National Director of Psychological Services, and is located in Washington, D.C.. It alleges that Defendant Denney is the BOP's Regional Director

of Psychological Services, located in Kansas City, Kansas. Defendant Nalley is the Regional Director of the BOP, located in Kansas City, Kansas. Defendant Watts is the Administrative Remedies Coordinator for the BOP, located in Washington, D.C. Defendant Lappin is the National Director of the BOP, located in Washington, D.C. None of these Defendants are alleged to reside or work in Colorado.

To comport with the due process clause of the 14th Amendment, the Court may not exercise personal jurisdiction over a defendant who is not a resident of Colorado unless that defendant is shown to have sufficient "minimum contacts" with the State of Colorado. *International Shoe Co. v. Washington*, 326 U.S. 310 (1945). Such "minimum contacts" with the forum state exist when the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *Int'l. Shoe*, 326 U.S. at 316. The "minimum contacts" test examines whether the defendant has purposefully directed its activities at residents of the forum state, whether the claims asserted arise out of that purposeful direction of activity, and whether the assertion of jurisdiction under the circumstances is reasonable and fair. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985); *Teierweiler v. Croxton and Trench Holding Co.*, 90 F.3d 1523, 1532-33 (10th Cir. 1996).

The Amended Complaint does not specifically allege facts that would subject the non-resident BOP Defendants to personal jurisdiction in the State of Colorado. The 10th Circuit has previously found that personal jurisdiction in Colorado over national and regional officials of the BOP does not arise simply because those officials have exercised supervisory responsibility over the BOP's operations in Colorado, or because an inmate has directed written complaints to the officials. *Hill v. Pugh*, 75 Fed.Appx. 715, 719 (10th Cir. 2003) (unpublished) ("It is not

reasonable to suggest that federal prison officials may be hauled into court simply because they have regional and national supervisory responsibilities over facilities within a forum state"). The Plaintiff here has alleged nothing more than that which *Hill* found insufficient. For example, he asserts that the BOP Defendants were placed on notice of the allegedly unconstitutional conditions at ADX by his various grievances, and that their failure to remedy the situation constitutes acquiescence. This is indistinguishable from the situation in *Hill* in which the inmate and his attorney had repeatedly complained in writing to the BOP officials, without success.

Similarly, the Plaintiff asserts that the BOP officials are responsible for failing to train or supervise the local ADX staff, but the Amended Complaint does not clearly and specifically allege which BOP Defendants had specific responsibility for training or supervising specific ADX staffers. At best, the Plaintiff has merely alleged a generalized failure to supervise. This is insufficient, as *respondeat superior* liability is not available in a *Bivens* action such as this. *See e.g. Lopez v. U.S.* 129 F.Supp.2d 1284, 1293 n. 1 (D.N.M. 2000), *citing Bibeau v. Pacific Northwest Research Found.*, 188 F.3d 1105, 1114 (9th Cir. 1999). Likewise, the Plaintiff asserts that the BOP Defendants are part of a "conspiracy" against him, but his allegations of this conspiracy are simply conclusory. He does not allege any specific facts that would demonstrate each BOP Defendant's joinder in an agreement to deprive him of constitutional rights. *Id., citing Weatherall v. Scherbarth*, 2000 WL 223576 (10th Cir. 2000) (unpublished), *citing Boddie v. Schneider*, 105 F.3d 857, 862 (2d Cir. 1997) ("a complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss"). Accordingly, the Court finds that the Amended Complaint does not make any specific assertions of conduct by the BOP Defendants that would amount to a purposeful

direction of activity into Colorado, such that the exercise of personal jurisdiction over them is appropriate.

The Plaintiff contends that certain of the BOP Defendants successfully raised personal jurisdiction objections to a similar suit he filed in the U.S. District Court for the District of Columbia, and suggests that the Court should judicially estop these Defendants from raising a personal jurisdiction defense in this suit after having successfully repelled jurisdiction in the District of Columbia. *See Georgacarakos v. Watts*, 2007 WL 1541501 (D.D.C. 2007). In the District of Columbia case, the court found that the complaint failed to allege the residence of any defendant and the only alleged connection that any Defendant had to the District of Columbia was that Defendant Watts was employed by the BOP in Washington, D.C. As to this point, the court found that maintaining the office was "by itself . . . insufficient to confer personal jurisdiction over a BOP official." *Citing Cameron v. Thronburgh*, 983 F.2d 253, 256 (D.C. Cir. 1993).

The Court finds nothing in the District of Columbia decision that would judicially estop the BOP Defendants from contending that no personal jurisdiction exists over them in Colorado. Judicial estoppel is an equitable doctrine that is invoked to prevent a party from prevailing in one case on an argument and then relying on a contradictory argument to prevail in another case. *Zedner v. U.S.*, 547 U.S. 489, 504 (2006). Determining whether it should be invoked involves consideration of many factors, including whether: (i) the party's later position is clearly inconsistent with its earlier position; (ii) the party succeeded in its assertion of the earlier position; and (iii) the party would gain an unfair advantage if not estopped. *Id.* Here, the Court cannot find that the BOP Defendants have taken inconsistent positions with regard to the issue of

personal jurisdiction. They merely alleged that the District of Columbia lacked personal jurisdiction over them. In this case, they do not assert the contrary position – that the District of Columbia <u>does</u> have personal jurisdiction over them. Rather, they assert that this Court <u>also</u> lacks personal jurisdiction over them.

This is not an inconsistent argument; for example, it would not be surprising that the BOP Defendants located in Kansas could simultaneously take the position that neither the District of Columbia <u>nor</u> Colorado has personal jurisdiction over them. The Plaintiff appears to assume that, if he cannot sue the BOP officials in the District of Columbia or in Colorado, he is left without any forum to sue these Defendants. This is unfounded. Every resident of the United States is necessarily subject to the personal jurisdiction of the federal district in which they reside. Moreover, even the District of Columbia court implied that, had the Plaintiff pled sufficient claims, personal jurisdiction against BOP officials working there might have been available. *See* 2007 WL 1541501 at *3 n. 2 ("The complaint does name defendant Watts who is employed in the District of Columbia. However, there is no allegation in the complaint that he was involved in the actions alleged by plaintiff").

Accordingly, because the Court finds that the Plaintiff has not adequately demonstrated this Court's personal jurisdiction over the BOP Defendants, the claims against those Defendants are dismissed pursuant to Fed. R. Civ. P. 12(b)(2). The Plaintiff's "Motion for Judicial Estoppel" is denied.

2. <u>Subject matter jurisdiction</u>

Next, the Defendants contend that the Court lacks subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) over some of the claims and defendants herein. Specifically, they

contend that the Court lacks subject matter jurisdiction over all of the Plaintiff's claims against the Defendants in their official capacities because the Plaintiff can point to no waiver of sovereign immunity.

The party asserting the existence of subject matter jurisdiction– in this case, the Plaintiff– bears the burden of proving such jurisdiction exists. *Montoya v. Chao*, 269 F.3d 952, 955 (10th Cir. 2002). Rule 12(b)(1) motions generally take one of two forms: (1) a facial attack on the sufficiency of the complaint's allegations as to subject matter jurisdiction; or (2) a challenge to the actual facts upon which subject matter jurisdiction is based. *Ruiz v. McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002), *citing Holt v. United States,* 46 F.3d 1000, 1002-03 (10th Cir.1995). Here, the Defendants attack the sufficiency of subject matter jurisdiction on the face of the Amended Complaint, and thus, the Court treats the allegations in the Amended Complaint as true. *See Sizova v. National Institute of Standards and Technology*, 282 F.3d 1320,1324 (10th Cir. 2002).

