IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 07-cv-01712-MSK-MEH

PETER GEORGACARAKOS,

     Plaintiff,

v.

WILEY,
CRUZ,
JAVERNICK,
COLLINS,
SUDLOW,
MADISON,
CHURCH,
LT. JOHN DOE,
HEIM,
MARTINEZ,
FENLON,
PUGH,
HOOD,
HERSCHBERGER,
BUREAU OF PRISONS,
DEPT. OF JUSTICE, and
UNITED STATES,

     Defendants.

_____

**OPINION AND ORDER GRANTING, IN PART**,
**MOTION FOR SUMMARY JUDGMENT AND DENYING REMAINING MOTIONS**
_____

**THIS MATTER** comes before the Court pursuant to the Defendants' Motion for

Summary Judgment (**# 645**, as supplemented **# 653**), the Plaintiff's response (**# 657, 658**), the

1

Defendants' reply **(# 667)**, and the Plaintiff's sur-reply **(# 670)**.[1]  In conjunction with that

motion, the Court has also considered several motions by the Plaintiff that bear, directly or

indirectly, on the Court's consideration of the summary judgment motion.  Specifically, the

Court has also considered: the Plaintiff's Motion to Strike **(# 680)** the Defendants' summary

judgment motion, and the Defendants' response **(# 687)**; the Plaintiff's Motion for Judicial

Notice **(# 749)**; the Plaintiff's Objection **(# 767)** to a July 21, 2009 Minute Order **(# 755)** by the

Magistrate Judge denying the Plaintiff's Motion to Suppress **(# 706)** certain letters by the

Plaintiff included in the Defendants' summary judgment papers; the Plaintiff's Objections **(#**

**769)** to the July 22, 2009 Minute Order **(# 759)** by the Magistrate Judge denying the Plaintiff's

Motion for Issuance of Subpoena **(# 705)**; the Plaintiff's Motion for Judicial Notice **(# 771)**; the

Plaintiff's Motion to Compel Discovery **(# 773)**; and the Plaintiff's Supplemental Motion for

Summary Judgment On Claim 3 **(# 792)**.  The Court also addresses numerous other motions by

the Plaintiff are pending in this matter – Docket # **678, 679, 716, 732, 742, 747, 760, 774, 781,**

**786, 787, 791, 797**, and **804**  – that do not directly bear on the summary judgment analysis.  In

the interests of efficiency, the Court will first address the summary judgment motion and related

motions, then, to the extent claims remain for adjudication, the Court will turn to the motions

listed above.

 The Court has discussed the basic background of this action in prior Orders **(# 284, 518)**,

and to the extent necessary, that factual recitation is deemed incorporated herein.  In summary,

the *pro se* Plaintiff is an inmate of the United States Bureau of Prisons ("BOP"), housed at the

---

[1]The Plaintiff did not seek leave to file a sur-reply.  Nevertheless, in the interests of
allowing the Plaintiff to be fully heard on the Defendants' motion, the Court has considered the
Plaintiff's sur-reply.

Administrative Maximum facility ("ADX") in Florence, Colorado. He asserts a number of claims, discussed in more detail below, relating to the conditions of his confinement, his eligibility for a transfer to a less secure prison, and various other matters. *See Docket* # 100, as supplemented # 314. The Defendants have moved for summary judgment **(# 645)** on each of the Plaintiff's claims, and the Plaintiff has both responded to that motion and, as listed above, filed various motions whose resolution could, arguably, bear on the summary judgment analysis. The Court will discuss the arguments raised in each motion in the course of its analysis.

<u>**ANALYSIS**</u>

**A. Standard of review**

In considering the Plaintiff's filings, the Court is mindful of his *pro se* status, and accordingly, reads his pleadings liberally. *Haines v. Kerner,* 404 U.S. 519, 520-21 (1972). However, such liberal construction is intended merely to overlook technical formatting errors and other defects in the Plaintiff's use of legal terminology and proper English. *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). *Pro se* status does not relieve the Plaintiff of the duty to comply with the various rules and procedures governing litigants and counsel or the requirements of the substantive law, and in these regards, the Court will treat the Plaintiff according to the same standard as counsel licensed to practice law before the bar of this Court. *See McNeil v. U.S.*, 508 U.S. 106, 113 (1993); *Ogden v. San Juan County*, 32 F.3d 452, 455 (10th Cir. 1994).

**B. Preliminary motions**

Before the Court turns to the Defendants' summary judgment motion, it first resolves any motion by the Plaintiff that could arguably affect the scope of the summary judgment analysis.

Thus, the Court considers any pending motion by the Plaintiff bearing on discovery, judicial notice, etc., even if those motions were filed after summary judgment briefing had been concluded.

The Court turns first to the Plaintiff's Motion to Strike **(# 680)** the Defendants' summary judgment motion. The Plaintiff contends that the summary judgment motion "added only procedural facts to [the Defendants' prior] Rule 12 motion," and that "to grant this motion, the Court would be required to contradict its previous findings." This argument is without merit. A Rule 12 motion is non-evidentiary: the Court treats every non-conclusory allegation in the Complaint as true and evaluates whether, as a matter of law, those allegations could, if proven, permit a verdict in the Plaintiff's favor. A Rule 56 motion is evidentiary in nature: the factual assertions in the Complaint are no longer relevant, and the Court examines whether the Plaintiff actually has evidence that supports his claims. Thus, a Rule 12 motion and a Rule 56 motion can address different issues, and the granting of a Rule 56 motion after a Rule 12 motion was denied is neither unusual nor improper. Accordingly, this motion is denied.

The Plaintiff files two motions **(# 749, 771)** requesting that the Court take judicial notice of certain matters. Fed. R. Evid. 201(b) permits the Court to take judicial notice of "adjudicative facts" where: (i) the fact is not subject to reasonable dispute; and (ii) it is either "generally known" within the jurisdiction or it is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." In the first motion, the Plaintiff requests that the Court take notice of several items, including the contents of certain documents that the Plaintiff attaches to the motion, the contents of certain specified provisions in the Code of Federal Regulations, a representation made by the BOP in a particular pleading in a different

case in this Court, and the consequences of a specific Supreme Court decision from 1979. In the

second motion, the Plaintiff requests that the Court take notice of findings by the Supreme Court

and a Circuit Court in a specific case, as well as a statistic – whose source is unstated –

concerning BOP prison populations. The Court has significant doubt as to whether many of

these matters are "adjudicative facts" as contemplated by Rule 201, much less that they are

"facts" at all – some of the "facts" cited by the Plaintiff are more in the nature of argument as to

what a particular case does or does not establish. But ultimately, the question of whether they

are judicially noticeable is irrelevant. With regard to those matters for which the Plaintiff has

attached supporting documentation, the Court has considered the supporting documentation as an

evidentiary submission in opposition to the Defendants' summary judgment motion, and with

regard to matters that cite to a particular regulation or case, the Court has considered the text of

the cited regulation or case. Accordingly, the motions for judicial notice are denied in part as

moot, and denied outright in all other respects.

The Plaintiff' has filed Objections (**# 767**) to a July 21, 2009 Minute Order (**# 755**) by the

Magistrate Judge denying the Plaintiff's Motion to Suppress (**# 706**) certain letters photocopied

by the Defendants. Specifically, the Plaintiff notes that the Defendants' summary judgment

reply attaches copies of two letters written by him to third parties and sent through the prison

mailroom, where they were reviewed and apparently copied by prison staff. The Plaintiff

contends that although the Defendants are permitted by prison policy to review inmate mail, they

may not copy the letters without probable cause to believe a crime is being committed. *Citing* 28

C.F.R. § 540.14(a), (c)(2). In denying the motion, the Magistrate Judge found that the regulation

cited by the Plaintiff did not, by its terms, apply to ADX, and further, that regulation of inmate

5

mail by prison officials is "essentially an administrative matter in which the courts will not intervene." *Citing U.S. v. Gordon*, 168 F.3d 1222, 1228 (10th Cir. 1998). The Plaintiff filed a timely Objection pursuant to Fed. R. Civ. P. 72(a), arguing that the regulation does indeed apply to ADX, and that the request for suppression of the photocopied letters does not constitute "intervening" in matters relating to inmate mail.

Pursuant to Rule 72(a), the Court will overturn a Magistrate Judge's ruling on a non-dispositive matter only if the ruling is "clearly erroneous" or "contrary to law." Although the Order may have been inaccurate in one particular aspect,[2] its conclusion that suppression was not warranted was correct.

The regulation cited by the Plaintiff states that "except for 'special mail,' outgoing mail from a sentenced inmate in . . . an administrative institution may not be sealed by the inmate and may be read and inspected by staff." 28 C.F.R.§ 540.14(c)(2). The cited regulation says nothing about prohibiting prison officials from copying inmate correspondence of concern, nor does the Plaintiff cite to any authority for his contention that such copying constitutes a seizure that must be supported by probable cause. To the contrary, the warrantless seizure of an inmate's mail does not violate the Fourth Amendment if justified by concerns of prison security. *Witherow v. Crawford*, 339 Fed.Appx. 785, 787 (9th Cir. 2009), *citing U.S. v. Vallez*, 653 F.2d 403, 406 (9th Cir.1981) (noting that inmates' 4th Amendment protections are minimal); *U.S. v.* Brown, 878 F.2d 222, 225 (8th Cir. 1989); *citing U.S. v. Kelton*, 791 F.2d 101, 102-03 (8th Cir. 1986);

_____

[2]It appears that the ruling was premised upon the conclusion that because 28 C.F.R. § 540.14(c)(1) refers to inmates in "minimum or low security" institutions, subsection (c)(2) does not apply here. However, subsection (c)(2) reflects a different set of rules applying to inmates at medium and higher security institutions. For the reasons discussed herein, however, any error is harmless.

*London v. Dorney*, 2009 WL 903392 (W.D. Ar. Apr. 1, 2009) (unpublished) ("the Court can not find any constitutional violation in the apparent copying and forwarding of [inmate]'s letter [to a witness asking the witness to give a deposition] to Prosecuting Attorney Wilson"). Here, it is obvious that the Plaintiff's letters – which confessed his membership in an organization considered by prison officials to be a white supremacist group and thus, of penological concern – implicated a security interest that permitted ADX staff to make and retain copies of the letters. Accordingly, the Magistrate Judge's ruling properly found that the letters should not be suppressed.[3]

The Plaintiff filed Objections (**# 769**) to the July 22, 2009 Minute Order (**# 759**) by the Magistrate Judge denying the Plaintiff's Motion for Issuance of Subpoena (**# 705**). The Plaintiff requested that the Court issue a subpoena "requiring Defendants to allow [an attorney] to inspect and photograph tangible things" – namely, specific areas inside ADX. The Plaintiff stated that such photography would not constitute a security threat if the photographs concerned only "cells and recreation areas," and if the photographs would be delivered to the Court for *in camera* review and never provided to the Plaintiff or others. The Magistrate Judge denied the request, finding that it effectively duplicated a prior request (**# 537**) that the Magistrate Judge had denied (**# 619**) and this Court had affirmed (**# 671**). In his Objections, the Plaintiff contends that the prior ruling was based on a request for production of photographs that, the Court found, did not

---

[3]The Court notes that, in any event, the Defendants' submission of the letters is irrelevant to any issues before the Court. The Plaintiffs offer the letters only to refute a contention by the Plaintiff in his response to the summary judgment motion – a contention that the Plaintiff "has never been in a white supremacist group." As is clear from the discussion below, whether the Plaintiff is (or was) a member of such a group is irrelevant to the analysis of any of the claims herein.

exist, whereas his current request sought leave to take such photographs. He also argues that "the security shibboleth must fail because the pictures may be numbered and cataloged and kept by Defendants."

