## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 07-cv-01712-MSK-MEH

PETER GEORGACARAKOS,

     Plaintiff,

v.

WILEY,
CRUZ,
JAVERNICK,
COLLINS,
SUDLOW,
MADISON,
CHURCH,
LT. JOHN DOE,
HEIM,
MARTINEZ,
FENLON,
PUGH,
HOOD,
HERSCHBERGER,
BUREAU OF PRISONS,
DEPT. OF JUSTICE, and
UNITED STATES,

     Defendants.

---

## DEFENDANTS HEIM, JAVERNICK, MARTINEZ AND WILEY'S SECOND MOTION FOR SUMMARY JUDGMENT

---

Defendants Heim, Javernick, Martinez and Wiley (collectively "Defendants"),[1] in their individual and official capacities, move for summary judgment on the remaining claims raised against them in the amended complaint, Doc. 100, as supplemented by Doc. 314.

---

[1] The Court has dismissed the remaining claims against Defendants Cruz, Hershberger, Hood, Pugh, the Bureau of Prisons ("BOP"), the Department of Justice ("DOJ"), and the United States.  Doc.

In its Opinion and Order Granting, in Part, Summary Judgment, the Court granted the defendants summary judgment on all of Plaintiff's claims with two exceptions.  Doc. 810 at 56.  Specifically, the Court denied without prejudice Defendants' motion for summary judgment as to "Plaintiff's substantive and/or procedural Due Process claim(s) relating to the destruction of his religious property and his claim relating to his participation in the step-down program."  Doc. 810 at 52.  The claim related to Plaintiff's participation on the Step-Down Program consists of two theories:  procedural due process and First Amendment retaliation.  *Id.* at 49.  The Court allowed Defendants to file a new motion for summary judgment on these claims within 30 days from the filing of the Court's Opinion.  *Id.* at 52.

Defendants are entitled to summary judgment on the remaining claims for several reasons.  First, Plaintiff cannot show that his denial of participation in the Step-Down Program by Defendant Wiley constitutes a deprivation of due process or that it was in retaliation of his exercise of his First Amendment rights.  Second, he cannot establish that Defendants violated his due process rights in destroying his manuscript in 2006.  Third, to the extent that he brings these claims under *Bivens*, there are no *Bivens* remedies for the remaining claims.  Fourth, even assuming that a *Bivens* remedy existed for each of the remaining claims, Defendants are entitled to qualified immunity because they did not violate his rights, or the rights at issue are not clearly established.  Accordingly, Defendants' motion should be granted and the remaining claims be dismissed.

---

810.  In previous proceedings, the Court also dismissed the claims against Defendants Dr. Denney, Michael Nalley, John Baxter, Harrell Watts and Harley Lappin.  Doc. 264.

## CLAIMS AND DEFENSES UPON WHICH JUDGMENT IS SOUGHT

I. **THE COURT SHOULD GRANT SUMMARY JUDGMENT ON THE REMAINING CLAIMS.**

 A. **Plaintiff's Claim Regarding Placement in the Step-Down Program does Violate Procedural Due Process.**

In this claim, Plaintiff alleges that Defendant Wiley refused to allow him to participate in the Step-Down Program even though he met the qualifications, and that such refusal violates his procedural due process rights afforded by *Wilkinson*.  Doc. 314 at 13; *see also* Doc. 810 at 49. Plaintiff conclusorily asserts that Defendant Wiley's sole reason for the denial was that Plaintiff did not have "more than a year [of] 'clear conduct.'"  Doc. 314 at 13.  Plaintiff seeks damages against Defendant Wiley and injunctive relief.  Doc. 100 at 40.

  1. **Burden of Proof and Elements of Claim.**

An inmate has a "heavy burden" to establish that a prison restriction violates his constitutional rights.  *See Shaw v. Murphy*, 532 U.S. 223, 226 (2001) (noting that a prisoner challenging a restriction must "overcome the presumption that the prison officials acted within their 'broad discretion'" and the court must address "the question whether [the inmate] has satisfied this heavy burden").

"The Due Process Clause guarantees due process only when a person is to be deprived of life, liberty, or property."  *Chambers v. Colo. Dep't of Corrections*, 205 F.3d 1237, 1242 (10th Cir. 2000) (quotations omitted).  Plaintiff bears the burden of establishing a procedural due process violation. "A person alleging that he has been deprived of his right to procedural due process must prove two elements: that he possessed a constitutionally protected liberty or property interest such that the due process protections were applicable, and that he was not afforded an appropriate level of process." *Zwygart v. Bd. of County Comm'rs*, 483 F.3d 1086, 1093 (10th Cir. 2007) (internal quotations omitted);

*see also Kentucky Dept. of Corrections v. Thompson*, 490 U.S. 454, 460 (1989) (setting forth elements of procedural due process violation).

For federal prisoners, a liberty or property right exists only where an interference with that right would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). "The Due Process Clause standing alone confers no liberty interest in freedom from state action taken 'within the sentence imposed.'" *Id.* at 480 (quoting *Hewitt v. Helms*, 459 U.S. 460, 468 (1983)).

The Due Process Clause does not protect an inmate against transfer from one institution to another: "[t]hat life in one prison is much more disagreeable than in another does not in itself signify that a [Fifth] Amendment liberty interest is implicated when a prisoner is transferred to the institution with the more severe rules." *Meachum v. Fano*, 427 U.S. 215, 225 (1976). "Transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence." *Hewitt*, 459 U.S. at 468.

In *Wilkinson v. Austin*, 545 U.S. 209 (2005), the Supreme Court found that the Ohio State Penitentiary ("OSP") did impose an atypical and significant hardship in relation to the ordinary incidents of prison life in light of the special conditions of confinement there. *Id.* at 224. The Supreme Court requires, in conducting an inquiry into whether the conditions of confinement impose an atypical and significant hardship, "identifying the baseline from which to measure what is atypical and significant in any particular prison system." *Id.* at 223. The Court held that a liberty interest was implicated because of the conditions of solitary confinement plus two additional factors: (1) placement was for an indefinite duration reviewed only annually; and (2) placement disqualified an otherwise eligible inmate from parole consideration. *Id.* at 224. "While any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context." *Id.*

After *Wilkinson*, the Tenth Circuit has held that four non-dispositive factors should be used to determine the baseline comparison required by *Wilkinson*, which is used in answering the question of whether a liberty interest is implicated:

> (1) the segregation relates to and furthers a legitimate penological interest, such as safety or rehabilitation; (2) the conditions of placement are extreme; (3) the placement increases the duration of confinement, as it did in *Wilkinson*; and (4) the placement is indeterminate (in *Wilkinson* the placement was reviewed only annually).

*Estate of DiMarco v. Wyo. Dept. of Corr.*, 473 F.3d 1334, 1342 (10th Cir. 2007). The *DiMarco* Court noted that "any assessment must be mindful of the primary management role of prison officials who should be free from second-guessing or micro-management from the federal courts." *Id.* Applying these standards, the Tenth Circuit held that the purpose in segregating the prisoner, a transgendered male; the prisoner's conditions of confinement in administrative segregation; the duration of her confinement; and the regular reevaluations of her confinement "do not weigh in favor of finding that DiMarco has an enforceable liberty interest." *Id.* at 1344.

The Supreme Court made clear in *Wilkinson* that, once at OSP, inmates were not entitled to a full complement of due process procedures, such as an adversary hearing or the right to present witnesses. The Court explained: "Where the inquiry draws more on the experience of prison administrators, and where the State's interest implicates the safety of other inmates and prison personnel, the informal, nonadversary procedures set forth in *Greenholtz* … and *Hewitt v. Helms* … provide the appropriate model." *Wilkinson*, 545 U.S. at 228-29 (citing *Hewitt v. Helms*, 459 U.S. 460 (1983); *Greenholtz v. Inmates of Neb. Penal & Correctional Complex*, 442 U.S. 1 (1979)). Because the Court cited *Greenholtz* and *Hewitt*, it is instructive to look at the procedures the Court upheld in those cases.