The conceptual difference between these "individual capacity" and "official capacity" claims is confusing. In *Kentucky v. Graham*, 473 U.S. 159, 165 (1985), the Supreme Court explained that an "official capacity" suit is simply an alternative way of pleading a claim against the <u>entity</u> employing the official. The real party in interest is not the named defendant, but the entity employing him or her, and indeed, when the named defendant leaves the office he or she occupies, the defendant's successor automatically assumes his or her predecessor's role in the litigation. *Hafer v. Melo*, 502 U.S. 21, 25 (1991). By contrast, an individual capacity suit names the individual defendant as the real party in interest, and seeks relief against the individual for his or her own personal conduct. *Id.* at 27. Contrary to common misconception, the

13

individual/official-capacity designation does not turn on what capacity the individual was acting in at the time of the challenged action – *i.e.* that actions taken in the course of employment are always in an "official capacity," while actions taken off-duty would always be in an "individual capacity." *Id.* at 27-28. Rather, the distinction is based upon the relief that is sought. If the plaintiff seeks to have a particular person pay money for having violated the plaintiff's rights, that claim is typically in an individual capacity. Conversely, if the suit seeks to compel that person to perform some legal duty – a duty that the entity, through the individual, refuses to perform – the suit would be against the person in an official capacity. Here, the Court understands the Plaintiff to be seeking a variety of remedies: monetary damages from each of the Defendants (*e.g.* individual capacity claims against each Defendant), as well as injunctive relief compelling the Defendants to construe or implement BOP regulations in a particular manner (*e.g.* official capacity claims).

A suit against any of the Defendants in their official capacity is effectively a suit against the United States itself. Suits against the United States itself are barred by the doctrine of sovereign immunity, and the burden is on the Plaintiff to show a clear and unambiguous waiver of such immunity. *Lane v. Pena*, 518 U.S. 187, 192 (1996). Two of the most prominent waivers relevant here are the waivers encompassed by the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.* and the Administrative Procedures Act ("APA"), 5 U.S.C. § 702. *Department of Army v. Blue Fox, Inc.*, 525 U.S. 255, 260 (1999). The FTCA provides that "the United States shall be liable [for tort claims] in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages." 28 U.S.C. § 2674. Thus, the United States has waived its sovereign immunity for tort

14

claims falling within the FTCA and, where otherwise appropriate, these claims can be asserted as official capacity claims against the United States itself. The APA contains a waiver of sovereign immunity for claims asserting wrongful agency action and seeking relief "other than money damages." 5 U.S.C. § 702; *see Blue Fox*, 525 U.S. at 260-62 (explaining meaning of "other than money damages"). Thus, to the extent that the Plaintiff asserts APA claims that the BOP failed to follow its own regulations, the Plaintiff may maintain official capacity suits seeking injunctive relief to compel compliance with those regulations.[6]

The Court will not attempt to unravel the claims and relief requested here to ascertain which claims would support official capacity claims against which Defendants. Doing so at this stage is simply unnecessary, as the individual/official capacity distinction is largely irrelevant until the Court reaches a stage where a remedy must be afforded. When – and if – the Court is required to afford the Plaintiff a remedy, the parties may revisit the question of whether such relief should be afforded in an official or individual capacity. It is sufficient to note at this stage that at least some of the claims could give rise to relief against certain Defendants in their official capacities, and thus, to the extent that the Defendants seek an undifferentiated dismissal of <u>all</u> official capacity claims for lack of subject matter jurisdiction, that motion is denied.

---

[6]Of course, not all of the numerous Defendants named by the Plaintiff will be amenable to injunctive relief directing compliance with a particular policy. Several of the Defendants are officials who have since retired from ADX. Because these Defendants would be unable to implement any injunctive relief on behalf of the BOP, no official capacity claims could lie against them in any circumstance. Other Defendants have limited spheres of responsibility, and would not be susceptible to official capacity claims that seek injunctive relief that the Defendant is unable to effectuate.

3. <u>Statute of limitations</u>

Next, the Defendants seek to dismiss portions of the Plaintiff's claims as being barred by the statute of limitations. Untimeliness is an affirmative defense upon which the Defendants have the initial burden of showing a claim to be untimely. Upon such a showing, the burden then shifts to the Plaintiff to either demonstrate a later accrual date or to establish a factual basis for tolling the statute. *See generally Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036, 1041 n. 4 (10th Cir. 1980).

No federal statutory limitations period exists for *Bivens* claims, and thus, the Court borrows the most appropriate state-law statute of limitations. *Van Tu v. Koster*, 364 F.3d 1196, 1198 (10th Cir. 2004); *Industrial Constructors Corp. v. United States Bureau of Reclamation*, 15 F.3d 963, 968 (10th Cir.1994). In Colorado, the two-year limit on suits fo personal injuries applies. *Appleby-El v. Catron*, 84 Fed.Appx. 9, 10 (10th Cir. 2003) (unpublished); C.R.S. § 13-80-102. Thus, the Plaintiff's claims here are governed by a two-year statute of limitations. The Plaintiff commenced this action on August 7, 2007,[7] and thus, only those events occurring on or after August 7, 2005 would be timely.

The Defendants' motion alleges that "Throughout the Complaint Plaintiff continually refers to events that occurred prior to [August 7, 2005]." The Defendants specifically point to three examples: (i) that in Claims 1 and 2, the Defendant refers to being released from the control unit at ADX in or about March 2003, but that he was placed in a "general population" cell inappropriate to his security classification; (ii) that in Claim 5, he alleges that Defendant

---

[7]The Court deems the action commenced on the date that the Plaintiff filed a Motion for Leave to Proceed *In Forma Pauperis*, rather than the date that that motion was granted and the Complaint deemed filed. *See e.g. Allen v. Bolger*, 597 F.Supp.2d 482, 484 (D. Kan. 1984).

Wiley removed televisions and radios from cells "years ago"; and (iii) that in Claim 6, the Plaintiff alleges that he has been denied access to a typewriter for 11 years. In addition, the Defendants state that the Plaintiff's remaining claims are "vague regarding the time frame of the alleged acts" and request dismissal of any claim which is untimely.

In response, the Plaintiff argues that: (i) the applicable statute of limitations is six years; (ii) the statute of limitations should be tolled as of the date a prior action brought by the Plaintiff in this Court was improperly dismissed; and (iii) that the violations are continuing, and thus, so long as they remain extant, claims regarding them are timely.

As to the first point, the Plaintiff argues that 28 U.S.C. § 2401(a) provides for a six-year statute of limitations, and that borrowing a state statute is inappropriate where Congress has specifically provided one. The statute cited by the Plaintiff provides that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." Whether the Court uses the "catch-all" statute of limitations in § 2401(a) or whether it borrows a state-law statute of limitations depends on whether "it is possible to make an educated guess as to what statute of limitations Congress intended to govern a particular cause of action." *Polanco v. U.S. Drug Enforcement Admin.*, 158 F.3d 647, 653 (2d Cir. 1998). Where the court cannot discern a Congressional intent or find a statutory cause of action that is closely-related, the Court will apply the catch-all six year statute. *Id.*

Here, it is again important to consider the various kinds of claims raised by the Plaintiff. First, the Plaintiff alleges claims for monetary damages against the particular persons who violated his Constitutional rights. As discussed above, these are individual capacity claims, not

claims against the United States.  *See e.g. Garrett v. Hawk*, 127 F.3d 1263, 1266 (10th Cir. 1997),

*citing Carlson v. Green*, 446 U.S. 14, 21-23 (1980).  Because they are not claims against the

United States, § 2401(a) does not apply, and it is well-settled that *Bivens* claims in Colorado are

subject to the state-law two year statute of limitations.[8]  *Van Tu*, 364 F.3d at 1198.  Thus, any

individual capacity claims asserted by the Plaintiff would be untimely unless the claims accrued

on or after August 7, 2005.

Next, the Plaintiff asserts claims that, arguably, could be subject to the Federal Tort

Claims Act.  Those claims are expressly subject to a two-part statute of limitations: the Plaintiff

must file a proper Administrative claim within two years of the event at issue, and then must

commence a lawsuit within six months of the agency's denial of that claim.  28 U.S.C. §

2401(b).  The Court will not speculate at this time as to which, if any, of the Plaintiff's claims

fall within the FTCA.  Nor will it attempt to determine, on an incomplete record, when the

Plaintiff's six-month statute of limitations began to run with regard to the particular claim.  It is

sufficient to note at this point that, to the extent the Plaintiff intends to assert claims under the

FTCA, he will be required to show that he has commenced suit within the time limits imposed

by § 2401(b).

Finally, the Plaintiff asserts some claims that could be construed as official capacity

claims.  As discussed above, these claims, although nominally asserted against a particular

individual, are effectively claims against the United States itself.  These claims, and these claims

only, would be subject to the six-year statute of limitations contained in § 2401(a).