It is not clear to the Court whether the Plaintiff requests the photographs to accompany his summary judgment response, or whether he simply seeks to obtain them for use at trial. Nevertheless, out of an abundance of caution, the Court assumes that, were the Plaintiff to obtain the pictures he requests, he would rely on them for his summary judgment briefing as well. In this regard, the Court respectfully disagrees with the reasoning of the Magistrate Judge that the instant request – for an individual to enter ADX and take photographs – is identical to the Plaintiff's prior request that sought production of any existing photographs. However, upon considering the Plaintiff's current request, this Court nevertheless finds that it was properly denied.

Fed. R. Civ. P. 34 permits, as a discovery tool, a party to request an opportunity to enter onto/into a particular location and inspect, and copy (here, photograph) information therein. However, to the extent the Plaintiff's current request can be treated as a discovery request under Rule 34, it is untimely, as the discovery period closed before the request was made. *See* Docket # 698 (noting that discovery cutoff was March 2, 2009, well before the instant request filed in June 2009). The Plaintiff has neither sought nor obtained an extension of the discovery deadline, and thus, his request to have someone enter ADX premises and take photographs is untimely. Moreover, the Court has doubts as to whether photographs are essential to the Plaintiff mounting a meaningful challenge to the summary judgment motion. To the extent the physical layout of ADX is at issue, the Defendants have supported their motion with verbal descriptions of the

8

facilities.  *See e.g. Docket* # 645, Ex. 3 (describing, for example, ADX cells as being "100 square feet," and recreation areas as being "separated by wire fencing"). There is no apparent reason why the Plaintiff cannot rebut those contentions with his own verbal descriptions of the relevant areas, rather than relying on photographs.  Indeed, the Plaintiff's own suggestion is that he not be allowed to view the photographs; rather, they would be supplied directly to the Court for review *in camera*.  Thus, to the extent the Plaintiff wished to draw the Court's attention to any particular aspect of the photographs, he would nevertheless have to verbally identify the relevant aspect of the area, at which point the photograph would be largely redundant of the Plaintiff's written description.  Accordingly, because the request to photograph the ADX premises was both untimely and unnecessary to the summary judgment motion, the Court overrules the Plaintiff's Objections and affirms the Magistrate Judge's denial of his request.

On August 4, 2009, the Plaintiff filed a Motion to Compel **(# 773)**, regarding a May 14, 2009 discovery request that sough to have the Defendants produce certain records for ""each Muslim discharged from the Control Unit the same year as himself," specifically identifying 7 inmates by name.[4]  The motion indicates that the Defendants objected to the request on relevance grounds, and contended that the request was precluded by the requirements of the Privacy Act, 5 U.S.C. § 552a.  Through oversight, this Court failed to refer the motion to the Magistrate Judge, as would normally be done with motions relating to discovery issues.  The Court will refer this motion to the Magistrate Judge for disposition.  As discussed below, the Court preliminarily

---

[4]By Minute Order **(# 663)** dated May 14, 2009, the Magistrate Judge extended the discovery deadline for the sole purpose of permitting the Plaintiff to propound this request for production.  The Plaintiff's motion indicates that the Defendants' response to the request was made on June 3, 2009.  On July 27, 2009, the Plaintiff filed a motion to compel **(# 764)** that the Magistrate Judge denied **(# 766)** for failure to comply with Fed. R. Civ. P. 37.

grants summary judgment to the Defendants on the Equal Protection claim to which the requested discovery relates. However, should the Magistrate Judge conclude that the Plaintiff's request should be granted and the discovery obtained, the Court will permit the parties to seek reconsideration of the provisional grant of summary judgment in light of the discovery that is produced.

Finally, the Plaintiff has filed a Supplemental Motion for Summary Judgment On Claim 3 (# 792). This filing contends that the evidentiary submissions made by the Defendants' summary judgment motion actually support certain arguments made by the Plaintiff. Accordingly, the Court treats this "motion" as a supplemental brief by the Plaintiff in opposition to the summary judgment motion.

### C. Defendants' motion

#### 1. Standard of review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter

for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

Where, as here, the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, the claim or defense must be dismissed as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## 2. Claims relating to security classification[5]

The Court turns first to the Plaintiff's claims regarding his security classification. The Amended Complaint alleges that, under "BOP custody-classification guidelines, [he] is a medium custody prisoner being maintained [at a high-security administrative prison]." He asserts that the Defendants have engaged in a conspiracy "to maintain [him] at an institution far

---

[5]In attempting to ensure that it has fully considered all of the claims intended to be raised by the Plaintiff, the Court has consulted the Amended Complaint (**# 100**, as supplemented **# 314**), which was the operative pleading when the Defendants' motion was filed; the Pretrial Order (**# 723**), into which the Amended Complaint thereafter merged; and the Plaintiff's own description in his deposition of the six claims he was intending to assert. *See Docket* # 645, Ex. 1.

There is not always a clear distinction among claims asserted by the Plaintiff, and assertions that appear in one claim often resurface in another, making it difficult to compartmentalize each claim completely. For example, the Complaint explains that Claim 1 entails the Defendants acting "in furtherance of unlawful and unconstitutional violations predicated on the behavior in Claims 2 & 3."

In an effort to bring some order to the claims, the Court has grouped the claims into general categories, based on the types of factual assertions made in the Plaintiff's pleadings.

about his security score." He contends that the Defendants have done so out of religious bias against him.  Treating the Plaintiff's pleadings liberally, the Court also considers whether the facts set forth below would support a substantive or procedural Due Process claim as well.

Until 2006, classification of inmates in the BOP was governed by BOP Program Statement 5100.07.  As of September 12, 2006, that Program Statement was amended, and the currently operative version is Program Statement 5100.08.  Both Program Statements provide that an inmate's security classification is reviewed on at least an annual basis, if not more frequently due to intervening events.  The purpose of the classification review is to determine what level of supervision is appropriate for the inmate, and, in turn, what in what type of facility he should be housed.  The regulations set forth more than a dozen factors to be considered, such as the severity of the inmate's offense, his criminal history score, his age and education level, history of drug or alcohol abuse, etc.  Each factor directs that a certain number of points be assigned based on the inmate's circumstances – *e.g.* a low criminal history score might result in 0 or 2 points being assessed, while a higher criminal history score might result in as many as 8 or 10 points being assessed.  The point scores for each factor are totaled, yielding an overall number.  Separately, the BOP determines whether certain "public safety factors" are present for a given inmate – factors such as whether the inmate has more than 20 years remaining on his sentence, whether he is a member of a disruptive group, whether he has a prior escape attempt, etc.  Once an inmate's score is calculated and his public safety factors, if any, are assigned, the BOP consults a table to determine the inmate's security level.  Under Program Statement 5100.08, an inmate with 16-23 points is considered to be a "medium security" inmate if he has no public safety factors, and a "high security" inmate otherwise.  An inmate with 24 or more

points is automatically considered a "high security" inmate.  Under the older version of the Program Statement, 15 or more points placed the inmate in a "high security" classification (although factors and points were attributed differently under the prior Program Statement than under the current version).

The Defendants have tendered the affidavit of Jack Fox, Associate Warden at ADX.  Mr. Fox states that, since 2003, the Plaintiff's classification score has consistently placed him in the "high security" category, making ADX an appropriate facility for him.  Mr. Fox states that in 2004, under the prior version of the Program Statement, the Plaintiff's score was 21 points, well over the "high security" threshold of 15 points.  In June 2006, the score was recalculated and the Plaintiff had 16 points, still in a "high security" classification.  The Plaintiff's status was again reviewed in November 2006, under the current version of the Program Statement, and his score was calculated to be 20 points, plus at least two public safety factors (a lengthy sentence left to serve and a high severity offense), resulting in a "high security" classification (although without the public safety factors, his point total would have made him eligible for a medium security facility).  The Plaintiff's status was reviewed again in March 2008, when the BOP concluded he had at least 25 points plus both the "sentence length" and "greatest severity offense" factors, again resulting in a "high security" classification.  Another review was conducted in March 2009, and again had at least 24 points plus the public safety factors.  Thus, the Defendants contend that the Plaintiff has always been appropriately assigned to a high security facility like ADX.

The Plaintiff offers two contentions in response: that he calculated his own scores on several occasions and they yielded a "medium security" score, and that Defendant Fenlon's

answers to interrogatories admitted that the Plaintiff's security score in August 2007 made him eligible for a "medium security" facility. *Docket #* 658 at 1-2.

The Court notes that, with regard to the first contention, the Plaintiff offers nothing but the conclusory assertion that his score was sufficient to place him in the "medium" category. With one exception, he offers nothing to indicate whether his dispute concerns the BOP's interpretation of the Program Statement's methodology, the correctness of the data the BOP relied upon in calculating his score, simple arithmetic errors by the BOP, etc. Without elaboration on the reasons why he believes the BOP's calculations are inaccurate, the Plaintiff's response on this point is nothing more than a conclusion; it is the functional equivalent of saying nothing more than "the BOP is wrong." Because the Plaintiff bears the burden of proof on this factual issue, his failure to come forward with anything more than conclusory assertions of error in the calculation of classification scores fails to demonstrate that there is a genuine dispute of fact requiring trial on this point. *Fisher v. Mullin*, 213 Fed.Appx. 698, 701 (10th Cir. 2007) (unpublished), *citing Ledoux v. Davies*, 961 F.2d 1536, 1537 (10th Cir. 1992) (conclusory allegations are insufficient to put a material fact in dispute"); *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1237 (10th Cir.2004).

The only instance in which the Plaintiff's affidavit gives any hint of the specific basis upon which he disagrees with the BOP is his assertion that his "public safety factor expired in August 2007," making him eligible for a medium security designation thereafter. The Court assumes that this contention refers to the "sentence length" factor. (The "severity of offense" factor requires that an inmate be housed in at least a "low security" facility, but cannot elevate an inmate's security level beyond that.) The "sentence length" factor is present when an inmate has

14

more than 30 years left to serve on his sentence. From his contention that the factor "expired" in

2007, the Court understands the Plaintiff to be arguing that his remaining sentence fell below 30

years during this period.[6] Without that sentence length factor, his 20 point score in his last

classification would thus make him eligible for a medium security institution. However, this

argument is merely theoretical, as the next time the Plaintiff was formally classified, he had a

base score of 25, and certain enhancements brought that score to 27. Because his score was now

about 24 points, he was subject to "high security" classification regardless of whether any public

safety factors were present. Thus, the mere fact that, for a short period of time, the Plaintiff was

theoretically eligible for a lower classification level,[7] the record reflects that he was not formally

reclassified at this time, and when his classification <u>was</u> formally reconsidered, he

unambiguously remained at a "high security" level.

The Plaintiff's remaining contention on this point is that Defendant Fenlon admitted that

the Plaintiff was eligible for medium security classification in his answers to the interrogatories

in this case. The Defendants attach Mr. Fenlon's interrogatory response to their reply, and it

unambiguously states that Mr. Fenlon calculated that the Plaintiff was subject to high security.

Mr. Fenlon was asked "when [the Plaintiff's] public safety factor expired in August 2007, why

didn't you submit paperwork for his transfer?". Mr. Fenlon responds that, when the next review

---

[6]A review of cases involving the Plaintiff indicates that the Plaintiff was initially
sentenced to life imprisonment in 2004 for involvement in a prison murder. That sentence was
vacated on appeal in 2005 and the matter was remanded for resentencing. In or about early
2007, the Plaintiff was resentenced to a term of 30 years, which was affirmed by the 3d Circuit.
*U.S. v. Georgacarakos*, 229 Fed.Appx. 189, 190 (3d Cir. 2007) (unpublished).