*Hewitt* makes especially clear that *some* notice and *some* opportunity to be heard are constitutionally sufficient, even if those rights are very limited. *Hewitt* involved a prisoner's procedural due process challenge to his confinement in administrative segregation pending an

investigation into misconduct charges against him.   459 U.S. at 462, 464.   The Supreme Court

approved the prison's process to review the prison officials' decision, even though it was informal

and not an adversary proceeding.   The Court held that it was sufficient that the inmate received

notice of the charges and an opportunity to present his side of the story, either in writing or orally:

> We think an informal, nonadversary evidentiary review sufficient both for
> the decision that an inmate represents a security threat and the decision to confine an
> inmate to administrative segregation pending completion of an investigation into
> misconduct charges against him. *An inmate must merely receive some notice of the charges*
> *against him and an opportunity to present his views to the prison official charged with deciding*
> *whether to transfer him to administrative segregation. Ordinarily a written statement by the inmate*
> *will accomplish this purpose, although prison administrators may find it more useful to permit oral*
> *presentations in cases where they believe a written statement would be ineffective.* So long as this
> occurs, and the decisionmaker reviews the charges and then-available evidence
> against the prisoner, the Due Process Clause is satisfied.

*Id.* at 476 (emphasis added).   While the Court sanctioned this informal process, it required prison

officials to "engage in some sort of period review of the confinement of such inmates.   This review

will not necessary require that prison officials permit the submission of any additional evidence or

statements." *Id.* at 477 n.9.

*Greenholtz* approved similarly cursory proceedings in the context of a procedural due process

challenge associated with parole review proceedings, despite the fact that parole proceedings

obviously implicate a far greater liberty interest (*i.e.*, freedom from confinement) than a mere

transfer between prisons.   442 U.S. at 3-4.   The parole procedures at issue were as follows.   To

determine whether a prisoner was eligible for parole, the parole board conducted an initial "informal

hearing" in which no evidence was introduced; the inmate was interviewed; and the board

considered any written statements from the inmate.   *Id.* at 4.   If the board determined that parole

was inappropriate after this informal hearing, it denied parole, informing the inmate of the reasons

why and making recommendations to correct deficiencies.   *Id.*   The Supreme Court sanctioned this

non-adversarial procedure, rejecting arguments that a formal hearing was required for every inmate

or that the board should be required to provide a statement of the evidence it relied upon:

At the Board's initial interview hearing, the inmate is permitted to appear before the Board and present letters and statements on his own behalf. He is thereby provided with an effective opportunity, first, to insure that the records before the Board are in fact the records relating to his case; and, second, to present any special considerations demonstrating why he is an appropriate candidate for parole. Since the decision is one that must be made largely on the basis of the inmate's files, this procedure adequately safeguards against serious risks of error and thus satisfies due process.

Next, we find nothing in the due process concepts as they have thus far evolved that requires the Parole Board to specify the particular "evidence" in the inmate's file or at his interview on which it rests the discretionary determination that an inmate is not ready for conditional release. The Board communicates the reason for its denial as a guide to the inmate for his future behavior. To require the parole authority to provide a summary of the evidence would tend to convert the process into an adversary proceeding and to equate the Board's parole-release determination with a guilt determination.

*Id.* at 15-16 (footnote and citations omitted).

In sum, the Supreme Court made clear in *Wilkinson* (and in *Greenholtz* and *Hewitt*) that when the prison administrator's decision draws upon his or her experience, the inmate only is entitled to informal, non-adversarial procedures under the Due Process Clause. Such procedures include some notice, an opportunity to be heard by the decision-maker, and some chance for periodic review of the confinement. In *Hewitt*, in particular, the Supreme Court sanctioned this informal process, requiring prison officials to "engage in some sort of period review of the confinement of such inmates. This review will not necessarily require that prison officials permit the submission of any additional evidence or statements." 459 U.S. at 477 n.9.

In its Opinion on Defendants' previous motion for summary judgment, this Court found that the conditions of confinement at the ADX do not impose "an 'atypical and significant hardship' when compared to the normal incidents of prison life, such that the Plaintiff would have a liberty interest …." Doc. 810 at 26. The Court noted that *Jordan v. Fed. Bureau of Prisons*, 191 F. App'x 639 (10th Cir. 2006), was "instructive … as the Plaintiff is housed at the same facility and subject to largely the same restrictions as Mr. Jordan was." Doc. 810 at 27. Thus, the Court concluded that

the conditions of confinement at the general population of the ADX "do not give rise to any cognizable constitutional deprivation." *Id.* at 28.

### 2.    Elements that Plaintiff Cannot Establish.

Plaintiff cannot establish that he has been deprived of a liberty interest by his continued confinement at the ADX when Defendant Wiley denied him admission to the Step-Down Program for two reasons.[2]  First, because the conditions of confinement in the Step-Down Program units (J-, K- and D/B Units) at the ADX are less restrictive than in the general population and because Plaintiff lacks a protected liberty interest in his confinement at the ADX, it follows that there is no constitutional depravation when he was not placed in the Step-Down Program. *Boultwell v. King*, 399 F.3d 1203, 1215 (10th Cir. 2005) (stating that there is no procedural due process violation when there is no liberty interest implicated).  Second, placement in, or advancement through, the Step-Down Program is a classification decision, for which no liberty interest attaches, as to whether he can safely function in a less-restrictive unit without posing a risk to institutional security and order; to the safety and security of staff, inmates or others, including the inmate himself; and to public safety. *Klein v. Pyle*, 767 F. Supp. 215, 217 (D. Colo. 1991) (holding that state prisoner lacked a liberty interest in being reclassified and could not, therefore, state a claim for relief).

Even if Plaintiff had a liberty interest to avoid continued placement at the ADX, he could not establish that Defendant Wiley (the only named defendant in this claim) violated his procedural due process rights under *Wilkinson*.  Plaintiff has been provided with adequate procedural protections regarding his placement, expulsion and readmission in the Step-Down Program.

---

[2] To the extent that this claim seeks damages against Defendant Wiley in his official capacity, it is barred by sovereign immunity.  A constitutional tort action for monetary damages cannot be maintained against the United States or its employees in their official capacities because there is no waiver of sovereign immunity for such a claim. *FDIC v. Meyer*, 510 U.S. 471, 475 (1994); *Hatten v. White*, 275 F.3d 1208, 1210 (10th Cir. 2002).

Plaintiff's progression through the Step-Down Program is a decision that ADX officials make based on their correctional judgment and experience, and he has received constitutionally sufficient process through the *Greenholtz/Hewitt* informal, non-adversarial procedures to periodically review his advancement. *Wilkinson*, 545 U.S. at 228-29; *Hewitt*, 459 U.S. at 477 n.9.

These procedures give him notice, an opportunity to be heard, an opportunity to appeal, and an opportunity for periodic review. They are set forth in the current ADX Institution Supplement and by the BOP's administrative remedy program. Under the Institution Supplement, Plaintiff's Unit Team reviews his advancement through the Step-Down Program every six months, in conjunction with his regularly scheduled Program Reviews. He receives at least 48 hours notice before a Program Review, and is expected to be present. Under the current Institution Supplement, he is *eligible* for advancement through the Step-Down if his Unit Team determines that he meets four different factors, such as having clear conduct for six months and active participation in all programs recommended by the team. At the Program Review, Plaintiff has an opportunity to raise any concerns, or express his views, about his confinement, including his advancement through the Step-Down Program.