---

[8]The Plaintiff's argument that ADX is a "federal territory" and is not in the State of
Colorado is frivolous.

The Plaintiff's second argument is that the statute of limitations should be tolled as of the date he commenced a prior action on essentially the same facts. The Plaintiff commenced *Georgacarakos v. Wiley*, 04-cv-02590, on December 16, 2004. On March 3, 2005, Judge Weinshienk dismissed the action on the grounds that some of the Plaintiff's claims were not properly exhausted under 42 U.S.C. § 1997e(a), and that 10th Circuit precedent such as *Ross v. County of Bernalillo*, 365 F.3d 1181 (10th Cir. 2004), compelled the dismissal of any case involving one or more unexhausted claims (the "total exhaustion" rule). The Plaintiff appealed the dismissal, and the 10th Circuit affirmed. *Georgacarakos v. Watts,* 147 Fed.Appx. 12 (10th Cir. 2005) (unpublished).

In 2007, the Supreme Court decided *Jones v. Bock*, 549 U.S. 199 (2007), which abrogated the "total exhaustion" rule of *Ross* and required courts to dismiss unexhausted claims, but to continue to hear properly-exhausted claims contained in the same action. The Plaintiff finds some vindication in *Jones*, and moves for reconsideration of Judge Weinshienk's order of dismissal and/or a ruling in this case tolling the statute of limitations as of December 16, 2004, effectively reviving his prior lawsuit.

As to the first point, the undersigned declines the invitation to reconsider a decision issued by another judge in another case. To the extent the Plaintiff believes that reconsideration of the decision by Judge Weinshienk is appropriate, his remedy was to seek the appropriate relief in that case.[9]

---

[9]The Court has some doubt as to whether such a motion now would be viable, however. In a decision by the 10th Circuit in another case involving this Plaintiff, *Georgacarakos v. U.S.*, 211 Fed.Appx. 730, 732 (10th Cir. 2007) (unpublished), the 10th Circuit affirmed the district court's refusal to grant Rule 60(b) relief nearly a year after the 10th Circuit had affirmed the dismissal of the plaintiff's case, despite what the Plaintiff claimed was an intervening change in

As to the second point, the Court finds that *Jones* does not warrant a tolling of the statute of limitations in this case. The 10th Circuit has not had occasion to consider the question of whether *Jones* permits a prisoner to revive or revisit a case that was previously dismissed under the "total exhaustion" rule, but at handful of district courts have. In *Jacobs v. Wilkinson*, 529 F.Supp.2d 804, 807 (N.D.Oh. 2008), the court considered a motion by an inmate to reopen a case that had been dismissed under the "total exhaustion" rule in 2003. After reviewing several other cases and precedent regarding when Supreme Court decisions should be given retroactive effect, the court concluded that "this court reads the Supreme Court's language in *Harper* [*v. Virginia Dept. of Taxation*, 509 U.S. 86 (1993)] to preclude applying *Jones* retroactively to a case that has been closed for three years and was no longer open or on direct review when *Jones* was issued."[10] 529 F.Supp.2d at 807.

In *Chambers v. Straub*, ___ F.Supp.2d ___, 2008 WL 2782891 (E.D.Mich. July 17, 2008), the court adopted the rationale of *Jacobs*, and further proceeded to find that motions invoking *Jones* to set aside an earlier dismissal based on the "total exhaustion" rule were motions under Fed. R. Civ. P. 60(b)(1), premised upon "mistake based upon legal error." *Id.*, *citing Okoro v. Hemingway*, 481 F.3d 873 (6th Cir. 2007). Such motions are subject to a strict

---

the law. "While a change in law can potentially provide the basis for an exception to the mandate rule, this exception does not apply after the judgment becomes final, which occurs after this court has disposed of the appeal and the time for a petition for certiorari has passed . . . Because the mandate had issued and the judgment was final, the district court lacked authority to act on appellant's Rule 60(b) motion." *Id.*

[10]The quoted portion of *Harper* states "When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule." 509 U.S. at 97 (emphasis added).

one-year deadline under Rule 60(c)(1), and thus, a motion made more than a year after *Jones* was issued would be untimely. The court proceeded to reject any argument that such a motion could be characterized as arising under Rule 60(b)(4)-(6), and thus not subject to a one-year deadline, finding that "in light of the 'precise fit' of the circumstances of the grounds raised by plaintiff for relief from judgment and subsection 60(b)(1), it would be inappropriate for this Court to invoke the other subsections of Rule 60(b) to grant relief to plaintiff." *Id.*, *citing McCurry ex rel. Turner v. Adventist Health*, 298 F.3d 586, 596 (6th Cir. 2002).

This Court finds the rationale in *Jacbos* and *Chambers* persuasive and adopts it. Here, the Plaintiff's prior action was dismissed on March 3, 2005. That dismissal was affirmed by the 10th Circuit on August 18, 2005, and the Plaintiff apparently did not petition for certiorari from the Supreme Court. Thus, at the time *Jones* was decided by the Supreme Court on January 22, 2007, the Plaintiff's prior action had been conclusively and finally resolved for nearly 18 months. Although this is not as long as the period in which the *Jacobs* case had been closed, this Court cannot conceive of a reason why a case that has been closed for 18 months should be revived but a case closed for a full three years should not. What is critical is that, as in *Jacobs*, the Plaintiff's prior action had been finally and conclusively dismissed when *Jones* was decided. The case was no longer "still open on direct review" and thus, retroactive application of *Jones* is not required by *Harper.* Moreover, as in *Chambers*, the Plaintiff's motion seeking reconsideration of the dismissal of his prior action was not filed here until March 14, 2008, almost 14 months after *Jones* was decided. Construing the motion as one seeking relief under Rule 60(b)(1), it is untimely.

Next, the Plaintiff requests equitable tolling of the statute of limitations in this case in light of what he asserts is, in retrospect, the improper dismissal of his prior lawsuit. In a *Bivens* claim, the Court applies the equitable tolling rules of the forum state. *Garrett v. Fleming*, 362 F.3d 692, 697 (10th Cir. 2004), *citing Delgado-Brunet v. Clark*, 93 F.3d 339, 342 (7th Cir. 1996). Under Colorado law, equitable tolling is "limited to situations in which either the defendant has wrongfully impeded the plaintiff's ability to bring the claim or truly extraordinary circumstances prevented the plaintiff from filing his or her claim despite diligent efforts." *Coit v. Zavaras*, ___ Fed.Appx. ___, 2008 WL 2355802 (10th Cir. June 10, 2008) (unpublished), *citing Dean Witter Reynolds, Inc. v. Hartman*, 911 P.2d 1094, 1099 (Colo. 1996).

Here, the Plaintiff does not allege that the Defendants somehow impeded his ability to bring any of the claims in this case in a timely manner. Nor does the Court find that extraordinary circumstances warrant tolling the statute of limitations to effectively revive the Plaintiff's prior action. Although the "total exhaustion" rule of *Ross* has since been abrogated by *Jones*, it was well-settled at the time the Plaintiff commenced his earlier action, and the Plaintiff's decision to commence a suit containing arguably unexhausted claims was done at his peril. The Plaintiff cannot point to diligent efforts to ensure that his prior suit complied with exhaustion requirements, and finds himself presently able to argue for revival of the suit only by virtue of a fortuitous intervening change in the law. Accordingly, the Court declines to equitably toll the statute of limitations in the instant case back to the date of his prior action.

Finally, the Plaintiff argues that some of the violations he complains of are continuing, and thus, not subject to a defense of untimeliness. Courts have recognized that in some circumstances, ongoing constitutional deprivations can constitute continuing violations that toll

the statute of limitations or otherwise defeat a defense of untimeliness. *See e.g. Cowell v. Palmer Township*, 263 F.3d 286, 292 (3d Cir. 2002). Whether the continuing violation doctrine should be applied requires consideration of several factors, including whether the repeated violations are somehow connected, whether they are constantly or only sporadically recurring, and whether the initial act had a degree of permanence that should have triggered the Plaintiff's awareness of the need to act. *Id.*; *see also Lovett v. Ray*, 327 F.3d 1181, 1183 (11th Cir.2003) ("the critical distinction in the continuing violation analysis is whether the plaintiff complains of the present consequence of a one time violation, which does not extend the limitations period, or the continuation of that violation into the present, which does").