[7]The Court does not understand the Plaintiff to raise any claims contending that he should
have received a formal reclassification upon the expiration of his public safety factor.

was conducted in March 2008, "Program Statement 5100.08 had become effective and the Plaintiff's criminal history points had increased based on the information in the 2004 Pre-Sentence Report (PSR). When re-scored, the Plaintiff still scored as a High security inmate." In his sur-reply, the Plaintiff again insists that Mr. Fenlon's interrogatory responses "admitted that Plaintiff's security level was medium in August 2007 to March 2008[, and] Fenlon's rationalization [in his response] is false: [Program Statement] 5100.08 replaced 5100.07 in October 2006, not October 2007." (Emphasis omitted).

It is unnecessary for the Court to address these contentions point-by-point. It is sufficient to note that, even if the Plaintiff's score would have qualified him for medium security designation between August 2007 and March 2008, it is undisputed that he was not re-scored during that time period, and he has failed to come forward with evidence refuting Mr. Fox's assertion that, when re-scored in March 2008, the Plaintiff continued to qualify for high security.

Because the Court finds that there is no genuine dispute of fact on this point, and the Plaintiff's classification scores warranted high security housing throughout the time period at issue here, the Court need not conduct a searching analysis of the elements of various possible constitutional claims that could be asserted by the Plaintiff, whether they sound in religious discrimination, Due Process, or otherwise. The Plaintiff's security classification throughout the time period at issue was consistent with the directives of the applicable BOP Program Statements, and thus, absent a challenge to the constitutionality of the Program Statement's classification scheme itself – a challenge the Court does not understand the Plaintiff to make – the Plaintiff's assignment to a high security facility cannot be said to have violated any of his constitutional rights.

3. Claims relating to religious discrimination

The Plaintiff appears to assert three potential claims that relate to alleged religious discrimination. First, he appears to contend that the Defendants impermissibly considered his religion (Paganism) or otherwise discriminated against him because of his religion when making security classification decisions. To the extent the preceding discussion does not adequately dispose of this contention, the Court also notes that the Defendants have put forth an affidavit stating that an inmate's religion is not a factor considered in security classification scoring. Program Statement 5100.07 and 5100.08 bear this out, as neither contains a mechanism for assigning point scores based on religion. Accordingly, this contention is patently without merit.

Second, the Plaintiff also contends that certain Muslim inmates were sent to ADX as a result of the same conduct that prompted his reassignment there,[8] but that the Muslims eventually obtained security classification scores allowing them to be transferred out to a medium security facility while he remains at ADX. The Court understands the Plaintiff to contend that this was a violation of his constitutional guarantee of Equal Protection under the 14th Amendment.[9] The Defendants contend that this claim is barred by the statute of limitations

_____

[8]The Plaintiff was involved in the murder of a fellow inmate. He contends that certain Muslim inmates took umbrage at that murder and, in retaliation, murdered another inmate.

[9]The Plaintiff also purports to assert this claim under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.* As relevant here, that statute provides that the Government "shall not impose a substantial burden on the religious exercise of" an institutionalized person, such as a prison inmate. 42 U.S.C. § 2000cc-1. Upon a showing by the inmate that his religious exercise has been burdened, the Government is required to show that the burden being imposed furthers compelling governmental interest and is the least restrictive means of doing so. *Id.*
Any RLUIPA claim premised upon the Muslim inmates receiving more beneficial treatment than the Plaintiff because of his religious exercise is essentially conterminous with his Equal Protection claim. To establish that the differential treatment he received compared to the

17

and, in any event, is disproved by the undisputed fact that security classification decisions do not take into account an inmate's religion.

Neither party has significantly developed the factual content of this claim. The Defendants provide no specific detail on the issue, other than the repeat that classification decisions do not include an assessment of an inmate's religion. The Plaintiff – who, admittedly, has an outstanding discovery request on this point – offers no particular details, other than to assert that the Muslim inmates were sent to ADX for the same reasons he was, that they were transferred out of ADX at an unspecified time,[10] and that they had higher classification scores than he does, although he again offers no specifics as to the time frame he is addressing or the means by which he purports to know that the Muslim inmates' classification scores were higher than his.

To establish an Equal Protection claim, the Plaintiff must show: (i) that similarly-situated individuals were treated differently; and either (ii) if differential treatment was based on a suspect classification or fundamental right, that it was not supported by a compelling

_____

Muslim inmates was based on his religious exercise, the Plaintiff must show that he was similarly-situated to the Muslims in all other material respects. (Otherwise, the premise that he received differing treatment because of his religion evaporates.) Should he do so, the differential treatment would be considered to intrude upon a fundamental right, thus requiring a showing by the Defendants that such treatment was the least restrictive way of meeting a compelling governmental interest – precisely the same test as would be applied in a RLUIPA clam. *See Hobbie v. Unemployment Appeals Com'n.*, 480 U.S. 136, 140-41 (1987) (burdens on religious exercise subject to strict scrutiny).

[10]The Amended Complaint appears to allege that the Muslims began leaving ADX as early as 2003, and the Defendants premise their statute of limitations argument on this point. Given the lack of meaningful factual development on this issue – such as identification of the dates upon which the last of the Muslim inmates left ADX, which in turn would suggest the accrual of the Plaintiff's Equal Protection claim – the Court declines to address the limitations argument at this time.

governmental interest, or (iii) if the differential treatment was not based on a suspect classification or fundamental right, the differential treatment was not justified by a rational connection to a legitimate state interest. *Kleinsmith v. Shurtleff*, 571 F.3d 1033, 1047 (10th Cir. 2009). The Court has some doubt that, even if he were to obtain the discovery he seeks, he would be able to establish the first element.[11] In this context, to show that the Muslim inmates were treated more favorably, the Plaintiff would have to show, at a minimum, that the Muslim inmates had total classification scores at least as high as his own and, to the extent that public safety factors can modify the result dictated by scores alone, that the Muslim inmates had similar or more severe public safety factors.

The Plaintiff contends in his affidavit that the Muslim inmates had higher classification scores than he did, but this assertion is suspect for several reasons. First, and most importantly, it is simply a conclusion, and thus, not sufficient to create a genuine issue of fact sufficient to prevent summary judgment. Second, the Plaintiff provides no explanation as to how he obtained personal knowledge of the Muslim inmates' custody scores. Assuming that he is not successful in obtaining official BOP records of those scores through discovery, he has failed to come forth with evidence that would indicate that his conclusions about those scores are reliable. At best, one might assume that the Plaintiff gathered the necessary data to calculate the Muslim inmates'

---

[11]At this point, the Court does not speculate as to what evidence either side would come forward with concerning the other element. *But see Fisher v. Oklahoma Dept. of Corrections*, 213 Fed.Appx. 704, 711 (10th Cir. 2007) (unpublished) (noting that state inmate classification system entailed consideration of numerous subjective factors in addition to objective ones, thus making it "implausibl[e]" that there would be no relevant differences between the plaintiff inmate the inmates he compared himself to in Equal Protection claim, and affirming grant of summary judgment despite inmate's outstanding discovery request for records relating to other prisoners).

scores from talking to them, but to the extent the Plaintiff relies upon their answers for the truth of the matters asserted, the hearsay rule would likely prevent him from admitting those answers and the results derived therefrom. *See generally Johnson v. Weld County, Co.*, ___ F.3d. ___, 2010 WL 430914 (10th Cir. Feb. 8, 2010) (evidence tendered in opposition to summary judgment motion need not be in a <u>form</u> that would be admissible at trial, but the underlying substance of the evidence must be such that, if tendered in proper form, it could be admitted); Fed. R. Evid. 802. Third, as discussed above with regard to the Plaintiff's calculation of his own score, it is clear that the Plaintiff and the BOP do not calculate scores the same way. Thus, even if the Plaintiff had the correct data regarding the Muslim inmates' circumstances (or obtained their actual classification scores through discovery), it is still not clear that the Plaintiff's own calculations of their scores and his own would be sufficiently reliable to be admissible; if the Plaintiff cannot show that his calculations conform to the Program Statement's method for determining a classification score, his calculations would be irrelevant and inadmissible.

On the record currently before the Court, the Defendants would be entitled to summary judgment on the Equal Protection claim, as the Plaintiff has come forward with nothing more than a conclusory assertion that he and the Muslim inmates were similarly-situated. Thus, the Court provisionally grants summary judgment to the Defendants on this claim. However, in deference to the Plaintiff's outstanding discovery request for more information concerning the inmates' classification records, the Court will vacate this ruling if the Magistrate Judge grants the Plaintiff's motion to compel production of the Muslim inmates' classification records. In that circumstance, the Defendants may, within 30 days of making the production directed by the Magistrate Judge, file a new summary judgment motion in light of the newly-produced

information.  If, on the other hand, the Magistrate Judge denies the Plaintiff's motion to compel, the record before this Court for purposes of this motion would be unchanged, and in that circumstance, for the reasons explained above, the Court's provisional grant of summary judgment to the Defendants will be final.

The third ground upon which the Plaintiff might be said to assert a claim of religious discrimination involves an event in August 2006, discussed more fully in the discussion of excessive force claims.  The Plaintiff alleges that such incident occurred when he protested the imminent destruction of his religious property by refusing to return to his cell and by disobeying orders to submit to restraints.  Prison staff eventually forcefully subdued the Plaintiff, and he was convicted of a disciplinary violation for refusing to obey an order.  That disciplinary conviction had future ramifications, including increasing his point total for future classification decisions and his ability to complete the ADX "step-down program," through which he might earn a transfer to a less-restrictive facility.  The Plaintiff appears to contend that these consequences constitute retaliation against him for the exercise of his First Amendment rights.  *See Docket #* 314 at 1-3.

The Defendants do not squarely address this claim in their motion – perhaps failing to give the *pro se* Amended Complaint as broad a reading as this Court does. The Court finds that such a claim is not cognizable under the facts shown in the record.  To establish a claim for First Amendment retaliation, the Plaintiff must show: (i) that he engaged in constitutionally-protected activity; (ii) that the Defendants took an action that would chill a person of ordinary firmness' willingness to engage in that activity; and (iii) that the Defendants actions were substantially motivated by the Plaintiff's protected conduct.  *McBeth v. Himes*, ___ F.3d ___, 2010 WL

762189 (10th Cir. Mar. 8, 2010), *citing  Nielander v. Bd. of County Comm'rs,* 582 F.3d 1155, 1165 (10th Cir. 2009).  Here, the Plaintiff cannot establish the first element.  To be constitutionally-protected, a person's activity must, at a minimum, be lawful; a person who commits an unlawful act, even with the most noble of First Amendment intentions, can nevertheless be punished for that unlawful act.  *See generally Nielander v. Board of County Comm'rs.,* 582 F.3d 1155, 1165 (10th Cir. 2009) (if plaintiff's statements constituted threats of violence, they were not constitutionally-protected).  Here, the Plaintiff's conduct in refusing to return to his cell and refusing to submit to restraints when ordered were violations of prison disciplinary rules, and thus unlawful, even if he engaged in those actions with First Amendment intentions.  Had the Plaintiff chosen to exercise his First Amendment rights by engaging in some form of protest that fell within prison rules, his conduct would be protected.  But by choosing to disobey rules as his form of protest, the Plaintiff forfeited any constitutional protections for his actions, and is thus susceptible to whatever proper punishment ensued.  Thus, to the extent the Plaintiff's religious discrimination claims are predicated upon the August 2006 incident, the Defendants are entitled to summary judgment.