If he is found to meet the minimum eligibility standards for advancement, the Unit Team then refers the inmate for consideration by the Step-Down Screening Committee, which considers a wide variety of factors in determining whether an inmate should be advanced to the next phase of the Step-Down Program. The Warden of the ADX, who is a member of the Committee, makes the final decision regarding placement in, or advancement, to the next phase of the Step-Down Program.

Under the current Institution Supplement, Plaintiff receives written notification of the decision concerning a decision for placement in, advancement through, and/or transfer out of, the Step-Down Program. If denied advancement, the inmate will receive a written notification with (a)

the reason(s) for the denial; and (b) the inmate may appeal the decision through the BOP's administrative remedy program. He may also request a special Unit Team review at any time and challenge the recommendations and decisions regarding the Step-Down Program. Accordingly, Defendant Wiley is entitled to summary judgment.

### i.  Plaintiff has Received Multiple Reviews of His Confinement while at the ADX.

a.      Plaintiff is presently confined at the ADX and, as relevant here, has been confined at the ADX since March 16, 2006. Ex. A-1, Decl. of Mark Collins, at ¶ 3 & Attach. 2 at 1.

b.      An inmate's incarceration at the ADX does not impact his sentence duration. Nor does it affect his parole eligibility, if applicable. Ex. A-1 at ¶ 6.

c.      Under BOP policy, there are three ways in which the BOP reviews the status of inmates: Classification, Program Review, and a Progress Report. *Id.* at ¶ 7 (citing Program Statements 5321.07, Unit Management Manual; 5322.12, Inmate Classification and Program Review; 5803.07, Progress Reports).

d.      Classification refers to the procedure by which an inmate's case is formally reviewed by the Unit Team, also known as a "team meeting." *Id.* at ¶ 8.

e.      Team meetings give staff and inmates the opportunity to discuss issues in an open format. *Id.* This is the inmate's opportunity for individual attention and he is encouraged to ask questions and discuss concerns. *Id.* The inmates are expected to attend. *Id.* At the ADX, the inmates can personally raise questions and concerns about their ADX confinement. *Id.*

f.      Classification includes an initial team meeting in which a careful review of the inmate's case and history are discussed and relevant programs are recommended. *Id.* at ¶ 9.

g.      Generally, the initial classification occurs within four weeks of an inmate's arrival at his designated institution. *Id.*

h.      The purpose of the meeting is to clearly define for the inmate: (1) sentence information, including financial obligations; (2) educational programs; (3) security/custody levels; (4) release plans; and (5) work assignments.  *Id.*  These programs reflect the needs of the inmate and are stated in measurable terms.  *Id.*  At the ADX, the inmates can personally raise questions and concerns about their ADX confinement, including placement in the Step-Down Program.  *Id.* at ¶ 8.

i.      After the initial classification, later team meetings are referred to as Program Reviews, which are identical in format as the Classification meeting.  *Id.* at ¶ 10.

j.      Program Reviews are held at least once every six months, or within 28 days after an inmate's transfer to another institution, and are conducted to monitor and evaluate the inmate's progress in all program areas.  *Id.*

k.      The inmates are provided at least 48 hours prior notice of scheduled Program Reviews, are expected to attend, and can personally raise questions and concerns about anything related to their confinement.  *Id.*

l.      In addition, an inmate's custody classification score is reviewed at least every 12 months at a regularly scheduled Program Review.  P.S. 5100.08, Ch. 6 at 1.

m.      Team meetings are documented in a Program Review Report ("PP-55"), which includes references to all recommendations and discussions at team meetings and notes any decisions made, such as placement in the Step-Down Unit Program.  Ex. A-1 at ¶ 11.  The Program Review Report is signed by the inmate, the team chairperson (usually the Unit Manager), and a copy is provided to the inmate.  *Id.*

n.      Since August 2005, Plaintiff has had Program Review Reports on the following dates: March 2, 2010; September 1, 2009; March 12, 2009; September 8, 2008; March 14, 2008; September 14, 2007; March 14, 2007; October 2, 2006; and April 19, 2006.  *Id.* at ¶ 12.

o.      During these Program Reviews, Plaintiff had the opportunity to raise any concerns he had about his ADX confinement, including his placement in the Program. *Id.*

p.      A third avenue by which an ADX inmate's status is reviewed is through the progress report, which is the principal document used by the Unit Team to evaluate the behavior and activities of inmates. *Id.* at ¶ 13.

q.      The progress report, which the inmate's Case Manager prepares with input from other unit staff, work detail supervisors, and education instructors, is a detailed, comprehensive account of an inmate's case history during his confinement. *Id.*

r.      The progress report reflects the inmate's past status, assesses his current status, and offers an indication of anticipated accomplishments, which may include the following:  the inmate's continued participation in a program; his plans after completion of the program; and the inmate's relationship with staff and other inmates, particularly with respect to attitude and punctuality. *Id.* at ¶ 14.

s.      A progress report is required once every three years and each time it is completed or updated the inmate is provided a copy, but only the most recent progress report is retained in the inmate's Central File. *Id.* at ¶¶ 15-16.  Plaintiff's most recent progress report is dated November 24, 2009. *Id.* at Attach. 1.  It noted his offenses, institutional adjustment, and his numerous incident reports, among other things. *Id.*

### ii.      The Conditions of Confinement in the Step-Down Program Units.

t.      The ADX is the most secure prison in the federal system and is designed to house inmates who require an uncommon level of security.  Ex. A-1 at ¶ 4.  The unique security and control procedures implemented to control these inmates are designed to enhance the safety of staff, inmates, and visitors. *Id.*

u.      The ADX has a Step-Down Program that consists of a stratified system of housing that provides inmates with incentives to adhere to the standards of conduct associated with a maximum security custody program.  Ex. A-1 at Attach. 9 at 5.

v.      As inmates at the ADX demonstrate periods of clear conduct and positive institution adjustment, they may progress from the General Population Units to the (J-Unit), Transitional (K-Unit), and Pre-Transfer Units (D/B-Unit).  *Id.* at ¶ 18.  Those successful in the Pre-Transfer Unit may move out to an appropriate BOP facility.  The types of privileges afforded to the inmates are determined by their housing unit assignments in this layered program.  *Id.*

w.      It will take an inmate a minimum of 36 months to work his way through the layered system of housing.  The minimum stay in a General Population Unit is 12 months, the Intermediate Unit 6 months, the Transitional Unit is 6 months, and the Pre-Transfer Unit is 12 months.  *Id.*

x.      The ADX currently has several housing units, including four General Population Units, two Step-Down Program Units, a Special Security Unit, a Special Housing Unit, and a Control Unit.  Id. at ¶ 21.

y.      The conditions of confinement in are as follows:  "Each cell in J Unit has approximately 75.5 square feet of living space and does not have a sallyport or a shower.  Each cell has a solid outer door.  Each cell solid outer door has a window, which looks out on to the range.  Each cell also has a window that looks outside, providing the inmate with natural lighting.  The inmates are assigned to one of 8 groups.  There are no more than 8 inmates to a group.  These inmates receive a minimum of 10.5 hours of out-of-cell recreation per week.  The inmates recreate out of their cells on the range with inmates in their assigned group.  The outdoor, out-of cell recreation is also with inmates in their assigned group, but in secure, single recreation areas.  The meals are provided to the inmates by groups, meaning each group is allowed out of their cells one at a time to come to the front of the range, receive their meals, and then return to their cells while unrestrained.  The inmates

eat their meals in their cells.  The inmates are unrestrained when out of their cells on the range.  The inmates receive 3, 15 minute social telephone calls per month.  They may receive up to five social visits per month.  Shower stalls are located on the range.  The inmates may shower anytime they are out on the range.  The inmates may talk with each other while in their cells, in moderate tones, or during their out-of-cell recreation."  *Id.* at ¶ 21(a).