With these principles in mind, the Court turns to the specific claims. Claim 1, which alleges a conspiracy among the Defendants to maintain him at a security classification more restrictive than that which he is eligible for, appears to be a claim that is subject to the continuing violation doctrine. It is not clear whether the fixing of his classification level is a one-time event or how frequently his eligibility for a less-secure classification is revisited, but it is clear that, to the extent that he can establish a viable constitutional claim based on his current classification level, that violation reoccurs each day that he is improperly held at a more restrictive level. In that respect, the Court finds that Claim 1 is timely.

Claim 2 alleges that the Defendants have discriminated against the Plaintiff on the basis of his religion, in that it has released similarly-situated inmates of other religious persuasions to lower-security facilities. To some extent, this claim overlaps with Claim 1 – *i.e.* that it repeats the allegation that the Plaintiff is subject to an incorrect security classification. However, to the extent that the Plaintiff intends to assert some claim sounding in disparate treatment, that claim

would not fall within a continuing violation doctrine. Although it arises in a different context, this Court draws some guidance from *National Passenger RR Co. v. Morgan*, 536 U.S. 101, 110 (2002). In the employment discrimination context, the Supreme Court made clear that "a discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened.'" *Id.* The Court expressly rejected the "continuing violation" doctrine when it related to "discrete acts" of discrimination, including "failure to promote [and] denial of transfer," even though those acts could be said to have continuing consequences. *Id.* at 114. Rather, a claim that a plaintiff was subjected to discrimination as the result of a less-worthy comparator receiving a discrete act of preferential treatment accrues at the time the plaintiff learns of the preferential treatment, and is not subject to an extended limitations period under a continuing violation theory. Thus, to the extent that the Plaintiff's claims of religious discrimination arise from acts that occurred prior to August 7, 2005, Claim 2 is untimely.[11]

Claim 3 involves a discrete act concerning the destruction of the Plaintiff's property, and indisputably occurred within the two year statute of limitations for *Bivens* actions. Claim 4 challenges the current conditions of the Plaintiff's confinement, as well as assert what appears to be claims of ongoing deliberate indifference to his medical needs. Claims challenging the constitutional sufficiency of current conditions of confinement are appropriately subject to the continuing violation theory. Claims of deliberate indifference to medical needs, on the other hand, typically involve discrete acts in which proper medical care is not afforded and is not

---

[11]Given the breadth of the stated claims and the deference due to *pro se* pleadings, the Court will not "dismiss" what might be untimely portions of particular claims. The Court expects that any discovery authorized by the Magistrate Judge will be mindful of the various limitations issues discussed herein, and the specific evidence regarding the timeliness of all claims will be addressed in greater precision by both parties at the summary judgment stage.

generally suitable for application of the continuing violation doctrine. Thus, as to that portion of Claim 4, the Plaintiff would have to show an act of deliberate indifference arising on or after August 7, 2005.

Claim 5 alleges discrete acts of the use of force that would appear to be timely. Claim 6 involves the Plaintiff's challenge to decisions by ADX staff to remove inmate access to televisions and radios in their cells. The Court finds that a challenge to the decision itself would not be subject to a continuing violation toll, as that would be a decision with a "degree of permanence" that should have prompted action. The mere fact that a one-time decision has continuing consequences that remain felt to the present day is not sufficient to invoke the continuing violation doctrine. *Morgan*, 536 U.S. at 114. However, to the extent that the Plaintiff alleges that the absence of televisions or radios renders his conditions of confinement unconstitutional, that claim would be appropriately subject to the continuing violation doctrine and would be timely.

Finally, Claim 7 appears to allege a variety of grievances concerning access to reading material and the ability to publish writings. Without a clearer identification of each particular portion of the claim, the Court is unable to definitively address the issue of timeliness. It is sufficient to note at this point that at least part of the claim refers to a "recent" BOP policy that prohibits access to books other than through retail suppliers. Assuming the Plaintiff asserts official capacity claims seeking recision or modification of this policy by the BOP, such a claim would be subject to a six-year statute of limitations, and thus, some portion of Claim 7 is likely to be timely.

Accordingly, that portion of the Defendants' Motion to Dismiss premised upon the untimeliness of the Plaintiff's claims is denied without prejudice, and a timeliness defense can be raised with more specificity at the summary judgment stage. The Plaintiff's Motion for Reconsideration of the ruling dismissing his prior action is denied.

### 4. Qualified immunity

The Defendants seek dismissal of Claims 1, 3, 5, and 6 to the extent they are asserted against them in an individual capacity, citing the doctrine of qualified immunity.

Government officials who perform discretionary government functions are entitled to qualified immunity from civil damages, provided their conduct does not violate clearly established rights of which a reasonable government official would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Supreme Court has recognized a qualified immunity defense both for § 1983 claims against state officials and *Bivens* claims against federal officials. *See Johnson v. Fankell*, 520 U.S. 911, 914 (1997). "In both situations, officials performing discretionary function[s], generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 520 U.S. at 914-15.

Once a Defendant raises the defense of qualified immunity in the context of a motion to dismiss, the Court must first determine whether the Plaintiff has asserted a violation of federal law. *Currier v. Doran*, 242 F.3d 905, 917 (10th Cir. 2001); *see also Ramirez v. Dept of Corrections,* 222 F.3d 1238, 1244 (10th Cir. 2000); *Dill v. City of Edmond*, 155 F.3d 1193, 1204 (10th Cir.1998). The Court does not apply a heightened pleading standard; rather, it reviews the Complaint under the traditional standards applicable to a motion to dismiss. *See Currier*, 242

F.3d at 916-917. If the allegations in the Complaint, taken in the light most favorable to the Plaintiff, allege a cognizable claim under federal law, the Court then turns to the question of whether the right abridged was "clearly established" at the time of the violation. *Brosseau v. Haugen*, 543 U.S. 194, 197-98 (2004). That inquiry is made in a "particularized sense," based on the specific facts of the case. *Id.* at 199-200. Typically, the inquiry is whether there was binding caselaw from the Supreme Court or 10th Circuit (or the clear weight of authority from other circuits) recognizing a violation of federal law in similar factual circumstances as of the date of the events at issue. *York v. City of Las Cruces*, 523 F.3d 1205, 1211-12 (10th Cir. 2008). However, in certain circumstances, the contours of the federal right at issue are so obvious that resort to caselaw is unnecessary. *Id; Brosseau*, 543 U.S. at 199. The Plaintiff bears the burden of showing that the right at issue was "clearly established." *Id.* at 1209.

With these standards in mind, the Court turns to Claims 1, 3, 5, and 6. Once again, Claim 1 alleges a conspiracy among the Defendants to retain the Plaintiff in a higher custody level than BOP regulations permit. Although the Plaintiff discusses this claim as arising out of the failure of ADX staff to comply with BOP regulations on inmate classification, the claim is also susceptible to construction as a claim that his misclassification deprives him of a liberty interest without due process.

It is well-settled that, in general, prison administrators are granted significant deference in classifying inmates, and normal disputes as to classification level do not give rise to a liberty interest that would support a due process claim. *Levoy v. Mills*, 788 F.2d 1437, 1440 (10th Cir.1986). However, the courts recognize at least two situations in which an inmate can challenge his classification level under the due process clause: (i) where the classification

imposes "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," and (ii) where prison regulations grant inmates liberty interests to which due process protections apply. *Chambers v. Colorado Dept. of Corrections*, 205 F.3d 1237, 1242 (10th Cir. 2000). The Plaintiff's Amended Complaint can be read as raising both types of claims.

With regard to the allegation that his assignment to a "general population" unit at ADX nevertheless imposes "atypical and significant hardship," the Plaintiff alleges generally that ADX's "general population" tiers are effectively indistinguishable from the restrictive control unit, in that he is subject to solitary confinement and "24/7 lockdown." He cites to *Wilkinson v. Austin*, 545 U.S. 209, 221-24 (2005), in which the Supreme Court found that restrictions at a state's "Supermax" prison posed "atypical and significant hardships within the correctional context," sufficient to give rise to a liberty interest in those inmates facing indefinite assignment there. The Court's decision in *Wilkinson* was based on a number of identified restrictions at the state Supermax facility:

> Inmates must remain in their cells, which measure 7 by 14 feet, for 23 hours per day. A light remains on in the cell at all times, though it is sometimes dimmed, and an inmate who attempts to shield the light to sleep is subject to further discipline. During the one hour per day that an inmate may leave his cell, access is limited to one of two indoor recreation cells.