### 4.  Claims related to conditions of confinement

The Plaintiff asserts one or more[12] claims that are premised upon the conditions of

_____

[12]A recurring theme in the Amended Complaint is an allegation by the Plaintiff that the "general population" conditions at ADX are no different than conditions in the disciplinary housing units, and that even "general population" conditions at ADX amount to solitary confinement.  Thus, although he is housed in a nominal "general population" unit, he alleges that he is entitled to the same Due Process protections that inmates assigned to solitary confinement or disciplinary segregation would receive.  It also explains the Plaintiff's reference in his supplement to the Amended Complaint that he "get[s] a year extra solitary confinement time, automatically, when an incident report is written, regardless of how minor the charges."  The "solitary confinement" being referenced is synonymous with incarceration in any unit of ADX;

confinement at ADX being unconstitutional of themselves (*i.e.* violating his 8th Amendment protection against cruel and unusual punishment) or sufficient to give rise to liberty interests that were infringed (*i.e.* violating his Due Process rights).

An inmate making a direct challenge to conditions of confinement under the 8th Amendment, must show that, judged by contemporary standards of decency, the conditions either "involve the wanton and unnecessary infliction of pain," that they are "grossly disproportionate to the severity of the crime," or that they entail "serious deprivation of basic human needs." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Prison officials must provide adequate food, clothing, shelter, and medical care to inmates, and take reasonable measures to guarantee those inmates' safety. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). In certain circumstances, adverse conditions that, of themselves, would not rise to unconstitutional levels can combine to create a mutually-reinforcing effect that renders them unconstitutional – for example, low cell temperatures coupled with the failure to issue blankets, or small cell sizes coupled with inadequate opportunities for out-of-cell exercise. *Wilson v. Seiter*, 501 U.S. 294, 304-05 (1991).

An inmate contending that the conditions of confinement give rise to a constitutionally-protected liberty interest must show that the conditions constitute an "atypical and significant hardship" when compared to the ordinary incidents of prison life. *Wilkinson v. Austin*, 545 U.S. 209, 223 (2005). In *Wilkinson*, the Court found that a combination of factors rose to that level: a prohibition on "almost all human contact," including cell-to-cell conversations among inmates;

---

the "extra year" is a reference to the fact that any disciplinary infraction in a 12-month prevents an inmate from completing the "step-down program," requiring him to start that program over again before a transfer from ADX becomes possible.

24-hour illumination of cells; 1 hour per day of indoor exercise in a small room; restrictions continuing indefinitely, subject only to annual review; and denial of eligibility for parole consideration. *Id.* at 223-24. The Court was particularly persuaded by the last two factors – the indefinite duration of the restrictions and the lack of parole eligibility – finding that the remaining factors, "save perhaps for the especially severe limitations on all human contact . . . likely would apply to most solitary confinement facilities." *Id.* at 224.

Mr. Fox's affidavit describes in some detail the conditions of confinement experienced by the Plaintiff in the General Population unit of ADX.[13] He states that inmates' cells are approximately 100 square feet, they are afforded 10 hours of out-of-cell recreation per week in outdoor wire-fenced areas that allow conversation between inmates, they receive meals in their cells, they receive television and radio programming on various subjects through a television and radio in their cells,[14] they may receive 5 visitors and two 15-minute social telephone calls per month (in addition to calls and visits relating to legal matters), they have effectively[15] unlimited ability to send and receive written correspondence with friends and family (subject to monitoring

---

[13]The record reflects that the Plaintiff was housed in the Control Unit of ADX from 1998 to 2003. Mr. Fox's affidavit does not address restrictions placed on inmates in the Control Unit, but even assuming that those conditions rise to the level of unconstitutionality, any claim by the Plaintiff arising out of conditions he was subjected to in 2003 and earlier would be barred by a 2-year statute of limitations applying to his *Bivens* claims. *See e.g. Appleby-El v. Catron*, 84 Fed.Appx. 9, 10 (10th Cir. 2003) (unpublished), *citing Industrial Constructors Corp. v. United States Bureau of Reclamation*, 15 F.3d 963, 968 (10th Cir. 1994) *and* C.R.S. § 13-80-102.

[14]The Plaintiff asserts that he was denied a radio up until an unspecified date in 2005. To the extent he intends to assert this as a separate claim in some capacity, it would likely be barred by the two-year statute of limitations as well.

[15]Inmates are provided with a specified allotment of writing paper and envelopes per month, and inmates with funds available in their commissary account may purchase additional supplies.

of incoming and outgoing mail for security concerns and restrictions on types of items that inmates can receive through the mail), and have daily or weekly contact with various members of the prison staff, such as medical and mental health staff, case managers, education staff, and corrections officers.

The Plaintiff does not directly challenge any of these representations; he simply places a slightly different gloss on them. He contends that he has "not had social contact with another human being at the ADX since 2005," but does not elaborate. Thus, it is not clear whether he is contending that ADX staff is denying him the opportunity to have monthly visitors and social phone calls, or whether he is simply stating that no one has chosen to visit or call him. Largely consistent with Mr. Fox's affidavit regarding recreation, the Plaintiff states that he receives "0-2 hours [of recreation] per day alone in a room or a kennel-type cage." The Plaintiff implicitly admits Mr. Fox's statement that inmates may converse with one another during recreation periods, although he complains that "whom I am placed in the recreation yard [with] . . . is entirely arbitrary," thus making him disinclined to have conversations with other inmates. Because the Plaintiff does not materially dispute Mr. Fox's contentions, the Court finds that the actual conditions at ADX are not in material dispute. With that in mind, the Court turns to the question of whether the effectively undisputed conditions give rise to constitutional relief.

The Court finds that the conditions of confinement described here neither rise to the level of an 8th Amendment violation, nor do they constitute an atypical and significant hardship sufficient to give rise to a liberty interest. The 10th Circuit has previously considered an essentially identical recitation of the conditions at ADX and concluded that they do not violate the 8th Amendment. *Ajaj v. U.S.*, 293 Fed.Appx. 575, 582-84 (10th Cir. 2008) (unpublished)

(finding elements such as "lockdown 23 hours per day in extreme isolation," "indefinite confinement," and "limited ability to exercise outdoors" did not, individually or in concert, amount to an 8th Amendment violation). The same result is warranted here. The conditions at ADX are undoubtedly extremely restrictive. However, they are not so extreme or inhumane that they could be deemed a significant departure from contemporary standards of decency, applied to the prison context. The Plaintiff's primary complaint seems to be the lack of social opportunities, but it is undisputed that ADX policies entitle him to have several social visits and phone calls per month, and the opportunity to converse daily with other inmates (albeit not of his choosing) in the recreation yard. These conditions are common to many high-security prisons around the country, and can hardly be said to violate contemporary standards of decency.

Nor does the Court find that these restrictions constitute an "atypical and significant hardship" when compared to the normal incidents of prison life, such that the Plaintiff would have a liberty interest that is implicated by his incarceration at ADX. The 10th Circuit considered this question as it related to restrictions on inmates at ADX in *Jordan v. Federal Bureau of Prisons*, 191 Fed.Appx. 639, 651-52 (10th Cir. 2006) (unpublished). There, the court was presented with evidence that an ADX inmate received access to the commissary, institutional programming, mental health and medical services, the law library, five hours of recreation per week, visitors, etc. *Id.* at 644. The court observed that, when assessing the "atypical and significant hardship" standard of the 14th Amendment, the relevant comparison is "inmates in the same segregation [level] or those in the general prison population." *Id.* at 651. The court found that the evidence established that individuals in ADX "experience restrictions and conditions comparable to those of general population inmates [in the adjacent high-security U.S.

Penitentiary], with the exception of one less social call per month and possibly seven hours less recreation time per week [depending on whether the general population inmate is eligible for group recreation or not]." *Id.* at 652. The court recognized that *Wilkinson* was "instructive" on the issue, but found that Mr. Jordan's conditions of confinement "were obviously not as onerous [as Wilkinson's]" on three grounds: (i) that he admittedly had frequent contact with staff; (ii) that the length of his sentence was not affected by the administrative detention; and (iii) that his confinement at ADX was not indefinite, but rather, was limited to the duration of an investigation into a prison murder in which Mr. Jordan was involved (an investigation that took approximately 5 years). *Id.* at 652.

*Jordan* is instructive here, as the Plaintiff is housed at the same facility and subject to largely the same restrictions as Mr. Jordan was.[16] Admittedly, the Defendants here, unlike those in *Jordan*, did not submit evidence regarding the restrictions that apply to general population inmates in other high-security facilities, but that omission is not dispositive. Most importantly, the burden of proving that the restrictions on him are "atypical" belongs to the Plaintiff, and thus, the failure to establish the restrictions on inmates at other high-security restrictions works to the Plaintiff's detriment, not the Defendants. The only evidence of restrictions in the record are those imposed on the Plaintiff, and in the absence of a comparator, the Court is unable to find that the Plaintiff has shown that those restrictions are "atypical" in high-security facilities. Moreover, cases such as *Jordan* aptly demonstrate that restrictions such as those at ADX, while harsh, are not so shocking to the conscience that they can be deemed to be "atypical and

---

[16]The record here reflects that the Plaintiff receives twice as much out-of-cell recreation time as Mr. Jordan did.

significant" of their own accord. The only characteristic that distinguishes the circumstances here from those presented in *Jordan* is the allegedly "indefinite" assignment of the Plaintiff to ADX, whereas Mr. Jordan's assignment there was limited to the time necessary to complete the murder investigation. But this is a distinction without a difference. As discussed below, the Plaintiff is not at ADX "indefinitely," and there is ample evidence in the record that he can obtain a transfer out of ADX upon completing the "step down program." In short, the Plaintiff "holds the keys" to his own release from ADX, and thus, one can hardly call his assignment there "indefinite." Thus, the Court finds that the conditions do not give rise to a protected liberty interest such that the Plaintiff could maintain a claim under the 14th Amendment.[17]

Accordingly, the Court finds that the conditions the Plaintiff is subjected to as part of his confinement at ADX do not give rise to any cognizable constitutional deprivation.

5. Mental health claims

As an adjunct to his claims relating to the conditions of confinement, the Plaintiff raises what appear to be two claims relating to the effect that such confinement has on inmates, such as himself, with mental health issues. He contends that extended confinement in a solitary cell with limited social contact violates BOP regulations prohibiting isolation of inmates who are prescribed antidepressants, citing 28 C.F.R. § 549.40 and BOP Program Statements 5212.07 and

---

[17]The Plaintiff may also be alleging, either as part of his conditions of confinement claims or separately, a claim based on the fact that he is not given access to a typewriter. The undisputed evidence in the record indicates that BOP facilities generally allow inmate access to typewriters, but ADX ceased doing so after several instances in which inmates used parts of the typewriters to fashion into weapons. The Plaintiff offers only conclusory assertions that this is untrue, and thus, the Court finds it undisputed that inmate access to typewriters poses a security threat. As discussed below with regard to the ban on certain softcover publications, all that is necessary is for the Defendants to show that a restriction on typewriters is reasonably related to a legitimate penological interest. They have done so.

6010.01.  In addition, the Court understands him to make a more generalized claim that he has received inadequate mental health treatment from the Defendants, a situation exacerbated by the stressful and isolating conditions of his confinement.