z.       The conditions of confinement in K-Unit are as follows:  "Each cell in K-Unit has approximately 75.5 square feet of living space and does not have a sallyport or a shower.  Each cell has a solid outer door.  Each cell solid outer door has a window, which looks out on to the range.  Each cell also has a window that looks outside, providing the inmate with natural lighting.  The inmates are assigned to one of 4 groups.  There are no more than 16 inmates to a group.  These inmates receive a minimum of 21 hours of out-of-cell recreation per week.  The inmates recreate with other inmates in their assigned group on the range, or outdoors, on a large recreation yard.  The inmates in this phase consume their meals out on the range with the other inmates in their assigned group.  The inmates are unrestrained when out of their cells.  The inmates receive four 15-minute social telephone calls per month and may receive up to five social visits per month.  Shower stalls are located on the range.  The inmates may shower anytime they are out on the range.  The inmates in this phase of the Program may leave the unit, unrestrained and under a staff escort, to purchase items from Commissary."  *Id.* at ¶ 21(b).

aa.      All inmates are provided with access to both indoor recreation and outdoor recreation.  Inmates who choose to go to outside recreation have access to sunlight and fresh air.  *Id.* at ¶ 22.

bb.      Each cell has a light, which the inmate may turn on and off as needed.  These lights have three settings (dim, medium, and bright).  The inmate controls the setting of the lights from inside his cell.  The inmate can turn the light completely off.  The inmate is required to turn the light on when staff are interacting with him at the front of his cell.   *Id.* at ¶ 23.

cc.     Inmates in J- and K-Units have individual black and white televisions in each cell, which provides 24-hour select broadcast channels (60 channels), channels for closed circuit institutional programming (Recreation, Education, Religious Services, and Psychology, etc., radio stations, and digital music channels). One of the television channels is utilized to provide bulletins to the inmates and has the date and time on it. *Id.* at ¶ 24.

dd.     All inmates have access to media and reading materials and to multiple libraries (legal, religious, and leisure) and can obtain materials from each library. *Id.* at ¶ 27. All inmates can also receive reading materials through the mail. *Id.*

ee.     In K-Unit, inmates are unrestrained when out of their cell and restraints are not required during escorts to various programming areas. *Id.* at ¶ 30. These inmates are subjected to pat searches and screened with a metal detector upon entering and leaving the unit, and random visual searches upon entering. *Id.*

### iii.    Plaintiff's Past and Current Advancement Through the Step-Down Program.

ff.     On August 9, 2006, Plaintiff was approved for placement in J-Unit, the intermediate phase of the Step-Down Program. *Id.* at ¶ 31. He was considered for placement under Institution Supplement FLM 5321.06F(1), General Population and Step-Down Unit Operations ("IS 5321.06F(1)"). *Id.*

gg.     Under IS 5321.06F(1) § 4D, inmates may be removed from the Program and returned to a GPU if found guilty of committing any prohibited acts by the Unit Discipline Committee ("UDC") or Discipline Hearing Officer ("DHO"). *Id.* at Attach. 3 at 4.

hh.     On August 17, 2006, Plaintiff was found guilty by the UDC of refusing an order, stemming from his actions on August 14, 2006, when he was forcibly removed from the range in J-Unit with the use of non-lethal munitions. *Id.* at ¶ 32.

ii.     Accordingly, Plaintiff was removed from the Step-Down Program. *Id.*

jj.      On October 13, 2006, IS 5321.06G(1) became effective. *Id.* at ¶ 34 and Attachment 6. In relevant part, under IS 5321.06G(1), to be eligible for placement in the Step-Down Program, an inmate must maintain a minimum of 12 months clear conduct while housed at the ADX's General Population. *Id.* at 3.

kk.     Following his misconduct on August 14, 2006, Plaintiff remained in Z-Unit (also known as the Special Housing Unit ("SHU")) until October 11, 2006, when he returned to F-Unit, a General Population Unit. *Id.* at ¶ 35.

ll.      While in the General Population, on November 29, 2006, he committed the disciplinary violation of Possessing an Unauthorized Item, see Att. 5 at 3, and, therefore, was moved to the SHU. *Id.*

mm.    On December 27, 2006, Plaintiff returned to the General Population. Id. at ¶ 36. However, on January 1, 2007, he committed disciplinary violations of Threatening Bodily Harm, Destroying Property of $100 or less, and Refusing to Obey an Order. *Id.* at Att. 5 at 2-3. He was, therefore, returned to SHU. *Id.* at Att. 2.

nn.     On January 25, 2007, he committed additional violations of Refusing to Obey an Order and Assaulting Without Serious Injury. *Id.* at Att. 5 at 2.

oo.     On March 22, 2007, he committed the disciplinary violation of Threatening Bodily Harm. *Id.*

pp.     On April 13, 2007, he committed the disciplinary violation of Interfering With a Security Device. *Id.* at 1-2.

qq.     As a result of these violations, because he had not maintained 12 months clear conduct as required by IS 5321.06G(1), he was not eligible for consideration for placement back in the Step-Down Program until April 12, 2008. *Id.* at ¶ 40.

rr.     In April 2008, Plaintiff was not immediately approved for the Step-Down Program, and on June 4, 2008, he filed a Request for Administrative Remedy with Defendant Wiley, challenging that decision.  *Id.* at ¶ 41.

ss.     In response to this request, Defendant Wiley informed Plaintiff that he was considered for Step-Down Program placement on June 9, 2008, but, because the factors that led to his previous removal from the Step-Down Program placement had not been sufficiently mitigated, he was denied placement.  *Id.* at ¶ 42.  Defendant Wiley also informed him that he if continued to meet the eligibility criteria, he would be considered again in six months.  *Id.*

tt.     Plaintiff appealed this decision both to the Regional Office and the Central Office, both of which upheld Defendant Wiley's decision.  *Id.* at ¶ 43.

uu.     Plaintiff committed additional disciplinary violations on the following dates: (1) assaulting without serious injury on July 20, 2008; (2) refusing to obey an order on July 25, 2008; and refusing to obey an order on July 28, 2008.  *Id.* at ¶ 44.

vv.     As a result of these violations, under the then-applicable Institution Supplement, Plaintiff became ineligible for consideration for placement in the Step-Down Program until July 27, 2009, or 12 months after the last disciplinary infraction.  *Id.* at ¶ 45.

ww.     On October 9, 2009, Plaintiff again was considered for placement in the Program, and was approved for such placement because he had remained disciplinary violation free for a minimum of 12 months, he had completed the education courses recommended by his Unit Team, he had displayed a positive attitude and rapport with staff, and had sufficiently mitigated both the factors that led to his initial placement in the General Population, and his prior removal from the Step-Down Program in August 2006.  *Id.* at ¶ 46.  He was placed in J-Unit on October 28, 2009.  *Id.*

      iv.     **Plaintiff Has and Will Receive Ample Process in Connection with His Progression through to ADX's Step-Down Program.**

xx.     On October 8, 2009, IS 5321.06I(1) became effective and was modified on December 8, 2009. *Id.* at ¶ 47 and Attachment 8.

yy.     IS 5321.06I(1) governs the current process and criteria for inmates' placement in, advancement through, transfer out of, and, if necessary, removal from the Step-Down Program. *Id.* at ¶ 48.

zz.     When Plaintiff is considered for advancement through, transfer out of, or removal from, the Program, he will be considered under the criteria set forth in IS 5321.06I(1). *Id.*

aaa.     Under IS 5321.06I(1), Plaintiff will be eligible to advance through the Step-Down Program if he meets the following factors: (a) a minimum of six months clear conduct while housed in J- or K-Units; (b) active participation in and completion of all programs recommended by the unit team; (c) positive behavior, including respectful and appropriate conduct towards staff and other inmates; and (d) positive overall institution adjustment, including personal hygiene and cell sanitation. *Id.* at ¶ 49.