> Incarceration at OSP is synonymous with extreme isolation. In contrast to any other Ohio prison, including any segregation unit, OSP cells have solid metal doors with metal strips along their sides and bottoms which prevent conversation or communication with other inmates. All meals are taken alone in the inmate's cell instead of in a common eating area. Opportunities for visitation are rare and in all events are conducted through glass walls. It is fair to say OSP inmates are deprived of almost any environmental or sensory stimuli and of almost all human contact.

545 U.S. at 214. The Court then set about distinguishing that situation from its prior decision in *Sandin v. Conner*, 515 U.S. 472, 485-86 (1995). In *Sandin*, the Court found no liberty interest in an inmate's 30-day assignment to solitary confinement as part of a disciplinary punishment, as such punishment was not atypical of ordinary prison life. *Id.* The Court in *Wilkinson* noted that many of the characteristics extant at the state Supermax facility "likely apply to most solitary confinement facilities." 545 U.S. at 224. However, it noted three characteristics that were sufficient to distinguish the Supermax facility from that in *Sandin* such that a liberty interest attached to confinement at the Supermax facility: (i) "especially severe limitations on all human contact"; (ii) that placement at the Supermax facility was "indefinite" and subject only to annual review, rather than for a discrete 30-day period as in *Sandin*; and (iii) that inmates subject to Supermax assignment were disqualified from parole consideration, even if otherwise eligible. *Id.* The Court noted that "any of these conditions standing alone might not be sufficient to create a liberty interest, [but] taken together they impose an atypical and significant hardship." *Id.* at 224. Juxtaposed against the Court's recitation of inmate restrictions in *Wilkinson*, the Plaintiff's Amended Complaint appears skeletal. Although the Plaintiff alleges that his "general population" assignment at ADX involves solitary confinement and "24/7 lockdown," he does not allege details about the size of his cell, recreational opportunities, where and how meals are taken, the ability to communicate with other inmates, lost opportunities for parole eligibility, or other factors that helped distinguish *Wilkinson* from *Sandin*. This makes it difficult for the Court to determine both whether the Plaintiff has sufficiently alleged enough "atypical and significant hardships" arising from the conditions of his confinement to state a due process claim, as well as to determine whether any deprivation of the liberty interest arising therefrom was "clearly

established" to be in violation of the due process clause. *See Wilkinson*, 545 U.S. at 225

(describing the due process necessary before an inmate can be assigned to the state Supermax

facility). Nevertheless, mindful the liberal construction that should be afforded *pro se* pleadings,

the Court will assume, for purposes of the instant motions, that the Plaintiff's generalized

references to *Wilkinson* in the Amended Complaint and his other pleadings were an implicit

assertion that the conditions he faces are equivalent to those found in the state Supermax facility.

Under these circumstances, the Court finds that the individual capacity claims asserted in Claim

1 are sufficient to overcome the Defendant's invocation of qualified immunity at this stage.[12]

Moreover, the Court finds that the Plaintiff has, at this stage, alleged sufficient facts to

allege a claim that the Defendants have assigned him to a facility more restrictive than that called

for by his security classification. The Plaintiff alleges that, by virtue of BOP regulations, he has

a particular classification level and that the level entitles him to assignment to a less-secure

facility than ADX. For purposes of the Motion to Dismiss, the Court assumes the Plaintiff to be

correct. *but see infra* (discussion of preliminary injunction motion).

The Defendants argue that the Plaintiff's ability to obtain relief based on a violation of

that regulation is not "clearly established." However, as noted above, courts have clearly

recognized that prison regulations can create enforceable liberty interests. *Chambers*, 205 F.3d

at 1242; *Meachum v. Fano*, 427 U.S. 215, 226 (1976). At the present level of factual abstraction,

---

[12]This is not to suggest that, at the summary judgment stage, the Plaintiff will continue to be able to overcome a claim of qualified immunity. At summary judgment, the deference afforded to general allegations in pleadings is replaced by a more searching inquiry into whether the Plaintiff can actually prove facts that would, for example, equate the conditions of his confinement with those of *Wilkinson*. If the Plaintiff fails to do so, the Defendants will be entitled to judgment on qualified immunity grounds.

where the Court defers to the Plaintiff's characterization of the regulation as being mandatory and providing for objectively calculable classification score, the Court finds that these cases are sufficient to "clearly establish" the Plaintiff possesses an enforceable liberty interest in his right to a facility assignment consistent with his classification level, even though no case appears to have specifically found a liberty interest arising under the particular BOP regulation at issue here. If, upon further factual development, the Defendants believe that the Plaintiff's rights under the regulation are not as clearly established as the Plaintiff asserts, they may file a summary judgment motion to that effect, and the Plaintiff will be obligated to come forward with a more particularized showing that courts have found the particular regulation at issue to create a liberty interest.

Next, the Court considers Claim 3. That claims alleges that various Defendants destroyed his property. Whether the Defendants are correct that allegations of non-compliance with BOP regulations governing inmate property are sufficient to overcome qualified immunity, it is evident to the Court that Claim 3 also asserts a cognizable due process claim under the Constitution, and that the rights of inmates to not have their personal property destroyed without due process is so well-established that citation to similar caselaw is unnecessary. Accordingly, the Defendants are not entitled to qualified immunity on this claim. A similar rationale applies to the Defendant's argument that they are entitled to qualified immunity on Claim 5, premised on the excessive use of force against the Plaintiff. Even assuming that the Plaintiff cannot support this claim solely by virtue of allegations of non-compliance with BOP regulations, the Plaintiff has adequately alleged a freestanding constitutional violation that is sufficiently well-established to overcome the assertion of qualified immunity at this stage of the litigation.

Finally, the Defendants assert qualified immunity with regard to Claim 6, which challenges restrictions on televisions and radios. As with the other claims discussed herein, the Court construes this claim to allege both regulatory and constitutional violations. For many of the same reasons stated with regard to Claim 1, insofar as it asserted that the Defendants violated a liberty interest created by the BOP's own regulations, the Court finds that the Plaintiff's characterization of the BOP's actions as being inconsistent with their own mandatory regulations is sufficient to state a due process claim that would overcome qualified immunity at this stage. It is less clear whether a freestanding Eighth Amendment or due process claim premised solely on the denial of access to radios and televisions could survive a qualified immunity challenge, or whether such a claim would only have vitality when coupled with the other allegations of inhumane conditions alleged in Claim 1. The Court need not resolve that issue at this time, however, because the Plaintiff's allegation that the BOP's actions are inconsistent with entitlements created by its own regulations are sufficient.

     5. <u>Personal participation</u>

The Defendants make a one-sentence argument that "the Complaint fails to allege sufficient facts to establish that any of these individual Defendants had sufficient personal participation in any of these alleged wrongful acts." This single sentence, without any additional argument addressing specific claims and allegations in the Amended Complaint, is insufficient to present this issue for meaningful adjudication.

Accordingly, the Defendants' Motion to Dismiss is denied to the extent it seeks outright dismissal of any of the claims against any particular Defendants.

## C. Motion for preliminary injunction

The Plaintiff filed a Motion for Preliminary Injunction **(# 16)**, requesting an order "direct[ing] the Defendants to obey their own regulations and program statements" relating to security classification, such that he would be assigned to a less secure facility than ADX.[13] The Court referred this motion to Magistrate Judge Hegarty for a Recommendation.

On May 1, 2008, following an evidentiary hearing, Magistrate Judge Hegarty recommended **(# 144)** that the motion be denied. The Magistrate Judge found that the Plaintiff is currently housed in the "single-celled general population unit" at ADX, having been there since his release from the control unit in March 2004. The Plaintiff's placement has been reviewed as recently as March 2008,[14] but BOP staff concluded that he was not a suitable candidate for "step down" – an assignment that loosens restrictions on an inmate and ultimately may result in transfer out of ADX – due to disciplinary incidents. (An inmate is not considered eligible for step down unless he has completed a full year without any disciplinary writeups.)