Turning first to the contention that his highly-isolated housing assignment violates BOP policies prohibiting such assignments for inmates diagnosed with depression or taking psychotropic medication, the Court construes this claim as arising under the Due Process clause: that is, that the Plaintiff claims that the regulations entitle him to a certain type of housing assignment (or, more accurately, entitle him to avoid a certain type of housing assignment), and that the Defendants have deprived him of that entitlement without notice or cause.  An essential component of any Due Process claim is an entitlement conferred by law, one which constrains or limits the discretion of BOP officials in a particular situation.  *Teigen v. Renfrow*, 511 F.3d 1072, 1078 (10th Cir. 2007).  Thus, the Court's first inquiry is what, if any, entitlements do BOP policies and regulations create for the Plaintiff in this area.

28 C.F.R. § 549.40 simply states that "Psychotropic medication is to be used only for a diagnosable psychiatric disorder or symptomatic behavior for which such medication is accepted treatment."  Program Statement 5212.07 is entitled "Control Unit Programs," and states that mental health staff will conduct evaluations of inmates in Control Unit assignments every 30 days.  In addition, it states that "Inmates requiring prescribed psychotropic medication are not ordinarily housed in a Control Unit."  Program Statement 6010.01 governs "Psychiatric Treatment and Medication, Administrative Safeguards For."  The Program Statement concerns safeguards governing the distribution of psychotropic medication to inmates, either on a voluntary or involuntary basis (*e.g.* providing for informed consent for voluntary prescriptions

and Due Process protections where the medication is to be administered involuntarily), but makes no reference whatsoever to any restriction on how inmates taking such medication should be housed.

At best, only Program Statement 5212.07 refers to housing assignments for inmates with psychotropic prescriptions, and it does so only in advisory terms – that Control Unit assignments are "not ordinarily" appropriate.[18]  However, this regulation does not <u>prevent</u> prison officials from housing inmates needing psychotropic drugs in the Control Unit where mental health staff deem it appropriate.  As noted above, the hallmark of a protected liberty interest is its non-discretionary nature; once a regulation affords discretion to a prison official, an inmate cannot claim a liberty interest in the outcome.  *Teigen*, 511 F.3d at 1078.  Thus, because there is no outright prohibition on housing inmates with psychotropic medications in Control Units – or, here, "general population" units equivalent to Control Units, as the Plaintiff alleges – the Plaintiff has failed to establish that he has a liberty interest in avoiding such assignments, and thus, fails to establish any Due Process claim in this respect.

The Court then turns to the Plaintiff's more generalized claim that he is receiving inadequate mental health and other medical care as a result of his incarceration.[19]  Claims of

---

[18]The Court assumes, without necessarily finding, that the antidepressants and other drugs prescribed to the Plaintiff fall within the definition of "psychotropic," and that, as he contends, his "general population" housing assignment is functionally equivalent to a "Control Unit" assignment.

[19]See e.g. Docket # 100 at 17-20 ("Defendants . . . have also shown deliberate indifference to Plaintiff's serious physical deterioration . . . including an abnormally rapid loss of vision and hearing . . . and sensory deprivation associated with prolonged isolation"; "Defendants have been totally indifferent to his various medical needs, keeping him indefinitely in solitary confinement . . . while suffering from clinical depression from same; keeping him in isolation on 4 psychotropic drugs; keeping him in isolation despite significant sensory loss").

inadequate prison medical treatment are analyzed under the 8th Amendment's "deliberate indifference" standard. To establish such a claim, an inmate must show: (i) that he suffered from a serious medical need – that is, one that has been diagnosed by a medical provider as requiring treatment or one which even a lay person would easily recognize as requiring medical attention; and (ii) the Defendants were subjectively aware of that need and that failing to treat it would pose an excessive risk to the inmate's health or safety, but nevertheless elected to delay or deny treatment for it. *See e.g. Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000). Allegations of negligent or even incompetent treatment are not sufficient. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

In support of their motion, the Defendants tender the affidavit of Paul Zohn, a staff psychologist at ADX. Based upon his own knowledge and review of the Plaintiff's medical records at ADX, Mr. Zohn describes an extensive course of medical and mental health treatment the Plaintiff has received. For example, the Plaintiff had a mental health consultation in March 2004, during which he reported symptoms of depression, insomnia, nightmares, and homicidal ideation, and was restated on a course of Paxil, an antidepressant. In July 2004, he met with a psychiatrist who determined that the Plaintiff was not experiencing psychotic symptoms. In a February 2006 evaluation, the Plaintiff reported increasing depressive symptoms, and his medication regimen was changed from Effexor to Prozac. He underwent periodic assessments over the next several months, and while he reported low mood and low energy, the psychiatric staff determined that there was no significant change in his mental status. He reported in an October 2007 consultation that he had ceased taking his medications, believing them to be the cause of a hand tremor and tinnitus, and refused both medication and further treatment. In

November 2007, at the Plaintiff's request, he was restated on Welbutrin, an antidepressant that he believed had been effective in the past. He was seen again by mental health staff in January 2008, where he continued to report depressive symptoms and requested an increase in his Welbutrin. In a June 2008 consultation, he complained of difficulty sleeping and requested to discontinue the Welbutrin. Mental health staff agreed and starting him on Paxil. After a July 2008 consultation, the Paxil was discontinued and replaced with Celexa. In a December 2008 consultation, he denied having symptoms of depression but reported "a feeling of impending doom," resulting in a prescription for Abilify. The Plaintiff's response to the Defendants' motion does not dispute any of these assertions.

It is readily apparent that the Plaintiff has received consistent, ongoing, and frequent treatment for his mental health issues, including consultations in which certain sensory issues – *e.g.* his reporting hand tremors and tinnitus – were addressed and where his medication regimen was continually considered and adjusted as necessary. To the extent the Plaintiff suffers from other maladies, neither the record nor the Plaintiff's response to the motion indicates that he advised the medical staff of these concerns during his frequent consultation sessions, and thus, the Defendants cannot be found to be deliberately indifferent to mental or physical health issues of which they were unaware. Thus, the Court finds that the Plaintiff has failed to demonstrate either the objective or subjective components of an 8th Amendment claim premised upon deliberate indifference to medical needs, and the Defendants are entitled to summary judgment on that claim.

6. Use of force

The Amended Complaint asserts a claim for use of excessive force in violation of the 4th

and 8th Amendments, regarding an incident in summer 2006.  The Plaintiff alleges that, upon learning that prison staff intended to destroy a manuscript that he had written and which he believed to be permissible religious property, he "took the last recourse of engaging in nonviolent civil disobedience to prevent the heinous deed.  To wit, he went into an open 'common' area during his time to shower and refused to return to his cell . . . [Certain Defendants] not only engaged two fully-armored and armed riot control squads . . . but also used non-lethal firearms and chemical agents," allegedly in violation of 28 C.F.R. § 552.20-23 and Program Statement 5566.06.  He contends that, after having been subdued, he "was then subjected to two days of physical torture by being 'four-pointed' to a slab of concrete" in violation of Program Statement 5566.06.  The Plaintiff states, several times, that he was "completely cooperative and nonaggressive"  The Amended Complaint also relates, albeit in far less detail, a second event occurring in March 2007, apparently in the vicinity of the Plaintiff's cell.  He contends that "although he was neither armed nor barricaded and gave no indications whatsoever of violence," the Defendants "used a machine to subject him to 'pepper spray'."

The Plaintiff was permitted to supplement **(# 314)** the Amended Complaint, and recites additional instances in which he alleges he was subjected to excessive force.  He states that in July 2008, he "threw his food trays on the range in protest over not receiving recreation."  He states that "despite not being armed or barricaded, [he] was shot with a less-than-lethal firearm."  He further asserts that, a few weeks later, he "blocked his inside grill because his legal mail had been opened and confiscated."  Once again, he asserts that he "was not armed or barricaded, but was shot in the back with a less-than-lethal firearm."  Thereafter, he states that he was "left in restraints as punishment . . . for 48 hours."

33

Excessive force claims in the prison setting are generally analyzed under the 8th Amendment's prohibition against cruel and unusual punishment. *Wilkins v. Gaddy*, ___ U.S. ___, 2010 WL 596513 (Feb. 22, 2010) (slip op.); *see also Smith v. Cochran*, 339 F.3d 1205, 1210 n. 2 (10th Cir. 2003). The "core judicial inquiry" as to an excessive force claim is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically to cause harm." *Id.* This, in turn, requires proof of two elements: (i) a use of force "objectively harmful enough to establish a constitutional violation"; and (ii) that "the officials acted with a sufficiently culpable state of mind." *Serna v. Colo. Dept. of Corr.*, 455 F.3d 1146, 1152 (10th Cir. 2006); *Smith*, 339 F.3d at 1212. The first element examines the objective level of force applied in the particular factual context and in light of contemporary standards of decency; the second element turns on whether the force was applied "in a good-faith effort to maintain or restore discipline or malicious and sadistically for the very purpose of causing harm." *Id.* With this standard in mind, the Court turns to the parties' evidentiary submissions on this point.

The Defendants have submitted the affidavit of M. Bier, a member of the Special Investigative Staff at ADX, responsible for investigating incidents involving the use of force. Ms. Bier states that in August 2006, the Plaintiff refused to leave the common area and return to his cell. The Warden authorized a Use of Force Team to be dispatched to address the situation. The Plaintiff refused orders by the Team to submit to restraints and orders to get down on the ground and drop an unknown item that was in his hand. Aware that the Plaintiff had a "prior history of combative behavior," including "repeated incidents requiring a Use of Force Team to extricate him from his cell," the Team members believed that escalation of force was necessary to resolve the situation. They discharged two bursts of pepper spray and four rounds of non-

lethal "stinger" ammunition.  Nevertheless, the Plaintiff continued to refuse orders to go to the

ground, and Team members then physically closed in on him, took him to the ground, and placed

restraints on him.  He was then taken to a decontamination shower to remove any residual pepper

spray and then taken to the Special Housing Unit, where he was examined by a physician's

assistant.  The assistant diagnosed and treated the Plaintiff for several contusions of the head,

torso, and legs.  The Plaintiff was then placed in four-point soft restraints.  Ms. Beir's affidavit

does not discuss the incident further.[20]

Ms. Bier also discusses another incident in which force was used, occurring in April

2007.  He states that on that date, the Plaintiff had placed some mail on the inner grill of his cell

in such a way that the grill could not be closed.  Staff instructed the Plaintiff to remove the mail,

but her refused to do so.  Staff then instructed the Plaintiff to come to the front of the cell and

submit to being placed in hand restraints, which he again refused. The Warden again approved a

---

[20]The Defendants also submit excerpts from the Plaintiff's deposition that describe certain aspects of this incident in greater detail.  The Plaintiff testified that, both before and after arrival of the Use of Force Team, he refused commands to submit to handcuffs until he was promised the return of his religious material.  When the Use of Force Team approached him, he jumped over a railing to the floor below the tier where the incident was occurring.  The Use of Force Team discharged the pepper spray towards the Plaintiff at this point, then proceeded down the stairs to the floor where the Plaintiff had jumped.  The Plaintiff climbed on a table and jumped back up to a railing, where he pulled himself back up to the original starting point.  The Use of Force Team then returned to the original floor and discharged the non-lethal ammunition at the Plaintiff.  Although some of the ammunition struck him, he jumped down to the floor below again.  At that point, he heard inmates in the nearby cells coughing from the pepper spray that had been discharged and elected to give himself up.  The Plaintiff concedes that throughout this period, the Team members were constantly instructing him to stop and get down on the floor, but he states that he refused to do so.  He explained that, in his opinion, forcing the Team to use weapons frequently results in them also performing the act that the inmate wanted them to perform the act that the resisting inmate demanded in the first place; in other words, "if I made them [use weapons against me], they would not destroy my property, because they always like to say afterwards, See, all you had to do was ask."