bbb.     An inmate's placement in, and advancement through, the Step-Down Program is a classification decision as to whether he can safely function in a less-restrictive unit without posing a risk to institutional security and order; to the safety and security of staff, inmates or others, including the inmate himself; and to public safety. *Id.* at ¶ 50.

ccc.     The Warden of the ADX makes all final decisions regarding an inmate's placement in, or advancement through, the Step-Down Program. *Id.* at ¶ 51.

ddd.     Under IS 5321.06I(1), eligibility for advancement through the Step-Down Program does not equate with appropriateness for advancement to the next phase. *Id.* at ¶ 52.

eee.     Under IS 5321.06I(1), Plaintiff's continued housing at the ADX and advancement through the Step-Down Program is reviewed at least every 6 months by members of his Unit Team. *Id.* at ¶ 53. The Unit Team reviews each inmate's case to determine eligibility for consideration for placement in, advancement through, and/or transfer out of, the Program. *Id.* Ordinarily, the

reviews are conducted in connection with regularly scheduled Program Reviews. *Id.* The inmates are provided at least 48 hours prior notice of scheduled Program Reviews, are expected to attend, and can personally raise questions and concerns about his placement in, advancement through, or transfer out of the Program. These meetings are held at least once every 6 months. *Id.* Program Reviews give staff and inmates the opportunity to discuss issues in an open format. *Id.*

fff.    Inmates meeting the above criteria do not automatically advance through the Step-Down Program but are referred to a Step-Down Screening Committee ("Committee") for consideration. *Id.* at ¶ 54.

ggg.    The Committee consists of the ADX Warden, Associate Warden with daily oversight of Unit Management, Captain, Special Investigative Agent, Case Management Coordinator, Unit Managers (Population, Intermediate, Transitional, & Pre-Transfer), Psychology, and Supervisory Attorney. *Id.*

hhh.    The Committee considers the following factors when making a decision about an inmate's progression through the Step-Down Program:  (i) the inmate's conduct while housed at the ADX; (ii) the inmate's participation in and completion of programs recommended by the unit team while housed at the ADX; (iii) the inmate's behavior and conduct towards, and interaction with, staff and other inmates while at the ADX; (iv) The inmate's overall institution adjustment, personal hygiene, and cell sanitation while at the ADX; (v) The reason(s) the inmate was designated to the ADX; (vi) the inmate's criminal history; (vii) the inmate's involvement with criminal organizations, if any, and the potential safety and security threat(s) implicated by such involvement; (viii) the inmate's overall adjustment during his history of confinement; (ix) the institution's safety and security needs, including the safety and security of staff; (x) the safety and security needs of the inmate; (xi) the safety and security needs of other inmates; (xii) the safety and security needs of the public; and (xiii) any other relevant factor(s). *Id.* at ¶ 55.

iii.     The inmates receive written notification of the decision concerning a decision for placement in, advancement through, and/or transfer out of, the Step-Down Program.  *Id.* at ¶ 56.

jjj.     If the inmate is approved from placement into, advancement to the next phase of, or transfer out of the Step-Down Program, the inmate will receive written notification that he has been approved.  *Id.* at ¶ 57.

kkk.    On April 13, 2010, Plaintiff was considered and approved for placement in K-Unit, the Transitional Unit of the Program.  *Id.* at ¶ 58.  He was approved because he actively participated in and completed the programs recommended by his Unit Team, and maintained clear conduct and continued to display positive institutional adjustment with his interactions with staff and other inmates, thereby demonstrating the likelihood he can function in a less-restrictive unit without posing a threat to the security or orderly running of the institution.  *Id.*

lll.     Under IS 5321.06I(1), if the inmate is denied placement into, advancement to the next phase of, or transfer out of the Step-Down Program, the Associate Warden's written notification includes the following:  (a) The reason(s) for the denial, unless it is determined that the release of this information could pose a threat to individual safety or institutional security, in which case that limited information may be withheld; and (b) The inmate may appeal the decision through the BOP's Administrative Remedy Program.   If the notification concerns the denial of a recommendation for transfer out of the Step-Down Program, the notice also includes the Regional Director's direction as to when the inmate should next be recommended for transfer out of the Program.  *Id.* at ¶ 59.

mmm. The denial of an inmate for placement in, advancement to the next phase of, or transfer out of the Step-Down Program does not preclude a different conclusion from being reached during a future review.  *Id.* at ¶ 60.

nnn.    If dissatisfied with a decision, Plaintiff may also request a Special Unit Team review at any time and challenge the recommendations and decisions, including decisions made regarding the Step-Down Program.  *Id.* at ¶ 61.

### 3.    Plaintiff's *Bivens* Claim against Defendant Wiley Fails.

#### a.    There is No *Bivens* Remedy for Denial of Procedural Due Process.

##### i.    Elements and Burden of Proof.

To the extent that Plaintiff seeks damages in this claim, Doc. 100 at 40, he lacks a *Bivens* remedy.  The burden of proof is unclear.  There are two questions that the Court must consider in determining whether a *Bivens* remedy exists.  First, "whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages."  *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007) (citation omitted).  Second, the Court must weigh the "reasons for and against the creation of a new cause of action, the way common law judges have always done," considering, for instance, the "inadequacy of discrete … remedies…."  *Id.* at 554 (citation omitted).

Since *Bivens*, which allowed an action for damages for a Fourth Amendment violation, the Supreme Court has recognized such a remedy in only two types of cases:  Eighth Amendment violations of the Cruel and Unusual Punishment Clause, *Carlson v. Green*, 446 U.S. 14 (1980); and Fifth Amendment violations of the equal protection component of the Due Process Clause, *Davis v. Passman*, 442 U.S. 228 (1979).  "Since *Carlson* [the Court has] consistently refused to extend *Bivens* liability to any new context or new category of defendants."  *Correctional Svs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001).  *Accord Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1948 (2009) (quoting *Malesko*).

In fact, the Court has declined to create *Bivens* remedies for "First Amendment violations by federal employers," "harm to military personnel through activity incident to service," and "wrongful denials of Social Security disability benefits."  *Robbins*, 551 U.S. at 550 (collecting cases).  Similarly, it

has declined to extend *Bivens* to claims against federal agencies, *FDIC v. Meyer*, 510 U.S. 471 (1994), and against private prisons. *Malesko*, 534 U.S. at 68.

In the context of procedural due process, the Supreme Court noted that such claims are not amenable for *Bivens* because the relief that provides the proper remedy against this type of constitutional violation by a government agency is injunctive:

> Inmates in respondent's position also have full access to remedial mechanisms established by the BOP, including suits in federal court for injunctive relief and grievances filed through the BOP's Administrative Remedy Program (ARP). *See* 28 CFR § 542.10 (2001) (explaining ARP as providing "a process through which inmates may seek formal review of an issue which relates to any aspect of their confinement"). This program provides yet another means through which allegedly unconstitutional actions and policies can be brought to the attention of the BOP and prevented from recurring. And unlike the *Bivens* remedy, which we have never considered a proper vehicle for altering an entity's policy, injunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally.

*Malesko*, 534 U.S. at 74.

### ii.      Elements that Plaintiff Cannot Establish.

Here, neither of the considerations under *Robbins* leans in favor of creating a *Bivens* remedy for a procedural due process violation.  There is an alternative, existing process that adequately protects Plaintiff's interests.  And that consists in filing an action against the agency for injunctive relief.  *See Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225, 1236 (10th Cir. 2005).  Further, while Plaintiff seeks damages for the alleged violations, the proper relief, if any, would be injunctive.  That relief would consist of additional process in connection with his denial of admission to the Step-Down Program.  Doc. 314 at 13.  And the undisputed evidence shows that such process would be pointless because Plaintiff is currently confined in K-Unit, the intermediate phase of the Step-Down Program.  Accordingly, Defendant Wiley is entitled to summary judgment.