---

[13]The Preliminary Injunction motion elaborates somewhat on the facts that led him to ADX. He contends that although he was accused of murdering a Muslim inmate in 1996, "it was a complex affair." He states that he came upon "a confrontation between three individuals," and that his role was "making sure the problem did <u>not</u> escalate into violence." (Later, he admits to "jumping into a knife fight already in progress and inflicting 3-4 superficial wounds" to the victim who "took off running . . . and literally bled himself to death.") He alleges that, in retaliation for this killing "20 Individuals, Muslims[,] decided to get revenge." He alleges that these Muslims randomly targeted and collectively murdered a white inmate. The Plaintiff contends that both he and some of these Muslims were sent to ADX as a result of the murders, but that the Muslims have since been released back to less secure facilities. The differing treatment received by the Plaintiff and the Muslims is what appears, in part or whole, to drive the Plaintiff's religious discrimination claims.

[14]The Magistrate Judge found that the Plaintiff was scheduled for another review in April 2008, bit the results of that review are not part of the record.

The Magistrate Judge noted that the Plaintiff believes that he is subject to a "medium" security level classification, but that the BOP has determined that the Plaintiff is subject to a "high" level. Initially, the BOP's classification was based solely on the fact that the Plaintiff had more than 30 years to serve on his sentence, a factor that automatically dictates a "high" security level. However, as of January 2008, the Plaintiff has less than 30 years left to serve. Nevertheless, in March 2008, the Plaintiff's classification level was reviewed and the BOP concluded that the Plaintiff should remain at a "high" level. The Magistrate Judge noted that "this recent re-classification has not been made a part of the instant action." The Magistrate Judge understood the Plaintiff to seek only an order directing the Defendants to comply with BOP Program Statement 5100.08, which the Plaintiff believes would require a transfer to a facility other than ADX.

Turning to the legal analysis, the Magistrate Judge first found that the Plaintiff was seeking an injunction to alter the *status quo*, and that such injunctions are disfavored and subjected to closer scrutiny. *Citing Schrier v. University of Colorado*, 427 F.3d 1253, 1258-59 (10th Cir. 2005). Judge Hegarty then turned to the traditional preliminary injunction factors, finding first that the Plaintiff had not shown the existence of imminent, irreparable harm. The Magistrate Judge found that the Plaintiff's claims that solitary confinement was causing him to suffer various mental and physical harm were "uncorroborated by independent evidence" and that his medical records showed no indication that prison staff considered the Plaintiff to be suffering from serious psychological or physical danger.

Next, the Magistrate Judge considered the Plaintiff's likelihood of success on the merits. Judge Hegarty extensively reviewed issues relating to exhaustion and timeliness of events arising

prior to August 2005 – including the Plaintiff's release from the control unit and assignment to a "general population" tier, the revocation of group recreation privileges at ADX in July 2005, and so on– and concluded that the Plaintiff was unlikely to succeed on these claims. The Magistrate Judge then turned to the Plaintiff's claims arising after August 2005, namely, those claims likely to be considered timely for *Bivens* purposes. Judge Hegarty found that, with regard to the Plaintiff's current complaints about his classification and housing assignment, 18 U.S.C. §3621(b) grants discretion to the BOP to make classification and housing determinations, and that inmates do not generally possess liberty interests in such decisions. After noting the "atypical and significant hardship" test of *Sandin* and *Wilkinson*, the Magistrate Judge observed that "the 10th Circuit has ruled that a move from a less restrictive to more restrictive unit within the general population at the ADX does not implicate due process concerns." *Citing Muhammad v. Hood*, 100 Fed.Appx. 782, 783 (10th Cir. June 7, 2004) (unpublished). The Magistrate Judge further noted that the 10th Circuit "has ruled that the BOP's program statements do not contain the mandatory language required to give an inmate a liberty interest in his prison classification." *Citing Sule v. Story*, 1996 WL 170156 (10th Cir. April 11, 1996) (unpublished). Thus, the Magistrate Judge concluded that the Plaintiff was not likely to succeed on his claims that he was entitled to a transfer based on the BOP's regulations.[15]

Finally, the Magistrate Judge found that the Plaintiff had not shown that the balance of hardships tipped in his favor, or that the requested injunction would be adverse to the public

---

[15]The Magistrate Judge went on to consider whether the Plaintiff was likely to succeed on constitutional challenges to the conditions of his confinement and to claims of religious discrimination. Because the Court understands the Plaintiff's preliminary injunction motion to address only a request for an order directing compliance with BOP's classification regulations, the Court does not consider this aspect of the Magistrate Judge's Recommendation.

interest, primarily because the Court is required to defer to prison officials in decisions concerning management and safety.  As a result, Judge Hegarty recommended that the Plaintiff's preliminary injunction motion be denied.

The Plaintiff filed timely Objections **(# 160)** to the Recommendation.  Although he argues that "not one sentence in the report accurately portrays the law or facts of this case," the Plaintiff focused on several specific contentions: (i) the Magistrate Judge repeatedly used the phrase "general population" without defining it or acknowledging the Plaintiff's argument that the distinction between the "general population" and the control unit at ADX was specious; (ii) that the Magistrate Judge did not cite *Wilkinson*; (iii) that the Defendants "defaulted" on the motion by "not even offer[ing] an explanation" as to certain points raised by the Plaintiff; (iv) that the Defendants "perpetrated fraud upon the court by hiding classification forms then giving anecdotal explanations which Plaintiff showed in a rule 9 motion are falsifications"[16]; (v) that the Magistrate Judge's reference to "single-cell general population" is inherently contradictory; (vi) that the Magistrate Judge's findings concerning "intra-ADX transfers" are irrelevant because the Plaintiff is requesting a transfer out of ADX; (vii) that the Magistrate Judge's "explanation about Public Safety Factors is also moot" because ADX is a "level 6 supermax" facility, not a level 5 "high" security facility; (viii) that the Magistrate Judge "literally commits perjury" in finding, with regard to the Plaintiff's religious discrimination claim, that the Plaintiff did not identify similarly-situated individuals; (ix) that "unequal treatment and discrimination is, all by itself, irreparable harm"; (x) that the Defendants were required by *McDonnell-Douglas v. Green*, 411

---

[16]It is unclear what "rule 9" motion the Plaintiff refers to, nor do the Objections elaborate on the "fraud on the court" allegations.

U.S. 792 (1973), "to give some explanation for this disparate treatment but failed to do so": (xi) that the Magistrate Judge erred in finding that the requested injunction sought to alter the *status quo*; (xii) that the Magistrate Judge's finding that the Plaintiff showed insufficient evidence of mental or physical deterioration is erroneous; (xiii) that the Magistrate Judge's findings concerning the Plaintiff's exhaustion of Administrative remedies and the statute of limitations are erroneous; (xiv) that there are "hundreds of cases that deem ADX conditions atypical"; (xv) that the Defendants "conceded the point" by establishing regulations dictating that inmates suffering from clinical depression not be assigned to ADX; (xvi) that the Magistrate Judge erred in finding that the balance of harms did not tip in the Plaintiff's favor because "what damage could the BOP possibly suffer from obeying its own regulations"; (xvii) a somewhat rambling version of the events leading up to and following the murder, concluding with the rhetorical questions "what danger is posed by the Plaintiff?" and "what are the chances of another terrorist-white supremacist-Muslim-schizophrenic getting into a knife fight with a friend of the Plaintiff?"

For purpose of reference, motions for preliminary injunction are generally treated as dispositive motions, and thus, the Court reviews the objected-to portions of the Magistrate Judge's Recommendation *de novo*. Fed. R. Civ. P. 72(b); *Mitchell v. Century 21 Rustic Realty*, 233 F.Supp.2d 418, 430 (E.D.N.Y. 2002). As to the remainder of the Recommendation, to which no specific objections are filed, the Court applies whatever standard of review it deems appropriate. *Summers v. State of Utah*, 927 F.2d 1165, 1167-68 (10th Cir. 1991). Here, the Court has also reviewed the unobjected-to portions of the Recommendation under the otherwise applicable *de novo* standard.