Use of Force Team who arrived on the scene and, after "confrontation avoidance" techniques were unsuccessfully attempted, discharged two bursts of pepper spray towards the Plaintiff. Approximately 12 seconds later, the Plaintiff agreed to submit to hand restraints, and was thereafter taken to a decontamination area to remove any remaining pepper spray residue.

Regarding the July 2008 incidents, Ms. Bier states that, after throwing his food tray (which struck a prison staffer), the Plaintiff refused to submit to restraints for escort to the Special Housing Unit. A Use of Force Team was again dispatched and gave to orders to the Plaintiff to submit to the use of restraints, but the Plaintiff refused. The Use of Force Team then discharged a single round of non-lethal ammunition at the Plaintiff, after which the Plaintiff agreed to submit to restraints. The Plaintiff was placed in ambulatory soft restraints and taken to the Special Housing Unit. He was examined and treated there by a physician's assistant who diagnosed a bruise on the Plaintiff's chest.

Finally, the second July 2008 incident proceeded along similar lines. Ms. Bier contends that the Plaintiff "became disruptive and barricaded the inner grill of his cell open." After refusing staff orders to submit to restraints, a Use of Force Team arrived and gave two additional commands to submit, both of which the Plaintiff refused. Upon being struck with two rounds of non-lethal ammunition, the Plaintiff submitted, was placed in soft ambulatory restraints, and was examined by a physician's assistant who diagnosed a bruise on the Plaintiff's upper back.

The Plaintiff's response to the Defendants' motion does not discuss, much less refute, any of the statements made in Ms. Bier's affidavit, and thus, the Court treats those facts as undisputed.

Turning first to the objective question of whether the Plaintiff has identified one or more

36

uses of force that could be considered excessive in light of the circumstances presented and contemporary standards of decency, the Court first looks to the BOP regulations cited by the Plaintiff – 28 C.F.R. § 552.20-23 and Program Statement 5566.06.  Such regulations, while not dispositive of the question, are nevertheless instructive, since force that exceeded that which a particular regulation would permit in the circumstances might reasonably be considered "excessive," while a use of force consistent with BOP regulations would likely not be considered to violate contemporary standards of decency.

28 C.F.R. § 552.20 provides that use of force is permitted "only as a last alternative after all other reasonable efforts to resolve a situation have failed."  Prison staff are permitted to use "only the amount of force necessary to gain control of the inmate . . . ."  Physical restraints are permitted as "necessary to gain control of [a violent or destructive] inmate," or where "precautionary restraints" are used the assist in "the movement and transfer of inmates," such as escorting an inmate to a Special Housing Unit.  28 C.F.R. § 552.22 sets forth several principles governing the use of force.  Among them, prison staff should first attempt to obtain the inmate's voluntary cooperation before resorting to force, force may not be used to punish, and only the amount of force necessary to obtain control of the inmate is permitted.  That regulation also states that restraints may be used to an inmate to the extent necessary to achieve physical control and should remain on until the inmate's self-control is regained.  Finally, 28 C.F.R. § 552.23 describes "confrontation avoidance techniques" to be employed before fore is used.  The ranking security official and a designated mental health professional shall "confer and gather pertinent information about the inmate and the situation" and shall "attempt to obtain the inmate's voluntary cooperation and, using the knowledge they have gained about the inmate and the

incident, determine if the use of force is necessary." Although the Plaintiff did not specifically cite to additional regulations, the Court also observes that 28 U.S.C. § 552.25 provides that chemical agents or non-lethal weapons may be used where an inmate "is armed and/or barricaded," where he "cannot be approached without danger to self or others," or where "delay in bringing the situation under control would constitute a serious hazard to the inmate or others." 28 U.S.C. § 552.25. Program Statement 5566.06 essentially repeats these provisions, with certain additional commentary.

Having reviewed the regulations cited by the Plaintiff, the Court finds that each incident at issue here involved a use of force that was entirely consistent with the regulations discussed above. It is undisputed that in each incident, the Plaintiff refused repeated staff instructions to submit to restraints, thus demonstrating attempts by prison staff to obtain the Plaintiff's voluntary cooperation. Because the Plaintiff was resistant to staff instructions, it is evident that the use of force became necessary to obtain the Plaintiff's cooperation. In each instance, the Use of Force team again attempted to obtain the Plaintiff's voluntary cooperation, thus satisfying the requirement that force not be used until confrontation avoidance techniques had been attempted. Because the Plaintiff continued to remain resistant, it thus became clear that force would be necessary to bring the Plaintiff under control. In all four instances, chemical or non-lethal means were used. 28 C.F.R. § 552.25 provides that such use is permitted when the inmate "cannot be approached without danger to self or others." In the August 2006 incident, which took place in the common room, the record indicates that Use of Force Team members were concerned about approaching the Plaintiff because of his "prior history of combative behavior." Under these circumstances, a conclusion that approaching the Plaintiff could present a physical danger to

team members, and thus, the use of non-lethal agents was consistent with BOP regulations.  The remaining three incidents all appear to occur when the Plaintiff was inside his cell.  In at least one of these incidents, the Use of Force Team specifically concluded that the Plaintiff was "barricaded" inside his cell, thus permitting non-lethal agents to be used in that situation as well.  As for the remaining two instances, one can readily conclude that, given the small size of ADX cells and the Plaintiff's history of combative behavior, attempts to involuntarily remove the Plaintiff from close quarters could very well result in physical danger to Team members or the Plaintiff.  Thus, use of non-lethal agents in these instances was consistent with the regulations as well.

All told, the Court cannot say that the circumstances described by Ms. Bier objectively point to a level of force that could be considered excessive under the circumstances.  In each instance, the Plaintiff was, by his own admission, engaging in disruptive and non-compliant behavior.  In each instance, repeated efforts were made to obtain the Plaintiff's voluntary cooperation.  When those efforts failed, prison officials administered relatively small amounts of force against the Plaintiff, in each instance, limiting the amount of force used to that commensurate with the situation.  For example, where the Plaintiff was in the more open confines of the common room, a greater amount of force – both non-lethal ammunition and pepper spray – were used, whereas in the more close confines of his cell, only one agent was used, and only one or two uses were made before the Plaintiff submitted.  Finally, it is undisputed that the application of force ceased immediately upon the Plaintiff's submission.

Under these circumstances, the Court finds that the Plaintiff has failed to come forward with evidence that the use of force in any of the incidents was objectively excessive.  Moreover, the

Court also finds that the Plaintiff failed to show that any of the Defendants employing the force did so with a culpable state of mind – indeed, the Plaintiff makes no showing whatsoever on this point. Although the Court can sometimes infer an actor's state of mind from the amount of force used – *i.e.* if patently excessive force is employed, the Court can infer the person applying the force was not doing so in a good-faith effort to restore order – no such inference is warranted here where the amount of force used was relatively minimal, restrained, and brief. *Serna*, 455 F.3d at 1152.

Accordingly, the Court finds that the Defendants are entitled to summary judgment on the Plaintiff's excessive force claim.[21]

---

[21]The Court notes that, although the Amended Complaint contends that the excessive force claim was based, in part, on the Plaintiff's contention that he was placed in four-point restraints for 48 hours following the August 2006 incident, he does not elaborate on that contention in his summary judgment response. A party faced with a summary judgment motion may not simply rest on allegations contained in the pleadings, and must come forward with admissible evidence establishing each fact he intends to rely upon. *BancOklahoma Mort. Corp. v. Capital Title Co.*, 194 F.3d 1089, 1097 (10th Cir. 1999). Although the Court construes the Plaintiff's *pro se* pleadings liberally, the Court will not automatically deem every individual allegation in the Amended Complaint as if set forth by an affidavit in opposition to the summary judgment motion; to do so would be to disregard caselaw such as *BancOklahoma*.

Moreover, one might reasonably conclude that the Plaintiff elected to abandon certain specific allegations made in the Amended Complaint about being subjected to four-point restraints after having had an opportunity to engage in discovery on those issues. BOP regulations permit application of four-point restraints on inmates in limited circumstances, and require extensive supervision and documentation if such restraint continues for any significant length of time. *See* 28 C.F.R. § 552.24 ( requiring staff monitoring every 15 minutes, a review by a Lieutenant and an opportunity for the inmate to use the toilet every 2 hours, review by medical personnel every 4 hours, and notification of the BOP's Regional Director if such use continues beyond 8 hours). Moreover, use of restraints must be extensively documented. 28 U.S.C. § 552.27.

In light of this, the Court assumes that the Plaintiff's failure to assert in his response that the lengthy use of four-point restraints on him constituted an independent and sufficient basis for his excessive force claim reflects a conclusion that, after having had the ability to engage in discovery and review the Defendants' restraint documentation, his recollection of the duration or circumstances of the incident were incorrect. Indeed, when asked to discuss the incident during

7.  <u>Destruction of and restrictions on personal property</u>

The Plaintiff appears to assert two separate claims relating to personal property.  First, he alleges that the Defendants seized and destroyed a manuscript that he had written, which he contends was religious property he was permitted to possess.  Second, he alleges that BOP regulations limiting the ability of inmates to receive softcover books impermissibly infringes on his First Amendment rights.

As described in the Amended Complaint, the incident involving the destruction of the manuscript occurred in August 2006.  He contends that the Defendants "refuse[d] to recognize the Plaintiff's religious property <u>as</u> religious property, [and] fixated on the idea of destroying it in its totality."  The property in question is described as "thousands of pages of original research, art, and creative writing" that was "simply deemed unworthy of religious protection and thus, a lone bigot was allowed to destroy ten years of Plaintiff's work on a whim."  The Plaintiff contends that the destruction of his manuscript violated 28 C.F.R. § 548.16, 28 C.F.R. § 543.30, and Program Statement 5580.07.[22]  The Court assumes that the Plaintiff intends to assert that these actions deprived him of a property interest in the manuscript without substantive or procedural Due Process.

---

his deposition, the Plaintiff noted only in passing that "they handcuffed my hands and feet in four-point restraints," but, several questions later, was asked whether there was anything else to say about this incident, and he responded "no."  Thus, the Court deems the Plaintiff to have abandoned the more elaborate allegations in the Amended Complaint that he was kept in four-point restraints for two full days, etc.

[22]The Plaintiff makes reference to having completed the requirements to make a claim for the destroyed property under the Federal Tort Claim Act, 28 U.S.C. § 2675(a), and references what appears to be a case number for a lawsuit or administrative claim – "TRT-NCR-2006-05436" – but it is not clear what the outcome of this proceeding was.

The Defendants do not offer any significant factual submission regarding this claim. Rather, they offer only the legal defense that the Federal Tort Claims Act provides the exclusive remedy for claims arising out of torts committed by federal employees – *i.e.* claims for negligent or willful destruction of property – but that claims by inmates are barred by the doctrine of Sovereign Immunity. With regard to the former point, the Defendants point to 28 U.S.C. § 1346(b)(1), which provides that federal courts have jurisdiction over "claims against the United States, for money damages, . . . for injury or loss of property . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office." The Defendants contend that this Act constitutes a limited waiver of the United State's otherwise Sovereign Immunity from suit for claims arising out of the destruction of a person's property. The Defendants go on to point out that, notwithstanding this limited waiver of immunity, Congress has rescinded that waiver when the property is lost or destroyed as a result of actions by "law enforcement officials," including prison staff. 28 U.S.C. § 2860(c); *Ali v. Federal Bureau of Prisons*, 128 S.Ct. 831, 835-36 (2008).