### b.      Even if a *Bivens* Remedy Existed, Defendant Wiley is Entitled to Qualified Immunity on this Claim.

### i.      Elements and Burden of Proof.

Government officials performing discretionary functions generally are granted qualified immunity and are shielded from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Wilson v. Layne*, 526 U.S. 603, 609 (1999) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *Romero v. Fay*, 45 F.3d 1472, 1475 (10th Cir. 1995). The primary purpose of qualified immunity is "to protect [public officials] from undue interference with their duties and from potentially disabling threats of liability." *Elder v. Holloway*, 510 U.S. 510, 514 (1994) (citation omitted). "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). Qualified immunity is immunity from suit, not merely from liability. *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

When the defense of qualified immunity is raised, "the Plaintiff initially bears a heavy two-part burden." *Reynolds v. Powell*, 370 F.3d 1028, 1030 (10th Cir. 2004) (internal quotation marks and citations omitted). To state a claim, the plaintiff demonstrate that: (1) the defendant's actions violated a constitutional right; and (2) the right allegedly violated was clearly established at the time of the conduct at issue. *Id.*; *Maestas v. Lujan*, 351 F.3d 1001, 1006-07 (10th Cir. 2003).

In *Saucier*, the Supreme Court established a two-point inquiry for qualified immunity in which, first, the court had to determine whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier*, 533 U.S. at 201. "[T]he next, sequential step is to ask whether the right was clearly established." *Id.* The Supreme Court urged that a court evaluating qualified immunity must consider the "threat reasonably perceived by the responsible officials." *See Hudson v. McMillian,* 503 U.S. 1, 8 (1992).

The Supreme Court recently modified the *Saucier* holding, stating that "while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory.  The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009).

> ### ii.     Elements that Plaintiff Cannot Establish.

First, it is not clearly established that confinement at the ADX poses "an 'atypical and significant hardship' when compared to the normal incidents of prison life, such that the Plaintiff would have a liberty interest …."  Doc. 810 at 26.  Second, even if Plaintiff could show that the right claimed is clearly established, he cannot show that Defendant Wiley violated his rights.  *See supra* § I.A.2.

> ### B.     Plaintiff's Claim that Defendant Wiley Retaliated against Him for His Exercise of his First Amendment Rights by Failing to  Place him in the Step-Down Program Fails.

In this claim, Plaintiff alleges that Defendant Wiley denied him access to the Step-Down Program in retaliation for Plaintiff's alleged exercise of his First Amendment rights.  Doc. 314 at 11; *see also* Doc. 810 at 49.  He seeks injunctive relief as well as damages.  Doc. 314 at 40.

> ### 1.     Elements and Burden of Proof.

Plaintiff must show that the "defendant acted with discriminatory purpose." *Iqbal,* 129 S. Ct. at 1948.  Thus, "to state a claim based on a violation of a clearly established right, [plaintiff] must plead sufficient factual matter to show that [defendants] adopted and implemented the detention policies at issue not for a neutral, investigative reason but for the purpose of discriminating on account of race, religion, or national origin." *Id.* at 1948-49.  However, even when there is evidence of an improper motive, if "the action was independently justified on grounds other than the

improper one defeats the claim.  *Robbins*, 551 U.S. at 558 n.10 (citing *Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274, 287 (1977)).

2.       **Elements that Plaintiff Cannot Establish.**

Here, Plaintiff cannot establish that Defendant Wiley retaliated against Plaintiff's exercise of his First Amendment rights.  He cannot show that Defendant Wiley acted with a discriminatory purpose and, even if he could, Defendant Wiley's actions are independently justifiable.  *See supra* § I.A.2(ff) – (ww).  The undisputed evidence shows that Defendant Wiley acted without considering Plaintiff's religion in making Step-Down decisions involving him.  Specifically, Defendant Wiley approved Plaintiff for placement in J-Unit in 2006, but because Plaintiff was found guilty of several offenses in August 2006 (which were the bases for his now-dismissed excessive force claims), he was removed from the Step-Down Program.  Plaintiff continued to commit disciplinary violations that rendered him ineligible for the Step-Down Program until April 2008 because he was in the SHU and not in the general population of the ADX.

When he was eligible in April 2008, Defendant Wiley did not approve his placement in J-Unit because the factors that led to his expulsion from the Step-Down Program in August 2006 had not been sufficiently mitigated.  Plaintiff was again deemed ineligible for the Step-down Program until July 2009 because he committed two additional disciplinary offenses.  When Plaintiff was again eligible and considered for placement in October 2009, he was approved for placement in J-Unit a second time.

3.       **Plaintiff's *Bivens* First Amendment Retaliation Claim against Defendant Wiley Fails.**

The elements and burden of proof are set forth *supra* § I.A.3.a.i.  Here, for the same reasons set forth *supra* § I.A.3.a.ii, there is no *Bivens* remedy for a First Amendment retaliation violation.  In particular, in *Robbins*, the Supreme Court declined to create a Fifth Amendment-based remedy of

"retaliation for exercising … property rights." *Robbins*, 551 U.S. at 562. The same reasoning should be applied here.

And even if a *Bivens* remedy existed, Defendant Wiley is entitled to qualified immunity on this claim because he did not retaliate against Plaintiff for his exercise of his First Amendment rights. *See supra* §§ I.A.2 and I.A.3.b.

### C.   Plaintiff's Claim for Destruction of a Manuscript Fails as a Matter of Law.

The Court has construed this claim as alleging that "Defendants seized and destroyed a manuscript that [Plaintiff] had written, which he contends was religious property he was permitted to possess." Doc. 810 at 41. Plaintiff asserts this claim against Defendants Javernick, Martinez, Heim and Wiley. Doc. 100 at 13. He seeks damages against these defendants for the destruction of his manuscript. *Id.* at 39. Plaintiff's claim, whether construed as either a procedural or substantive due process violations under the Fifth Amendment, fails.[3]

### 1.   Elements and Burden of Proof of a Substantive Due Process Claim.

The Court described the elements and burden of proof as follows:

> The substantive portion of the Due Process clause prohibits government entities from depriving persons of liberty or property for arbitrary and capricious reasons, or by means of conduct that shocks the conscience. *Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008). When a substantive Due Process claim challenges prison policies, the inmate is required to show that the regulation "lacks a rational relationship to legitimate penological interests." *Sperry v. Werholtz*, 321 [F. App'x] 775, 778 (10th Cir. 2009) (unpublished), *citing Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

Doc. 810 at 46-47.

### 2.   Elements that Plaintiff Cannot Establish.

Applying these standards, Plaintiff cannot prove that, as applied to him, the BOP regulations and policies governing possession and destruction of property violated his substantive due process

---

[3] To the extent that this claim seeks damages against Defendants in their official capacities, the claim is barred by sovereign immunity. *See supra* n.2.

rights.  He cannot show that the BOP regulations are not rationally related to legitimate penological interests.  The policies are designed to contribute to a safe environment for staff and inmates by reducing fire hazards, security risks, and sanitation problems related to inmate personal property. Accordingly, Plaintiff cannot show that a violation of his rights occurred and Defendants are entitled to summary judgment.

a.      An inmate's possession of personal property is governed by 28 C.F.R. § 553.10 *et seq.* and primarily by BOP Program Statement ("PS") 5580.07, *Personal Property, Inmate.*  Ex. A-2, Decl. of Todd Javernick, at ¶ 5.

b.      Pursuant to PS 5580.07, an inmate may ordinarily only possess that property which he is authorized to retain upon admission to the institution, which is issued while he is in custody, which he purchases in the commissary, or which is approved by staff to be mailed to, or otherwise received by the inmate.  *Id.* at ¶ 5 (citing 28 C.F.R. § 553.10).

c.      The regulations allow for the management of inmate personal property in the institution, and contribute to a safe environment for staff and inmates by reducing fire hazards, security risks, and sanitation problems related to inmate personal property.  *Id.*

d.      Under BOP policy, there are two types of contraband, "hard contraband" and "nuisance contraband."  28 C.F.R. § 553.12.

e.      Nuisance contraband is "any item other than hard contraband . . . which previously has been authorized for possession by an inmate, but whose possession is prohibited when it presents a threat to security or its condition or excessive quantities of it present a health, fire, or housekeeping hazard. Examples of nuisance contraband include: . . . altered personal property; excessive accumulation of commissary, newspapers, letters, or magazines which cannot be stored neatly and safely in the designated area...."  Ex. A-2 at ¶ 7 (quoting 28 C.F.R. § 553.12(b)).

f.      PS 5580.07 provides two penological interests for creating a category of "nuisance contraband" and limiting the amount of space for an inmate to store his personal property:

> Allowing an inmate to retain excess personal property increases the likelihood that property will be damaged or lost, and thereby increases the risk to the BOP of liability claims.