The Recommendation correctly notes that a party seeking a preliminary injunction must establish four elements: (i) likelihood of success on the merits; (ii) imminent irreparable harm; (iii) a balancing of the equities tipping in the party's favor; and (iv) that the injunction is not adverse to the public interest. *Schrier, supra.* Moreover, contrary to the Plaintiff's argument in the Objections, the Magistrate Judge correctly observed that this injunction seeks mandatory relief, rather than preservation of the *status quo*, and thus, is subjected to additional scrutiny. *Id.* The Plaintiff argues that the present controversy arose when he was released from the control unit at ADX "and was discharged." However, the record reflects that the Plaintiff was not "discharged" from ADX, but merely reassigned to another housing unit. A request that the Court direct the transfer of the Plaintiff to another facility entirely seeks mandatory, not prohibitory relief, and thus, does not request a *status quo* injunction.

The Court will not address the Plaintiff's Objections point-by-point because many of the Plaintiff's Objections entail findings by the Magistrate Judge that are not necessary to the resolution of the issue here.[17] As stated above, the Court finds that the preliminary injunction

---

[17]In passing, the Court will address one issue that the Plaintiff appears to be particularly exercised about. The Plaintiff disputes that ADX has a "general population" tier, and insists that these tiers are identical to the control unit. This contention is belied by the BOP's own Program Statement 5100.08, *see* Ch. 7, p. 17-18, which specifically refer to "ADX Florence general population units," as well as cases such as *Muhammad, supra.*, in which the 10th Circuit has also referred to "general population" units at ADX. At best, the record merely reflects that the Plaintiff construes the term "general population" to mean something different than the BOP and 10th Circuit do. (It appears to the Court that the Plaintiff finds the concept of solitary confinement cells and the notion of "general population" inherently inconsistent, although it does not appear that the BOP does.) The Plaintiff points to nothing in the BOP's regulations that indicate that, from a regulatory perspective, a "general population" unit cannot entail solitary confinement.

Moreover, for constitutional purposes, there is no particular legal significance to the term "general population." The label given to the unit is of no importance; what is of importance under cases like *Sandin* and *Wilkinson* are the particular privileges or restrictions that are

motion relates <u>only</u> to the Plaintiff's claim that he is entitled to a transfer by operation of the BOP's regulations. Unlike the Magistrate Judge, the Court does not interpret the Plaintiff to seek preliminary injunctive relief on the strength of his claims of unconstitutional conditions of confinement or equal protection violations.  Thus, the Court does not consider that portion of the Recommendation, nor the Plaintiff's Objections thereto, that address any claims other than the claim directed at the BOP's classification regulation.

Similarly, because the Plaintiff seeks prospective injunctive relief – that is, a transfer to another facility – the Magistrate Judge's consideration of statute of limitations and exhaustion issues as part of the "likelihood of success" element was unnecessary.  What is relevant is whether the Plaintiff <u>currently</u> is entitled to a transfer under BOP policies; whether he was deprived of a transfer he was entitled to at some point in the past is not an issue that can be remedied by a preliminary injunction.

Upon a *de novo* review of the motion papers, the transcript of the evidentiary hearing, the Magistrate Judge's Recommendation, and the Plaintiff's Objection, the Court agrees with the Magistrate Judge that a preliminary injunction should be denied, but does so for different reasons than those expressed by the Magistrate Judge.  First, and perhaps most importantly, the Magistrate Judge found that, contrary to the Plaintiff's claim that he is entitled to "medium" security classification, in March 2008, the BOP reviewed the Plaintiff's classification and concluded that he was at a "high" security classification level.  The Plaintiff's Objections do not address the March 2008 decision, much less demonstrate that the BOP's conclusion was somehow in error; indeed, at the hearing, the Plaintiff acknowledged that "as of the last couple of

imposed on inmates.

weeks," his security classification is now "high." Although the Magistrate Judge found that this (re-)classification was not at issue "has not been made a part of the instant action," it would appear to be dispositive for purposes of obtaining provisional injunctive relief. As discussed above, provisional relief is appropriate only if the Plaintiff can show that, as of today, he remains entitled to a transfer under the BOP's classification regulations. The fact that he was improperly denied a transfer in the past but is no longer eligible for one is an issue that can be cured by declaratory or monetary relief, but not an injunction compelling a transfer that is no longer appropriate. Because the record shows that the Plaintiff is currently classified as a "high" security offender suitable for assignment to ADX, this alone would warrant denial of the preliminary injunction motion.

The Court further finds that the Plaintiff, by his own admission, is not eligible for a transfer out of ADX under current BOP policies. The record appears to indicate that the only means by which an individual may be assigned out of ADX is by participating in a step down program.[18] The Plaintiff admitted at the evidentiary hearing that he is eligible to participate in a step down program that will ultimately result in a transfer out of ADX by satisfying several criteria: he must remain free of disciplinary incidents for a full year prior to the decision granting him step down status, he must participate in prison programs, and he must be evaluated by a "team" to determine whether he is capable of stepping down. The record is somewhat unclear

_____

[18]Specifically, Chapter 7, page 19 of BOP Program Statement 5100.08 states that "Once an inmate completes the ADX Florence program," the Warden will submit a transfer request. The record does not adequately address whether "complet[ing]" the "ADX Florence program" involves completing the step down program or, as the Plaintiff believes, simply finishing a control unit assignment. The inadequacy of the record on this point is held against the party with the burden of proof – the Plaintiff.

whether the Plaintiff had satisfied the first two criteria at the time of the evidentiary hearing, but the third criteria is necessarily a subjective one.

To create a liberty interest, a regulation must "use language of an unmistakably mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed [or] that administrative segregation will not occur absent specified substantive predicates." *Washington v. Harper*, 494 U.S. 210, 221 (1990). The regulation must "establish substantive predicates to govern official decision-making" and "mandat[e] the outcome to be reached upon a finding that the relevant criteria have been met." *Kentucky Dept. of Corrections v. Thompson*, 490 U.S. 454, 462 (1989). Where regulations confer some discretion on prison administrators in deciding what prison to transfer an inmate to, a liberty interest will not arise. *Meachum*, 427 U.S. at 228. The Plaintiff does not contend that there are objective criteria that constrain the team's discretion in concluding that a particular inmate is suitable for step down treatment. Thus, participation in a step down program is subject to the discretion of prison officials, and there is no indication in the record that the BOP policies so restrict that discretion that the Plaintiff would have an enforceable liberty interest in compelling his admission to the step down program. Thus, the record does not show that the Plaintiff would be likely to succeed on a due process claim based on the criteria for participating in the step down program.

The Court understands from the Plaintiff's Objections that his claim is not that he should be admitted to (or processed through) the step down program, but that he should have immediately been transferred out of ADX at the conclusion of his stint in the control unit. The Plaintiff does not point to mandatory language in Program Statement 5100.08 that would compel

41

such a transfer, even assuming the Plaintiff's SENTRY score entitled him to a "medium"

designation.  Indeed, Program Statement 5100.08 states that:

> It should be clearly understood that the Custody Classification
> Form only recommends an inmate's custody. The Unit Team
> and/or Warden is the final review authority. The intent of the
> Custody Classification system is to permit staff to use professional
> judgment within specific guidelines. Custody changes are not
> dictated solely by the point total.

*Ch*. 6, p. 1-2.  Thus, by definition, Program Statement 5100.08 allows the BOP to use

"professional judgment" in deciding whether an inmate should be assigned based upon his

classification score or upon other considerations.  Because the Plaintiff has not shown that

Program Statement 5100.08 contains mandatory, non-discretionary language, he has not shown a

likelihood of success on his claim that BOP regulations create a liberty interest in assignment to

a medium security facility.

Although this alone would justify denying the motion for preliminary injunction, the

Court also finds that the Plaintiff has further failed to satisfy both the balance of hardships and

the public interest factors.  The BOP is entitled to a high degree of discretion with regard to

placing prisoners according to the security needs of other inmates, prison staff, and the general

public, and courts must be reluctant to meddle in that discretion.  Undoubtedly, the Plaintiff

would prefer to be in a less-secure facility with more privileges, but at the same time, the

Plaintiff admits having been involved in the murder of another inmate in 1996, has incurred

recent disciplinary violations, and has apparently been recently adjudged by the ADX team to be

unsuitable for a step down assignment at this time.  Under these circumstances, directing his

transfer would be an inappropriate usurpation of the BOP's discretion and expertise by this

Court.