The Plaintiff's response does not specifically address the Defendants' argument, nor does the Plaintiff offer any factual elaboration of this claim.[23]

28 U.S.C. § 2860(c) provides that the provisions of the Federal Tort Claims Act do not apply to any claim based on "the detention of any goods, merchandise, or other property by . . . any law enforcement officers." In *Ali*, the Supreme Court held that that statute included prison officials, such that the plaintiff inmate's claim for damages arising out of the loss of his personal

---

[23] At best, the Plaintiff's affidavit asserts only that "my religion stands, to this day, secretly classified as 'continuous white supremacist activities.'"

property by prison officials during a facility transfer was not actionable. 552 U.S. at 215-16. To the extent the Plaintiff asserts a claim for his destroyed property under the Federal Tort Claims Act, *Ali* would appear to be dispositive.[24]   However, a liberal construction of the Plaintiff's pleadings yields a contention that the claim is not simply one of negligent loss or destruction of property, but rather, a constitutional claim for willful destruction of his property without Due Process. The Defendants do not address the possibility of such a claim being asserted, leaving it to the Court to assess whether such a claim might lie.

In *Hudson v. Palmer,* 468 U.S. 517, 533 (1984), a state inmate alleged that prison officials intentionally destroyed his personal property during a shakedown of his cell. He brought claims under § 1983, sounding in deprivation of property without Due Process. The trial court dismissed the claim, finding that even if the inmate were correct, the availability of post-deprivation state tort remedies – *i.e.* a claim against the responsible official for conversion – prevented the conclusion that the officials' actions violated the Due Process clause. Drawing upon a prior ruling that <u>negligent</u> loss of an inmate's property by prison officials does not give rise to a Due Process claim, the Court extended that reasoning to situations involving the intentional <u>and</u> unauthorized destruction of an inmate's property by prison officials. *Id.* at 533, *citing Parratt v. Taylor*, 451 U.S. 527 (1981). The Court explained that its prior ruling in *Parratt* was premised upon the impracticability of the state providing a pre-deprivation remedy when property was lost or destroyed through negligence – *i.e.* in situations that were

---

[24]The Court in *Ali* noted that Congress has provided an administrative remedy for aggrieved inmates to claim small amounts of damages for lost property. 552 U.S. at 228 n.7.  31 U.S.C. § 3723(a)(1) provides that any federal agency may settle a claim for up to $1,000 arising out of damage to or loss of private property due to the negligence of a federal officer.

unintentional and unanticipated.  It found that same reasoning applicable to cases of intentional destruction of property where the destruction was an unauthorized act by a prison official, as the state would have no way of predicting when that might occur.  *Id.* at 533 ("the state can no more anticipate and control in advance the random and unauthorized intentional conduct of its employees than it can anticipate similar negligent conduct").  Thus, the Court held, "an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available."  *Id.* (emphasis added); *compare Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 435-36 (1982) (declining to extend *Parratt*'s rationale to situation in which the deprivation of property was not negligent or unauthorized, but occurred pursuant to an established state procedure).

   *Hudson* involved a state prisoner, but the 10th Circuit has applied it in situations involving federal prisoners as well.  In *Wilson v. U.S.*, 29 Fed.Appx. 495, 496-97 (10th Cir. 2002), a federal inmate alleged that prison staff "lost or misplaced" a number of books taken from his cell.  The trial court construed the inmate's complaint as raising a claim under the Federal Tort Claims Act, and proceeded to dismiss it on the grounds of the "law enforcement officer" exemption later addressed in *Ali*.  On appeal, the 10th Circuit affirmed, noting that characterizing the claim as one under the Tort Claims Act was necessary because the inmate had no ability to raise a *Bivens* claim sounding in Due Process in those circumstances.  *Id.* at 496.  To the extent the prison officials were alleged to have acted negligently, the 10th Circuit explained, the Due Process clause was not implicated, as it does not protect against negligent deprivations of property.  *Id.* at 496.  If, on the other hand, the inmate's claim could be construed as one alleging the intentional

44

destruction of his property, the court held that "the prison provided Wilson with an administrative remedy after the loss of his books,"[25] and this post-deprivation process was sufficient under *Hudson*. *Id.* at 496-97. The Court in *Wilson* did not address the apparent requirement in *Hudson* – that the intentional destruction must have been the rogue, unauthorized act of a prison official before a Due Process claim would be precluded; indeed, the court in *Wilson* made no mention whatsoever of whether it considered the inmate to be alleging that the prison official's actions were authorized or unauthorized.

The Court is unable to conclusively adjudicate the contours of any cognizable Due Process claim at this time. It appears, under *Hudson*, that the claim would turn on the question of whether the destruction of property was an unauthorized act by a prison official. If so, *Hudson* (and *Wilson*) would seem to compel a grant of summary judgment in favor of the Defendants; if not, the Court is aware of no authority that would preclude a *Bivens* Due Process claim against the responsible officials.

The Defendants construed the claim only under the Federal Tort Claims Act, and in that respect, they are correct that no such claim is cognizable here as a result of *Ali*. At the same time, the Defendants did not afford the Plaintiff's *pro se* pleadings the same broad reach that this Court does, and thus overlooked the possibility of a Due Process claim (substantive, procedural, or both) arising in these circumstances. Before the Court allows this claim to proceed to trial, the Court will allow the Defendants an opportunity to file a new summary judgment motion, if they

---

[25]*Wilson* does not specifically identify the contours of the suitable administrative remedy, but it is clear that it is not a claim under the Federal Tort Claims Act, as the 10th Circuit affirmed the trial court's finding that the "law enforcement official" exemption precluded an inmate suit under that Act.

so choose, to address the viability of a Due Process claim in these circumstances. Within 30 days of the date of this Order, the Defendants shall either file a new summary judgment motion addressing the viability of a Due Process claim premised upon the destruction of the Plaintiff's manuscript (and related personal property), or else file a notice with the Court that the Defendants believe that such a claim requires trial.

The second issue raised by the Plaintiff appears to be a substantive Due Process challenge to a prison regulation limiting the ability of inmates to receive certain softcover publications. As framed by the Plaintiff's Amended Complaint, this claim contends that in recent years, "a total restriction [was implemented prohibiting inmate receipt] of every book unless purchased retail by prisoners." He contends that "95% of all intellectual material is now prohibited under a contraband problem that does not and never has existed" as "BOP records show that contraband smuggled into penitentiaries via softcover books was trivial to the margin of nonexistence." He points out that in *Bell v. Wolfish*, 441 U.S. 520 (1979), the BOP "conceded that a ban on any but hard-cover books not received from a retailer constituted an exaggerated response to security concerns."

Assuming, for purposes of this motion, that the Plaintiff has a cognizable property interest in softcover reading material sent to him by persons other than retailers, the question presented is whether the BOP policies prohibiting his receipt of these materials violates his substantive Due Process rights. The substantive portion of the Due Process clause prohibits government entities from depriving persons of liberty or property for arbitrary and capricious reasons, or by means of conduct that shocks the conscience. *Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008). When a substantive Due Process claim challenges prison policies, the

inmate is required to show that the regulation "lacks a rational relationship to legitimate penological interests."  *Sperry v. Werholtz*, 321 Fed.Appx. 775, 778 (10th Cir. 2009) (unpublished), *citing Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

The Defendants indicate that the ban on softcover publications is embodied in Program Statement 5266.10.  It provides, as relevant here, that inmates at administrative institutions such as ADX "may receive softcover publications only from the publisher, from a book club, or from a bookstore."  The Program Statement permits an inmate to make application to his Unit Manager for an exception if "the publication is no longer available from the publisher, book club, or bookstore."  Ms. Bier's affidavit elaborates briefly on the reasons for this policy.  He explains that although the facility subjects incoming mail to x-ray scanning, contraband material sometimes contains contraband that is non-metallic or otherwise not detectible by x-ray review.  He points out that, despite the requirement that inmates obtain softcover publications directly from the publisher or a bookstore, ADX staff has still intercepted incoming publications from such sources containing, for example, heroin lodged in the spine of books, heroin affixed to the back of stamps, and prohibited magazines that were disguised as permitted ones by virtue of the cover of the permitted magazine being glued onto the cover of the prohibited one.  The Plaintiff's response to the motion does not address these contentions.

It is readily apparent to the Court that the ban on softcover publications from any source other than the publisher or a bookstore is rationally related to the legitimate penological interest in maintaining prison security by preventing the entry of contraband.  As Ms. Bier's affidavit points out, softcover publications provide a means to smuggle contraband into the facility in many ways that x-ray or even cursory visual inspection would be unable to readily detect.  The

BOP balances inmates' need to obtain such publications for educational or leisure reading against the need to ensure that publications entering the facility are likely to be free of contraband. It does so based on the reasonable assumption that legitimate publishers and bookstores would be least likely to jeopardize their businesses by including contraband in material sent directly to prisoners, and the assumption that tainted shipments could be readily investigated by contacting the established business that dispatched it; neither of those same salutary benefits are found when inmates obtain publications from unknown, and potentially untraceable, third parties. *Bell*, 441 U.S. at 549-50 (finding similar restriction on receipt of hardcover books constitutional).[26] Moreover, the policy contemplates exceptions where the desired material is not otherwise available from a publisher or bookstore, allowing the inmate to document that fact to his Unit Manager and perhaps obtain the desired publication. Under these circumstances, the Court cannot find that the BOP's policy is arbitrary and capricious, shocking to the conscience, or otherwise violative of the Plaintiff's substantive Due Process rights.

8. Step-down participation

The final major category of claims asserted by the Plaintiff are those relating to his participation in the step-down program at ADX. The supplement **(# 314)** to his Amended Complaint alleges that his August 2006 protest of the destruction of his religious property, *see* excessive force discussion *supra*, was later used against him when, in April [2008?], he became

_____

[26]The Plaintiff makes much of a passing comment in *Bell* that indicates that, as of 1979, the BOP intended to loosen its restrictions on inmate receipt of softcover publications. 441 U.S. at 549-50 ("petitioners have informed the Court that the Bureau proposes to amend the rule further to allow receipt of paperback books, magazines, and other soft-covered materials from any source"). The Court observes that the current Program Statement 5266.10 was issued in 2003, suggesting that the experiment attempted by the BOP in 1979 with regard to unlimited inmate access to softcover publications was concluded to be ill-advised and rescinded.

eligible to participate in ADX's "step-down program," completion of which permits an inmate to be transferred out of ADX to a less-restrictive facility. He contends that he "met all the requirements" of the step-down program, but that Defendant Wiley "denied him access for no other reasons than that he had protested the destructions of his religious property almost two years earlier." The Plaintiff deems this to be impermissible retaliation against him for the exercise of his First Amendment rights, as well as a deprivation of Due Process. (The latter contention apparently relates to an assertion that he complied with a requirement of the step-down program by not receiving a disciplinary write-up in 12 months, but that the Defendants nevertheless deemed him to be unsuccessful based on disciplinary write-ups preceding that 12 month period).

The Defendants do not address the substance of this claim. Rather, the move for summary judgment on it on the grounds that the Plaintiff filed a motion to supplement, seeking to add this claim, before he had fully completed the administrative exhaustion process. The Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), provides that an inmate shall not commence an action until he has fully exhausted available administrative remedies. The BOP maintains a four-step administrative remedy program that applies to all inmate grievances. 28 C.F.R. § 542.10 *et seq.* In summary, an inmate must file a written grievance with the local facility (on a "BP-9" form), appeal any denial of that grievance to a Regional Office (on a "BP-10" form), and appeal any denial from the Regional Office to the General Counsel (on a "BP-11" from). Once the General Counsel rules on the BP-11 appeal, the grievance is deemed exhausted. The Defendants acknowledge that the Plaintiff filed two grievances concerning his exclusion from the step-down program. However, they contend that he moved to supplement **(# 314)** the

Amended Complaint to add step-down program claims on October 6, 2008, but that his BP-11 appeals were not denied by the General Counsel until October 28, 2008 and November 28, 2008. Thus, the Defendants argue, the claims were unexhausted at the time they were first asserted in this suit.