> By providing secured space, and adhering to guidelines on retention of property, the individual inmate has responsibility for securing personal property.

Ex. A-2 at Attach 1 at § 7.

g.      Under 28 C.F.R. § 553.11, the warden of each institution also may set local limits on the amount of commissary items, newspapers, magazines, etc. each inmate may retain. Ex. A-2 at ¶ 8.

h.      From March through July 2006, Institution Supplement FLM 5580.06, Personal Property, Inmate ("IS 5580.06"), was in effect and identified the type and quantity of personal property an inmate was allowed to possess at the ADX. *Id.*

i.      Under IS 5580.06 § 4(A), "[t]he amount of personal property allowed each inmate will be limited to those items which can be neatly and safely placed in storage.… Under no circumstances will any materials referred to in this policy be accumulated to the point where they become a fire, sanitation, security, or housekeeping hazard." *Id.* at Attach. 2.

j.      IS 5580.06 § 4(A) also defines "'reasonable' amount of property … as meaning all authorized items that can be neatly stored in the inmate's cell…." *Id.*

k.      Under IS 5580.06 § 4(G), an inmate's personal compositions, manuscripts and correspondence filed in authorized folders, were required to be properly organized and were limited to two. *Id.* at ¶ 19.  Personal papers and correspondence must not exceed one cubic foot. *Id.*

### 3.      Elements and Burden of Proof of a Procedural Due Process Claim.

Generally, Plaintiff has the burden to establish that he has a property interest and that he did not receive constitutionally sufficient process. *Zwygart*, 483 F.3d at 1093.  However, the specific elements of the claim depend upon whether the alleged destruction of Plaintiff's property was either

unauthorized and intentional, or pursuant to a formal policy. The Court correctly identified the elements when the destruction of an inmate's property was unauthorized and intentional. *See* Doc. 810 at 44 (stating that Supreme Court held that "an unauthorized intentional deprivation of property by a state employee does not constitute violation of the procedural requirements of the Due Process Clause … if a meaningful postdeprivation remedy for the loss is available." (quoting *Hudson v. Palmer*, 468 U.S. 517, 533 (1984)).

If Plaintiff can establish that he had a property interest in the manuscript, then he must show that he received inadequate process under the three factors established by *Mathews v. Eldridge*, 424 U.S. 319 (1976). *See Gillihan v. Shillinger*, 872 F.2d 935, 940 (10th Cir. 1989) (quoting *Mathews*).[4] The three *Mathews* factors are:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. at 335.

When the plaintiff lacks a property interest, however, the Tenth Circuit requires that his claim "be reviewed under *Sandin*'s atypical-and-significant-deprivation analysis." *Steffey v. Orman*, 461 F.3d 1218, 1221 (10th Cir. 2006). "The Supreme Court mandate since *Sandin* is that henceforth we are to review property and liberty interest claims arising from prison conditions by asking whether the prison condition complained of presents 'the type of atypical, significant deprivation in which a State might conceivably create a liberty [or property] interest.'" *Cosco v. Uphoff*, 195 F.3d 1221, 1224 (10th Cir. 1999).

---

[4] Because the destruction of Plaintiff's property occurred pursuant to BOP policy, the *Hudson*-line of cases is inapplicable. *Gillihan*, 872 F.2d at 939-40.

### 4.     Elements that Plaintiff Cannot Establish.

Plaintiff's claim fails on multiple grounds.  First, he cannot establish that he had a property interest because the manuscript (or 18 inches of personal papers) was "nuisance contraband" under BOP policy.  Destroying contraband possessed by prisoners is not an atypical and significant condition of confinement.  *Steffey*, 461 F.3d at 1222-23.

Second, even if he could establish a property interest, he received sufficient pre-deprivation process.  After the manuscript was identified as "nuisance contraband" by the BOP, Plaintiff never administratively challenged that designation, otherwise identified the manuscript as religious property, or mailed the manuscript out of the ADX.  In accordance with BOP policy, Plaintiff had 120 days to take any of these actions, but he did nothing.  At the end of the 120 days, the BOP, pursuant to policy, destroyed the manuscript.  Accordingly, Defendants are entitled to summary judgment.

a.     In accordance with BOP regulations, staff are to seize any items which have been identified as contraband whether the items is found in the physical possession of the inmate, in his living quarters, or in common areas of the institution.  Ex. A-2 at ¶ 9 (citing 28 C.F.R. § 553.13(a)).

b.     Staff are to dispose of items seized as contraband, including those items found in the property of inmates processed through Receiving and Discharge ("R&D"), in accordance with § 553.13(b) and section 10 of PS 5580.07.  *Id.* (citing 28 C.F.R. § 553.13(b) and Att. 1 at pgs. 11-14.

c.     Items of personal property confiscated as hard or nuisance contraband are inventoried and stored.  *Id.* at ¶ 10 (citing 28 C.F.R. § 553.13(b)).

d.     Following an inventory of the confiscated items, staff provide the inmate with a copy of the inventory as soon as practicable and, if the inmate establishes ownership of the item, but the items has been identified as contraband, staff mail such item(s), other than hard contraband, at the inmate's expense, to a destination of the inmate's choice.  *Id.* (citing 28 C.F.R. § 553.13(b)(2)(i)-(iii)).

e.      Where the inmate has insufficient funds and no likelihood of receiving new funds, or when the item has not been altered and had been originally permitted for admission to the institution or had been purchased from commissary, the Warden or designee may authorize the institution to pay the cost of such mailings. *Id.* at ¶ 11 (citing 28 C.F.R. § 553.13(b)(2)(iii)).

f.      Under BOP policy, staff must prepare and to retain written documentation describing any items destroyed and the reasons for such action. *Id.* at ¶ 12 (citing 28 C.F.R. § 553.13(b)(2)(v)).

g.      Under BOP policy, several steps must be taken when staff destroy contraband:   (1) ordinarily, the Correctional Systems Manager Captain or designee receives the inmate's proof of ownership and determines if an item is contraband.  (2) When it is determined that the items is to be destroyed, the Correctional Systems Manager Captain or designee will prepare the written documentation describing the item(s) destroyed and the reasons for this action.  (3) Ordinarily, property is held for 120 days before it is destroyed.  This delay allows the inmate the opportunity to obtain proof of ownership and/or appeal the decision through the Administrative Remedy Procedure.  (4) The employee who actually destroys the property, and at least one witness to the disposal, will state in writing that they have witnessed the destruction.  (5) Records of disposal of property will remain on file for at least two years to ensure the availability of information necessary to an investigation of a subsequent tort claim. *Id.* at ¶ 13.

h.      In addition, the personal property of inmates departing the institution on writ is inventoried and placed in storage in R&D during the inmate's absence. *Id.* at ¶ 14.