Accordingly, the Court overrules the Plaintiff's Objections and adopts the Magistrate Judge's Recommendation, albeit on the alternative grounds stated above. The Plaintiff's Motion for Preliminary Injunction is denied.

### D. Motion for Summary Judgment

The Plaintiff moves for summary judgment **(# 84)** on each of his claims.

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

When the movant has the burden of proof on a claim for which he seeks judgment, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(e). Once the moving party has met its burden, to avoid summary

judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999).

When making a motion for summary judgment, a party with the burden of proof may not simply rest on assertions contained within his pleadings, and must come forward by adducing specific facts supporting the claim. *BancOklahoma Mort. Corp. v. Capital Title Co.*, 194 F.3d 1089, 1097 (10th Cir. 1999). The facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). The Court notes that the Plaintiff's motion is supported by an extensive Appendix **(# 143)**, which the Plaintiff describes as being 700-800 pages. The Plaintiff's motion itself does not purport to identify specific documents within that Appendix by page or exhibit number. The Court declines to page through hundreds of documents in search of evidence that would support the Plaintiff's claim. *Adler*, 144 F.3d at 672 ("The district court has discretion to go beyond the referenced portions of these materials, but is not required to do so"). Rather, that is the Plaintiff's obligation as a litigant to cull the evidence and identify, with particularity and by page, that which is probative of a particular factual assertion. As the 10th Circuit in *Adler* observes, the courts play a neutral role in the litigation process, and should be "wary of becoming advocates who comb the record of previously available evidence and make a party's case for it." *Id.*

Because the Plaintiff has not supported the factual averments constituting his summary judgment motion with specific citation to evidence in an admissible form, the motion is denied.

### E. Remaining motions

The Plaintiff's "Motion for a More Definite Statement" **(# 131)** appears to seek a more detailed "response [by the Defendants] to the Plaintiff's post-hearing submissions" pursuant to Fed. R. Civ. P. 12(e). It is not clear to the Court what "post-hearing submissions" the Plaintiff refers to, nor the "response" from the Defendants that is alleged to be unclear. In any event, Rule 12(e) relates to compelling a more definite statement of a "pleading to which a responsive pleading is allowed." "Pleadings" consist of Complaints and Answers; a "post-hearing submission" is not a pleading. Thus, Rule 12(e) would not apply in any event, and this motion is denied.

The Plaintiff also moves for a "Rule 12 Preliminary Hearing" **(# 157)**, incident to the Defendants' Motions to Dismiss. The Plaintiff purports to make this request pursuant to Fed. R. Civ. P. 12(d), which he contends states that "upon application of any party, there shall be a hearing to address defenses pleaded in a Rule 12 motion to dismiss." Rule 12(d) says no such thing; it merely requires the Court receiving evidentiary material in support of a Rule 12 motion to permit the opposing party the opportunity to submit evidentiary material in response. The Court has scrupulously ensured that, in deciding the Defendants' Rule 12 motions, it did not look beyond the allegations in the Amended Complaint. Accordingly, there was no need for leave to submit evidentiary material under Rule 12(d), and the Court is aware of no authority that entitles a party to "a hearing to address defenses" raised in a Rule 12 motion.[19] This motion is denied.

---

[19]The Plaintiff may be referring to Rule 12(*i*), which provides that, upon the request of a plaintiff, the court must resolve a Rule 12(b) motion asserting a defense prior to trial or else issue an order specifically deferring that motion. By its terms, no relief is warranted under this rule in these circumstances.

The Plaintiff has filed a Motion requesting the "Tak[ing of] Judicial Notice of Facts and Legal Implications of Defendants Admissions in Their Response to the Fifth Request for Subpoena of Documents For Preliminary Injunction" **(# 194)**.  He asks the Court to take judicial notice that the Defendants' response to a request for "documents justifying Plaintiff's disparate treatment from similarly-situated prisoners beginning in March 2003" was that such documents do not exist.  Even assuming – without necessarily finding – that this is a proper subject for judicial notice under Fed. R. Evid. 201, the Plaintiff does not attach a formal discovery response containing such a representation by the Defendants.  Without having been "supplied with the necessary information," Fed. R. Evid. 201(d), the Court declines to take such notice.  This motion is denied.

The Plaintiff files an "Ex Parte Motion for Judgment of Default" **(# 200)**, which the Court has treated as a reply in support of the Plaintiff's Motion for Reconsideration.  This motion brings to the Court's attention the fact that the Defendants did not respond to the Motion for Reconsideration.  A default judgment under Fed. R. Civ. P. 55 is available only where a party has failed to defend against a claim seeking "a judgment for alternative relief" – *i.e.* a claim in the Amended Complaint.  The Plaintiff confuses the concept of a default judgment with a party's confession of a motion by not filing a response.  A party's confession of a motion merely waives the party's right to contest the facts asserted and to offer arguments or evidence in response; it does not automatically result in the motion being granted.  *Murray v. City of Tahlequah*, 312 F.3d 1196, 1200 (10th Cir. 2002). Because the Court has found that the Motion for Reconsideration lacks merit on its face, the fact that the Defendants may have confessed it is irrelevant.

The Plaintiff has filed a "Pro Se Motion . . . to Order the Magistrate and AUSA to Cease Mocking His Pleadings and Afford them the Respect Required" (**# 247**).  The Court has reviewed the allegations raised by the Plaintiff in the motion and finds them to be without merit.  Indeed, the Court finds that <u>all</u> parties in this action have generally comported themselves with admirable diligence, professionalism, and restraint.  Seeing no particular disrespect of the Plaintiff's pleadings exhibited by either the Defendants or the Magistrate Judge, the Court denies this motion.  The Court encourages the parties to continue to conduct themselves with the dignity and respect that they have shown to date.

Finally, the Plaintiff moves to hasten the Court decision on the motion for preliminary injunction (**# 275**).  Having now ruled on that motion, the Court denies this motion as moot.

### <u>CONCLUSION</u>

For the foregoing reasons, the Plaintiff's Objections (**# 160**) to the May 1, 2008 Report and Recommendation (**# 144**) of United States Magistrate Judge Michael E. Hegarty are **OVERRULED**, and the Court **ADOPTS** the Recommendation, albeit on different grounds.  The Plaintiff's Motion for Preliminary Injunction (**# 16**) is **DENIED**.  The Plaintiff's Motion for Summary Judgment (**# 84**) is **DENIED**.  The Plaintiff's Motion for Reconsideration (**# 92**) of the ruling dismissing his prior case is **DENIED**.  Defendants Baxter, Denny, Lappin, Nalley, and Watts' Motion to Dismiss (**# 123**) is **GRANTED** and all claims against Defendants Baxter, Denny, Lappin, Nalley, and Watts are **DISMISSED** for lack of personal jurisdiction.  The Clerk of the Court shall modify the caption of the case to reflect the dismissal of these Defendants, as well as the Plaintiff's voluntary dismissal of all claims against Defendant Unknown Executive Panel.  The Defendants' Motion to Dismiss (**# 124,** as amended **# 180-2**) is **DENIED**. The

Plaintiff's "Motion for a More Definite Statement" (**# 131**) is **DENIED**.  The Plaintiff's "Motion for a Rule 12 Preliminary Hearing" (**# 157**) is **DENIED**.  The Plaintiff's Motion Requesting the Taking of Judicial Notice (**# 194**) is **DENIED**.  The Clerk of the Court shall terminate the Plaintiff's "Ex Parte Motion for Judgment of Default" (**# 200**), which the Court has treated as a reply in support of the Plaintiff's Motion for Reconsideration. The Plaintiff's "Pro Se Motion . . . to Order the Magistrate and AUSA to Cease Mocking His Pleadings and Afford them the Respect Required" (**# 247**) is **DENIED**.  The Plaintiff's "Motion for Judge to Render Decision on Preliminary Injunction . . . ." (**# 275**) is **DENIED AS MOOT**.

Dated this 12th day of September, 2008

BY THE COURT:

Marcia S. Krieger
United States District Judge

48