This is not the classic situation in which an inmate utterly failed to exhaust the administrative grievance process with regard to his claims. Rather, it is the more unusual situation where the inmate filed his claims prematurely, while simultaneously pursuing the administrative remedy scheme to exhaustion. The Defendants do not contend that the Plaintiff's attempted exhaustion was deficient in any substantive respect, but only that it was approximately 30-60 days early.

A few courts have recognized that dismissal under the PLRA in these circumstances is unwarranted. In *Underwood v. Wilson*, 151 F.3d 292, 296 (5th Cir, 1998), the court observed that, because the exhaustion requirement was non-jurisdictional, courts could excuse a premature filing where "dismissal would be inefficient and would not further the interests of justice or the Congressional purposes behind the PLRA." There, as here, an inmate had prematurely filed claims while simultaneously exhausting them administratively. By the time the case was presented to the court, the inmate had completed the administrative process. In such circumstances, the 5th Circuit recognized that "dismissing the suit and requiring him to refile is inefficient."[27] Similar logic applies here. Where an inmate has commenced a suit before

---

[27]In *Underwood*, the District Court had dismissed the claims as unexhausted. The 5th Circuit, although recognizing the inefficiency in dismissing claims that could be refiled, also acknowledged that dismissal could serve to deter other inmates from similar premature filings, and thus, the District Court's dismissal could be affirmed for that reason.

exhausting his administrative remedies, any dismissal of that suit on those grounds should be without prejudice. *Gallagher v. Shelton*, 587 F.3d 1063, 1068 (10th Cir. 2009). Thus, dismissal of the step-down claims on exhaustion grounds will serve little purpose: the Plaintiff is a prolific filer, and one would readily expect that he would again move to assert the step-down program claims in this suit, and given the fact that the Defendants have been aware of those claims since October 2008 and had every opportunity to address them substantively, the Court would be inclined to grant such a motion, notwithstanding the advanced age of this case or the expiration of deadlines in the Scheduling Order.[28] Thus, the Court declines to grant summary judgment to the Defendants on this claim, notwithstanding the Plaintiff's premature filing.

Nevertheless, as with the claim relating to the destruction of religious property, the Court is not inclined to set this case for trial without granting the Defendants the opportunity to test the substantive merit of the Plaintiff's supporting evidence. Accordingly, should the Defendants seek to address this claim substantively in a new summary judgment motion, they may do so in accordance with the schedule set forth above. In the alternative, the Defendants may concede that the claim presents a genuine issue of fact and request that the Court simply set the matter for trial.

9. Conclusion

For the foregoing reasons, the Court grants the Defendants' summary judgment motion in part. The Defendants are entitled to summary judgment on any of the Plaintiff's claims relating

---

[28]Were he to make such a motion, the Court would likely grant it, notwithstanding the age of this case and the expiration of the Scheduling Order's deadline for amendment of pleadings. The Defendants have known of the supplemental claims since their filing in October 2008 and had every opportunity to address them in discovery. Thus, they could show no prejudice from the Court re-allowing those claims into the litigation.

to his security classification level, the conditions of his confinement at ADX, deliberate indifference to his medical needs, the alleged use of excessive force against him, and the policy banning receipt of softcover publications from certain sources.

The Court provisionally grants summary judgment to the Defendants on the Plaintiff's Equal Protection claim relating to the transfer of the Muslim inmates, but that ruling will be vacated and the parties will be permitted to address that claim in more detail should the Magistrate Judge grant the Plaintiff's Motion to Compel relating to that issue.

The Court denies summary judgment without prejudice, and permits the Defendants to file a new summary judgement motion, with regard to the Plaintiff's substantive and/or procedural Due Process claim(s) relating to the destruction of his religious property and his claim relating to his participation in the step-down program.

### D. Remaining pending motions

Having limited the possible scope of future proceedings in this case to the issues discussed above, the Court now turns to the remaining pending motions, and examines them only to the effect that they are not rendered moot by the foregoing discussion.

Docket # 678 is the Plaintiff's Motion for a Preliminary Injunction, requesting that the Defendants "apply Program Statement 5100.07 equitably . . . to end the constitutional abuses in this case [or] at a minimum, the Defendants should be forced to explain the disparate treatment of the Plaintiff." The Magistrate Judge has recently recommended (**# 796**) that this motion be denied. Pursuant to the preceding discussion and ruling on summary judgment, the Court denies the motion, albeit for different reasons than the Magistrate Judge recommends. To the extent this motion is premised upon errors made in the Plaintiff's own security classification, it is

denied as moot for the reasons discussed above. To the extent it implicates the Equal Protection claim, the Court has provisionally granted summary judgment to the Defendants on that claim, pending a ruling by the Magistrate Judge on the outstanding discovery request. Accordingly, the motion is, at this time, denied as moot. Should the Court later vacate that provisional grant, the Defendant can refile a motion seeking appropriate relief.

Docket # 679 is a Motion in Limine by the Plaintiff concerning the admissibility of certain evidence. The Court does not address such matters prior to trial. The motion is denied as premature, and may be raised orally when the subject evidence is addressed during trial.

Docket # 716 is a Rule 72(a) Objection by the Plaintiff to an Order (**# 696**) by the Magistrate Judge denying the Plaintiff's request for a court-ordered medical examination of him. The Court construes this claim to relate primarily to the Plaintiff's mental health claims, which are no longer part of this litigation. Thus, this Objection is overruled as moot.

Docket # 732 is a Rule 72(a) Objection by the Plaintiff to an Order (**# 719**) of the Magistrate Judge denying the Plaintiff's request for service of a subpoena. The evidence sought to be obtained relates to the excessive force claims, which are no longer part of this litigation. Thus, the Objection is overruled as moot. Similarly, the Court overrules as moot Docket # 747, a Rule 72(a) Objection by the Plaintiff that also relates exclusively to the excessive force claims.

Docket # 742 is a motion by the Plaintiff to amend the Pretrial Order (**# 723**) approved by the Court. The Plaintiff seeks to identify certain additional exhibits he wishes to present and witnesses he intends to call. A party seeking to modify a Pretrial Order must show that denial of the request would constitute "manifest injustice." Fed. R. Civ. P. 16(e); *Davey v. Lockheed Martin Corp.*, 301 F.3d 1204, 1208 (10th Cir. 2002). Typically, that will require a showing that

the other side can cure any prejudice resulting from the modification, that the modification will not result in disruption of the case schedule or trial, that the modification is not the result of bad faith by the movant, and that the movant timely sought the modification. *See Koch v. Koch Industries, Inc.*, 203 F.3d 1202, 1222-23 (10th Cir. 2000). The Plaintiff's motion provides nothing more than a recitation of the matters he wishes to add, and thus, fails to make the required showings. The Court also notes that some of the matter sought to be included – *e.g.* videotapes from the use of force incidents – are no longer relevant in this action. Accordingly, the motion is denied.

Docket # 760 is a motion by the Plaintiff to consolidate this action with *Georgacarakos v. Watts*, D.C. Colo. Case No. 09-cv-01658-ZLW. That case was dismissed by this Court and the dismissal was affirmed by the 10th Circuit. Accordingly, this motion is denied as moot.

Docket # 774 is a *habeas* petition, requesting that the Court review the Plaintiff's underlying criminal conviction pursuant to 28 U.S.C. § 2241. The motion is denied for several reasons. To the extent the Plaintiff seeks to obtain *habeas* relief, he must do so by commencing a proper *habeas* action and use the appropriate form petition available from the Clerk of the Court. Moreover, the Court has severe doubts that such a petition would be timely in any event, as the Plaintiff's conviction became final as early as 2005 when it was affirmed by the 3d Circuit. *See U.S. v. Georgacarakos*, 229 Fed.Appx. 189, 190 (3d Cir. 2007) (reciting history); *Georgacarakos v. U.S.*, 546 U.S. 989 (2005) (denying petition for cert. from order affirming conviction). Finally, the underlying conviction is irrelevant to any of the issues that might remain in this action – *i.e.* the destruction of her personal property and claims relating to participation in the step-down program. Accordingly, this motion is denied.

Docket # 781 purports to be a motion by the Plaintiff pursuant to Fed. R. Evid. 702, but in actuality is a proffer by the Plaintiff of an intent to call experts and the tender of two expert reports pursuant to Fed. R. Civ. P. 26(a)(2). The designation of experts and tender of reports, coming long after the close of discovery, is untimely, and the Plaintiff offers no explanation as to why this designation could not have been made earlier. Moreover, the proffered testimony – concerning the Plaintiff's "Paganism and outreach work in the 'racialist' movement" – is irrelevant to the remaining claims in this action. Accordingly, the motion, to the extent it seeks to reopen discovery or to permit late disclosure of experts, is denied.

Docket # 786 is a request by the Plaintiff to set a trial date. Because the Court anticipates supplemental summary judgment motions that may affect the scope of this case and the time required for a trial, the Court declines to set a trial date at this time. The Plaintiff may request that a trial date be set after the Court has addressed any supplemental summary judgment motions. This motion is denied.

Docket # 787 is the Plaintiff's Rule 72(a) Objection to a decision by the Magistrate Judge to postpone a settlement conference. The Court finds that the Magistrate Judge's decision is not clearly erroneous or contrary to law, and the Objection is overruled.

Docket # 791 is a filing by the Plaintiff captioned as a "Supplemental Rule 706(d) Motion." He requests that the Court appoint his two tendered experts at the Court's expense pursuant to Fed. R. Evid. 706. Because the Court has already deemed the Plaintiff's designation of those experts untimely and irrelevant, this motion is denied.

Docket # 797 is a request by the Plaintiff that the Court schedule a Final Pretrial Conference. The Court previously conducted such a conference on June 4, 2009 **(# 671)**. The

Plaintiff's belief that this case is otherwise "in limbo" is unfounded. The motion is denied.

Docket # 804 is a request by the Plaintiff, directed to the Clerk of the Court, to provide him with a copy of the Magistrate Judge's Recommendation on Plaintiff's Second Supplemental Motion for Preliminary Injunction. The Clerk of the Court shall send a copy of that Recommendation to the Plaintiff. However, the Court notes that it is unnecessary for the Plaintiff to file Objections to that Recommendation, as the Court has independently denied the underlying motion for the reasons discussed above.

## CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment (**# 645**) is **GRANTED IN PART**, and **DENIED IN PART.** To the extent the Defendants wish to submit a new motion for summary judgment on the issues identified herein, they shall do so within 30 days of the date of this Order. For the reasons set forth herein, the Court **DENIES** the motions or, where appropriate, **OVERRULES** the Objections found at Docket **# 678, 679, 680, 716, 732, 742, 747, 749, 760, 767, 769, 771, 774, 781, 786, 787, 791, 792,** and **797**. Docket **# 773**, the Plaintiff's Motion to Compel, is **REFERRED** to the Magistrate Judge for consideration in the first instance. In conjunction with Docket **# 804**, the Clerk of the Court shall mail a copy of Docket #796 to the Plaintiff.

Dated this 30th day of March, 2010

**BY THE COURT:**

Marcia S. Krieger
United States District Judge

56