i.      This inventory is documented on BOP form BP-383 - Inmate Personal Property Record ("BP-383"). *Id.*

j.      Plaintiff was released from the ADX on March 2, 2006, as a result of a federal writ. *Id.* at ¶ 15 (citing Attachment 3).

k.      Prior to his release on this writ, on March 1-2, 2006, staff completed an inventory of Plaintiff's personal property and documented the inventory on four BP-383 forms.  *Id.* at ¶ 16 (citing Attachment 4).  His property was then stored in the R&D storage area while he was on writ.  *Id.*

l.      The BP-383 forms reveal that Plaintiff possessed the following personal property in excess of that allowed by BOP policy: (a) a total of 18 inches of personal papers; (b) one altered book; (c) 17 pamphlets; (d) 11 books; and (e) 172 photos.  *Id.* at ¶ 17.

m.      All of this excess property is nuisance contraband.  *Id.*

n.      While Plaintiff had the opportunity to identify any of his excess property as "religious" in the BP-383 form, he never did so.  *Id.* at ¶ 18.

o.      On March 16, 2006, Plaintiff returned to the ADX from the writ.  *Id.* at ¶ 20.

p.      On March 20, 2006, staff reviewed the inventory of Plaintiff's personal property with him. *Id.*  Plaintiff signed section 10(b) of each of the BP-383 forms without noting any discrepancies in the quantities or description of the property, thereby certifying the accuracy of the inventory.  *Id.*

q.      In the two BP-383 form that noted the excess property, he indicated he wanted the books, pamphlets, and altered book to be disposed of as trash.  *Id.* at ¶ 21 and Attach. 4.  The excess photographs he requested to be mailed to a Geri Bernier in Florida.  *Id.*  He requested the books be mailed to a Roy Kosonen in Danbury, Connecticut.  *Id.*

r.      He also asked that the excess 18 inches of personal papers be stored.  *Id.*

s.      In the BP-383 forms, he noted that none of his individual pieces of property, including the excess property, exceeded $100 in value.  *Id.* at Attach. 4.

t.      When Plaintiff's property was inventoried, he was notified that he had until July 18, 2006 (120 days from March 20, 2006), to provide an address and stamps if he wanted to mail the 18 inches of personal papers, the excess property.  *Id.* at ¶ 22 (citing Attachment 5).

u.      In accordance with BOP policy, Plaintiff was informed that the excess property constituted nuisance contraband and that it could not be stored.  *Id.*

v.      Plaintiff failed to provide an address of postage to mail the excess 18 inches of personal papers on or by July 18, 2006.  *Id.* at ¶ 23.  He also did not appeal through the administrative remedy program the determination that the excess 18 inches of personal papers were nuisance contraband. *Id.*

w.      On July 18, 2006, Defendant Martinez completed an Abandoned Inmate Property form (BP-S515) requesting permission to destroy the abandoned contraband in accordance with policy.  *Id.* at ¶ 24 (citing Attachment 6).

x.      Defendant Martinez noted on the form that Plaintiff's property had been inventoried when he "departed the institution for a federal writ.  [Plaintiff] failed to provide an address or postage to mail out excess property."  *Id.* at Attach. 6.

y.      Acting Warden John Shartle approved the request.  *Id.*  Defendant Wiley did not approve it or destroyed Plaintiff's property.  *Id.* at Attach. 6.

z.      On July 14, 2006, after receiving approval, in accordance with BOP policy, Correctional Systems Officer Martinez and Correctional Systems Officer Roy destroyed the abandoned nuisance contraband (the 18 inches of personal papers).  *Id.* at ¶ 25.

aa.     Defendants Javernick and Heim did not destroy Plaintiff's property.  *Id.* at Attach. 6.

## 5.      Plaintiff's *Bivens* Claim for Destruction of Property Fails.

### a.      There is No *Bivens* Remedy for Such a Violation.

The elements and burden of proof are set forth *supra* § I.A.3.a.i.  Here, for the same reasons set forth *supra* § I.A.3.a.ii, there is no *Bivens* remedy for a procedural or substantive due process violation for destruction of an inmate's contraband.[5]

In addition, Plaintiff has an alternative, existing process that adequately protects his procedural due process interests.  *Robbins*, 551 U.S. at 550.  As the Seventh Circuit recently noted, a prisoner who claims that law enforcement officials employed by the Department of Justice (such as BOP's correctional officers) damaged or destroyed his property may recover a monetary amount for the loss, notwithstanding the sovereign immunity bar under the Federal Tort Claims Act.  *See United States v. Norwood*, ___ F.3d ___, 2010 WL 1541268, *5 (7th Cir. 2010) (citing 31 U.S.C. § 3724(a)).

In relevant part, section 3724 allows settlement of claims of "not more than $50,000 in any one case … [for] damage to, or loss of, privately owned property, caused by an investigative or law enforcement officer as defined in section 2680(h) of title 28 who is employed by the Department of Justice acting within the scope of employment that may not be settled under chapter 171 of title 28."  31 U.S.C. § 3724(a).  Plaintiff filed a claim for the destruction of his property and the BOP denied it.  Ex. A-3.  Thus, Plaintiff employed the adequate post-deprivation process available to him.  The BOP could have settled this claim but decided not to do so.

Further, there is no *Bivens* remedy for a substantive due process violation in this context.  The Supreme Court has never recognized one and, in fact, has rejected a "freestanding" substantive due process claim when the procedural due process aspect fails.  *See District Attorney's Office for Third Judicial Dist. v. Osborne*, 129 S. Ct. 2308, 2322 (2009).

> **b.      Even if a *Bivens* Remedy Existed, Defendants are is Entitled to Qualified Immunity on this Claim.**

---

[5] Admittedly, *Gilliham* recognized a constitutional tort claim by a state prisoner against state prison officials under 42 U.S.C. § 1983.  *See* 872 F.2d at 940.  But such a claim is not under *Bivens* and *Gilliham* is, therefore, inapposite.

Plaintiff cannot show that Defendants Javernick, Heim and Wiley personally participated or approved the destruction of the manuscript. *See supra* § I.C.4(w) –(aa). None of these defendants actually participated in, or approved of, destroying the manuscript. While Defendant Wiley's name is typed in the form that approved the destruction of the manuscript, a different individual actually approved it. Plaintiff cannot show the requisite personal participation by the fact that Defendant Wiley denied his administrative appeal regarding the destruction of the manuscript. *See Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) (stating that "a denial of a grievance, by itself without any connection to the violation of constitutional rights alleged by plaintiff, does not establish personal participation"). And the undisputed evidence shows that neither Defendants Javernick nor Heim actually witnessed or carried out the destruction. Further, Defendant Martinez is entitled to qualified immunity because did not violate Plaintiff's rights, having acted pursuant to BOP policy. *See supra* § I.C.2 & I.C.4.

**II.      CONCLUSION.**

For the reasons set forth above, summary judgment should be granted as to Plaintiff's remaining claims and they should be dismissed with prejudice.

Respectfully submitted,

DAVID M. GAOUETTE
United States Attorney


s/Juan G. Villaseñor
JUAN G. VILLASEÑOR
Assistant United States Attorney
United States Attorney's Office
1225 Seventeenth Street, Suite 700
Denver, Colorado 80202
Telephone: (303) 454-0100
Facsimile: (303) 454-0404
E-mail: juan.villasenor@usdoj.gov

## CERTIFICATE OF SERVICE (CM/ECF)

I hereby certify that April 29, 2010, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

j.b.garcia@usdoj.gov
lisa.christian@usdoj.gov

and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participants in the manner (mail, hand- delivery, etc.) indicated above the nonparticipant's name:

Via U.S. Mail
Peter Georgacarakos
Register No. 03029-036
USP Florence ADX
P.O. Box 8500
Florence, CO 81226

s/ Juan G. Villaseñor
United States Attorney's Office