IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 07-cv-01712-MSK-MEH

PETER GEORGACARAKOS,

     Plaintiff,

v.

WILEY,
CRUZ,
JAVERNICK,
COLLINS,
SUDLOW,
MADISON,
CHURCH,
LT. JOHN DOE,
HEIM,
MARTINEZ,
FENLON,
PUGH,
HOOD,
HERSCHBERGER,
BUREAU OF PRISONS,
DEPT. OF JUSTICE, and
UNITED STATES,

     Defendants.

---

## OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT AND OVERRULING OBJECTIONS

---

**THIS MATTER** comes before the Court pursuant to the Plaintiff's Motion to Alter

Judgment **(# 820)**, which seeks reconsideration of certain portions of this Court's March 30,

2010 Opinion and Order **(# 810)**, the Defendants' response **(# 825)**, and the Plaintiff's reply **(# 830)**; the Defendants' Second Motion for Summary Judgment **(# 824)**, the Plaintiff's response **(#**

1

**836)**, and the Defendants' reply **(# 842**, as supplemented **# 843)**; the Defendants' Objections **(#**

**844)** to the Magistrate Judge's May 27, 2010 Orders **(# 840, 841)** granting, in part, the Plaintiff's

Motion to Compel **(# 819)**, and the Plaintiff's response **(# 847)**; the Plaintiff's Motion to

Disallow Irrelevant Evidence **(# 845)**; the Plaintiff's Motion to Disallow Hearsay Evidence **(#**

**846)**; the Plaintiff's Motion to Remove Nonparties **(# 848)**; and the Plaintiff's Motion to Order

the Bureau of Prisons to Collect PLRA Payments Sequentially **(#  856)**, the Defendants'

response **(# 857)**, and the Plaintiff's reply **(# 860)**.

## FACTS

The Plaintiff is an inmate in the custody of the Federal Bureau of Prisons ("BOP"),

housed at the Administrative Maximum ("ADX") facility in Florence, Colorado.  He initially

asserted a variety of claims, mostly of constitutional magnitude under *Bivens*, but the Court's

Orders on the Defendants' dispositive motions – most notably, the Court's March 30, 2010

Opinion and Order, familiarity with which is assumed – distilled the number of claims currently

extant to three: (i) a claim that he was denied Equal Protection, in violation of the 14th

Amendment, when certain Muslim inmates were transferred to a less-restrictive facility and the

Plaintiff was not[1]; (ii) a claim that the destruction of his allegedly religious property deprived

him of substantive or procedural due process, in violation of the 5th Amendment; and (iii) claims

that his expulsion from ADX's "step-down program" (through which inmates may ultimately

obtain a transfer to a less-restrictive facility) violated his due process rights and, further,

---

[1]Based on the record that existed at the time of the Court's Opinion, the Court
provisionally granted summary judgment to the Defendants on this claim.  However, the Court
noted that an unresolved discovery issue raised the possibility that the Plaintiff might ultimately
obtain evidence that would demonstrate a triable claim, and thus, the Court acknowledged that it
would reconsider that ruling if the Plaintiff successfully obtained sufficient additional evidence.

constituted impermissible retaliation against him for his exercise of his First Amendment rights.

The Court's March 30, 2010 Order granted the Defendants leave to submit a motion for summary judgment directed at the latter two groups of claims (destruction of property and expulsion from the step-down program), and the Defendants have done so (**# 824**). The Court will describe the arguments raised in these motions as part of its analysis.

Separately, the Court referred the outstanding discovery issue affecting the first group of claims to the Magistrate Judge.[2]  The Plaintiff had moved to compel (**# 819**) the production of the "Control Unit Executive Panel Review" forms, also known as forms "BP-338," for each of 7 specific inmates for the year 2003.  (The Plaintiff contends that the 7 named inmates are the "Muslims" whom, he contends, were involved in the same conduct that resulted in the Plaintiff being sent to the ADX Control Unit, and yet the Muslims were released from the Control Unit earlier than the Plaintiff was because of BOP partiality toward their religion.)  The Defendants filed a response (**# 826**), arguing that: (i) none of the named Defendants had custody of the BP-338 forms; (ii) that BP-338 forms are routinely destroyed annually, and thus, forms from 2003 no longer exist; (iii) three of the seven named inmates were never placed in security classifications similar to the Plaintiff, and thus, requests for those individuals' records were irrelevant; (iv) the remaining four inmates were released from the Control Unit in 2003, and thus, any Equal Protection claim premised on those inmates' release from the Control Unit would be untimely, making those records irrelevant as well; and (v) release of the information sought by the Plaintiff would require an order under the Privacy Act that both permitted the

---

[2]The initial motion to compel (**# 773**) was denied without prejudice (**# 812**) by the Magistrate Judge, with the Plaintiff being given leave to refile it.  The Plaintiff then refiled (**#819**) the motion.

release of the information and assuaged the BOP's concerns as to potential security concerns that would accompany releasing this information to the Plaintiff.

By Order (**# 833**) dated May 12, 2010, the Magistrate Judge granted in part the Plaintiff's motion.  Turning aside most of the Defendants' arguments, the Magistrate Judge directed that the BOP produce 7 items of information with regard to each of the four named inmates who were actually assigned to the Control Unit: (i) the date the inmate was assigned to the Control Unit; (ii) the basis for the transfer to the Control Unit; (iii) the inmate's total classification score (presumably, at the time the inmate was released from the Control Unit); (iv) the inmate's public safety factors (presumably, at the time of release from the Control Unit); (v) the date the inmate was assigned out of the Control Unit; (vi) the basis for the inmate's transfer out of the Control Unit; and (vii) whether the inmate was transferred to a lower classification status (*e.g.* to a medium-security institution or lower), as part of the transfer from the Control Unit.  The Magistrate Judge scheduled an additional hearing to address any Privacy Act concerns that would arise out of the disclosure of such information.

Prior to that hearing, the BOP submitted a supplemental affidavit (**# 838**), noting that: (i) the four inmates in question were released from the Control Unit between January and March 2003; (ii) three of the four inmates committed no disciplinary infractions during their time in the Control Unit, one of the four committed one violation of a "200-level" (*i.e.* serious) disciplinary offense, and the Plaintiff committed 8 disciplinary violations, 5 of which were 200-level, during his own Control Unit time; (iii) no BP-338 forms existed from 2003.

Following colloquy at the scheduled hearing to discuss the Privacy Act concerns, the Magistrate Judge issued a supplemental order (**# 841**), acknowledging that the 2003 BP-338s

4

appear to have been destroyed, but noting that information about the four Muslim inmates remains relevant.  Thus, the Magistrate Judge attempted to craft "a substitute for the BP-338s" that would "recreate the information" that they would have contained.  The Magistrate Judge directed that the BOP submit to a deposition on written questions under Fed. R. Civ. P. 31(a)(4), orally addressing, for each inmate, the seven categories of information identified in the May 12, 2010 Order, and two additional categories: (viii) the basis for the inmate's transfer out of USP Florence; and (ix) a "detailed description of all incident reports the inmate received while in the Control Unit of the ADX."  The Magistrate Judge noted that the only oral objection that the Defendants had lodged to this process was that they believed the information sought was irrelevant because any Equal Protection claim the Plaintiff could raise in this action based on the release of these inmates from the Control Unit in 2003 would be barred by the statute of limitations.  The Magistrate Judge noted that this Court had declined to reach the statute of limitations issue on the Equal Protection claim in its March 30, 2010 Opinion, and the Magistrate Judge was not willing to rule on the substantive issue of the timeliness of any Equal Protection claim in the guise of resolving a discovery dispute.

The Defendants filed timely Objections **(# 844)** to the Supplemental Order pursuant to Fed. R. Civ. P. 72(a), arguing: (i) the Magistrate Judge abused his discretion in *sua sponte* modifying the Plaintiff's request for production of the BP-338s, which the Defendants responded to by showing the requested information to be non-existent, to become a request for a deposition of the BOP; (ii) that the proposed deposition is futile, as the Plaintiff is indigent and will not be able to retain the services of a court reporter to record the BOP's answers to the questions, as

contemplated by Rule 31(b)[3]; and (iii) the material sought is irrelevant, as any Equal Protection claim premised upon the release of the Muslim inmates in 2003 would be barred by the statute of limitations.

## ANALYSIS

In considering the Plaintiff's filings, the Court is mindful of his *pro se* status, and accordingly, reads his pleadings liberally. *Haines v. Kerner,* 404 U.S. 519, 520-21 (1972). However, such liberal construction is intended merely to overlook technical formatting errors and other defects in his use of legal terminology and proper English. *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). *Pro se* status does not relieve the Plaintiff of the duty to comply with the various rules and procedures governing litigants and counsel or the requirements of the substantive law, and in these regards, the Court will treat the Plaintiff according to the same standard as counsel licensed to practice law before the bar of this Court. *See McNeil v. U.S.*, 508 U.S. 106, 113 (1993); *Ogden v. San Juan County*, 32 F.3d 452, 455 (10th Cir. 1994). In construing the pleadings liberally, the Court will not take on the responsibility of serving as the Plaintiff's attorney, such as constructing arguments and searching the record for evidence in support of the Plaintiff's contentions. *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005).

### A. Discovery objections and the Equal Protection claim

To review the general contours of the Equal Protection claim, which is the only claim implicated by the Defendants' discovery Objections, the Court understands the Plaintiff to assert

---

[3]The Defendants propose that, if the Plaintiff is unable to pay for a court reporter, the Court permit the Defendants to answer the listed questions in writing, as responses to interrogatories under Rule 33.

this claim as part of the Amended Complaint's (# 100) second claim for relief.  In that claim, the Plaintiff states that he is an adherent of the Pagan religion.  He contends that the Defendants have improperly equated that religious observance with espousal of "white supremacist" beliefs, and thus, have taken adverse actions against him because of those religious beliefs.

Specifically, the Plaintiff was convicted of being involved in the murder of a fellow inmate in a prison in Pennsylvania in 1996.   The Plaintiff contends that, in retaliation[4] for the murder that he was involved with, a group of Muslim inmates at the facility in Pennsylvania murdered a second inmate.  Both the Plaintiff and several of the Muslim inmates involved with the second murder were transferred to ADX and placed in the highly-restrictive Control Unit. The Plaintiff and the Muslim inmates were all released from the Control Unit in 2003. Thereafter, the Plaintiff contends that the Muslim inmates were transferred to medium-security institutions, while the Plaintiff remained housed in a "general population" unit at ADX.  The Plaintiff contends that the more favorable treatment received by the otherwise similarly-situated Muslim inmates was a result of BOP discrimination against him on the basis of his religious beliefs, in violation of the Equal Protection clause.

1.  Standard of review

Rulings on non-dispositive issues by a Magistrate Judge are reviewed by this Court pursuant to Fed. R. Civ. P. 72(a), and will be reversed only if they are "clearly erroneous or contrary to law."  28 U.S.C. § 636(b)(1)(A); *Hutchinson v. Pfeil*, 105 F.3d 562, 566 (10th Cir. 1997); *Ariza v. U.S. West Communications, Inc.*, 167 F.R.D. 131, 133 (D. Colo. 1996).

---

[4]Although not strictly relevant to the proceedings herein, the evidence at the Plaintiff's trial on murder charges indicated that reason for the murder was that the victim had recently converted to the Muslim religion.

Accordingly, the Defendants' Objections will be overruled unless the Court finds that the Magistrate Judge abused his discretion or, if after viewing the record as a whole, the Court is left with a "definite and firm conviction that a mistake has been made." *Ariza,* 167 F.R.D. at 133, *citing Ocelot Oil Corp. v. Sparrow Indus.,* 847 F.2d 1458, 1464 (10th Cir.1988).

      2. <u>Relevance</u>

The Defendants contend that the Magistrate Judge's ruling, finding that the evidence sought by the Plaintiff was relevant, was contrary to law because the Equal Protection claim is clearly untimely.

This Court addressed the timeliness of the Plaintiff's claims in general terms in an Opinion and Order (**# 284**) dated September 12, 2008.  At that time, addressing the Defendants' invocation of the statute of limitations, this Court concluded that: (i) the Plaintiff's *Bivens* claims were subject to a two-year statute of limitations; (ii) that the case was commenced on August 7, 2007, and thus, only *Bivens* claims that accrued on or after August 7, 2005 were timely; and (iii) although the Plaintiff argued that certain claims presented "continuing violations" for which the statute of limitations never truly began to run, to the extent his second claim for relief asserted a claim that he was subjected to discriminatory or unequal treatment because of his religion, "that claim would not fall within a continuing violation doctrine."  As a result, to the extent the Plaintiff asserts an Equal Protection claim, that claim must have accrued on or after August 7, 2005.

The Court returned to the question of the timeliness of this claim in its March 30, 2010 Opinion.  There, the Court observed that the Defendants once again raised the argument that the Equal Protection claim was untimely, but the Court noted that "[n]either party has significantly

developed the factual content of this claim" on summary judgment.  The Court took note of the

Defendants' statement that "the Muslims began leaving ADX as early as 2003," and noted that

the "accrual of the Plaintiff's Equal Protection claim" might be said to correspond with "the

dates upon which the law of the Muslim inmates left ADX," but noting the absence of a

developed factual record, the Court expressly "decline[d] to address the limitations argument at

this time."

The Defendants' Objections argue that the Equal Protection claim is untimely (and the

discovery requests are thus irrelevant) because "the dates when [the Muslim] inmates left the

Control Unit" – between January and March 2003– "are outside the two-year statute of

limitations."  But this argument misconstrues the Plaintiff's claim.  His contention is that the

more favorable treatment received by the Muslim inmates was not that they were transferred out

of the Control Unit earlier than he was; rather, his claim is that after being discharged from the

Control Unit, the Muslim inmates were transferred to medium-security prisons while the Plaintiff

remained at the high-security ADX facility.  *See e.g. Docket* # 100 at p. 5a (defendants "kept him

in solitary confinement [*i.e.* ADX] for years while releasing similarly-situated prisoners of other

religions . . . to regular penitentiaries"); *Docket* # 810 at 17 (the Court understands the claim to

be "that the Muslims eventually obtained security classification scores allowing them to be

transferred out to a medium security facility while [the Plaintiff] remains at ADX").

A *Bivens* claim accrues, and the statute of limitations begins running, on the date that a

plaintiff knows or should know of the existence of cause of the injury that is the basis of his

action.  *Hoang Van Tu v. Koster*, 364 F.3d 1196, 1199 (10th Cir. 2004).  For purposes of the

Plaintiff's Equal Protection claim here, the Plaintiff could not have known of any unequal

treatment until, at the earliest, the Muslims began being transferred out of ADX while the Plaintiff remained there.  Thus, it is the date of the Muslims' transfer <u>from ADX</u>, not from out of the Control Unit, that is the key to any statute of limitations argument.  As best the Court can determine from the record, the Defendants have not provided the dates upon which the Muslims were transferred out of ADX, only the dates they were transferred out of the Control Unit. Accordingly, the Court cannot say that the Plaintiff's Equal Protection claim is clearly untimely, and, by extension, this Court finds that the Magistrate Judge did not act contrary to law in finding that the information requested was relevant to the Equal Protection claim.

The Court also finds the Defendants' contention that the Magistrate Judge abused his discretion by *sua sponte* modifying the Plaintiff's request for production of the BP-338s to be more akin to an interrogatory seeking certain information to be without merit.  The Magistrate Judge has broad discretion to resolve discovery disputes, *Pflum v. U.S.*, 212 F.R.D. 580, 582 (D. Kan. 2003), and is always guided by Fed. R. Civ. P. 1's instruction that determinations promote the "just, speedy, and inexpensive" resolution of the issues.  Here, the Plaintiff made clear that his discovery request was intended to obtain the "classification scores" of the Muslims, and the vehicle by which he believed that information could be obtained was production of the BP-338s completed in 2003.  Once the Defendants came forward with information that those forms no longer existed, the Magistrate Judge wisely forestalled additional motion practice by both sides with regard to this request, looking past the form of the Plaintiff's request to its substance: a request for information about the Muslim inmates' releases from ADX.  Constraining a Magistrate Judge's ability to overlook matters of form and cut to the substantive heart of a discovery dispute would needlessly encourage "Gotcha!"-style litigation, where the slightest

inaccuracy or deviation from form would allow parties to resist discovery requests that seek clearly discoverable material.  Finally, the Defendants have not articulated any particular prejudice that they suffer as a result of the Magistrate Judge's recharacterizing of the Plaintiff's discovery request.  Under these circumstances, the Court cannot say that the Magistrate Judge's decision to treat the Plaintiff's request for production as one in the nature of an interrogatory request was an abuse of discretion.

Finally, the Court turns to the question of whether the Magistrate Judge's decision to direct a deposition on written questions under Rule 31 constituted an abuse of discretion.  Although the Court would be inclined to find that the Magistrate Judge's decision to prefer one discovery mechanism over another would not be an abuse of his considerable discretion, this particular issue is moot.  The Defendants' Objections request that they instead be permitted to respond to the questions in writing, as if responding to an interrogatory, and the Plaintiff's response to the Objections agrees that he "wishes to allow Defendants to respond in written form."  Accordingly, the Court overrules the Defendants' Objections and affirms the Magistrate Judge's Order, modified to reflect the parties' agreement that the Defendants will respond to the nine questions by means of a written, rather than oral, response.[5]

### B.  Defendants' summary judgment motion

---

[5]Because the Court is directing the production of additional evidence bearing on the Equal Protection claim, it vacates that portion of the March 30, 2010 Order that granted provisional summary judgment to the Defendants on that claim.  Should the Defendants believe that, despite the additional evidence that is produced, the Plaintiff still cannot establish the Equal Protection claim, they may file a summary judgment motion with regard to that claim within 30 days of producing the evidence.

1.  <u>Standard of review</u>

Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002). Where, as here, the Plaintiff bears the burden of proof on the claims at trial, the Defendants must point to an absence of sufficient evidence to establish one or more elements of the claim or defense that the non-movant is obligated to prove. If the non-movant comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required; if the respondent fails to produce sufficient competent evidence to establish its claim or defense, the claim or defense must be dismissed as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

2.  <u>Destruction of property claim</u>

Summarizing the basic facts of this claim, the Plaintiff contends that, in August 2006, the Defendants destroyed a manuscript that the Plaintiff describes as "thousands of pages of original research, art, and creative writing" that had taken him 10 years to compile. He contends that the Defendants "refuse[d] to recognize the Plaintiff's religious property <u>as</u> religious property, [and] fixated on the idea of destroying it in its totality." This Court construed these assertions to arguably raise a claim that the Plaintiff was deprived of his property without due process, in violation of the 5th Amendment.

The Defendants' motion contends that, on or about March 2, 2006, ADX staff conducted an inventory of the Plaintiff's cell. At that time, staff concluded that the Plaintiff was in

possession of numerous items that exceeded BOP policies governing inmate property, including "18 inches of personal papers" and numerous books, pamphlets, and photographs.  Staff concluded that this excess property constituted "nuisance contraband" – that is, "excessive accumulation of commissary, newspapers, letters, or magazines which cannot be stored neatly or safely" in cells without producing a health, fire, or housekeeping hazard.  ADX staff reviewed its inventory findings with the Plaintiff, inquiring how he wanted each item of contraband to be disposed of.  He indicated that he wanted the pamphlets destroyed, and the books and photographs sent to specified non-incarcerated individuals for safekeeping.  With regard to the personal papers, the Plaintiff requested that the papers remained stored by the BOP.  He was advised that the BOP would not store the papers for him, and that he had 120 days within which to provide an address and stamps if he wished to have the papers sent out, barring which, the papers would be destroyed.  The Plaintiff did not supply the necessary postage and an address to send the papers out, and did not formally challenged the staff's designation of the papers as prohibited contraband.  As a result, on July 18, 2006, the conclusion of that 120 day period, Defendant Martinez sought permission to destroy the papers as "abandoned property," and acting Warden John Shartle approved the request.  On July 24, 2006, Mr. Martinez and Defendant Roy destroyed the property.

The Plaintiff's version of events adds some interstitial detail, but does not outright contradict the Defendants' version of events.  The Plaintiff contends that, after being advised that the 18" of papers were deemed contraband, he was told by Mr. Roy that if he discarded 6 inches of personal papers, the 18" of papers would be returned.  The Plaintiff contends that he proceeded to both discard and mail out far more than 6" of papers, but Mr. Martinez "refused to

acknowledge this."[6]  Near the July 18 deadline, the Plaintiff sought to mail out an additional 18"

of material, asking Mr. Madison "to let me credit the postage to my account."  Mr. Madison

"took the material and agreed to let [the Plaintiff] sign a 'Form 24' for postage" on July 17, 2006,

and told the Plaintiff that Mr. Madison would speak to Mr. Martinez.  By the time Mr. Madison

spoke with Mr. Martinez, Mr. Martinez had already put in a request for authorization to destroy

the property.  The Plaintiff contends that, on the following Saturday (which would be July 22,

2006), he spoke to Ms. Heim, whom he identifies as "[Mr. Martinez's] boss."  Ms. Heim told the

Plaintiff that she "had taken [the] manuscripts away from [Mr.] Martinez and placed them 'in

holding,'" and that she would "speak with [Mr.] Madison about returning them."  Nevertheless,

the Plaintiff later learned that Mr. Martinez had destroyed the property.

        The Court's March 30, 2010 Opinion construed the Plaintiff's claim relating to his

property as one arising under *Bivens* and implicating the 5th Amendment's guarantee against a

deprivation of property without due process of law.  The Court attempted to stake out the general

boundaries of this claim by referring to *Hudson v. Palmer,* 468 U.S. 517, 533 (1984) and *Wilson

v. U.S.*, 29 Fed.Appx. 495, 496-97 (10th Cir. 2002), and concluded that the Defendants could not

be held liable under the due process clause for negligent destruction of the property or for

intentional-yet-unauthorized destruction of the property; on the other hand, if the property was

intentionally destroyed by the Defendants acting under BOP authorization, the Court explained

that it was "aware of no authority that would preclude a *Bivens* due process claim against the

---

[6]A memorandum from Mr. Martinez to the Plaintiff, attached to the Plaintiff's affidavit,
suggests that Mr. Martinez believed that the "papers" the Plaintiff was attempting to send out
were simply pages the Plaintiff tore out of a book in an attempt to generate the requisite number
of "inches" of paper.

responsible officials."

To establish a due process claim, the Plaintiff must show: (i) that he was deprived of a protected liberty or property right, and (ii) that procedural protections warranted by that right were not properly observed. *Swarthout v. Cooke*, 131 S.Ct. 859, 861 (2011). The existence of a liberty or property right is a necessary element of such a claim, and there is no need to examine the procedural protections that were or were not followed if no constitutionally-protected interest was implicated by the conduct. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) ("those who seek to invoke [the due process clause's] procedural protection must establish that one of these interests is at stake"). Thus, the Court turns first to the question of whether the Plaintiff can show that the destruction of his manuscript deprived him of a property right protected by the 5th Amendment.

The Defendants contend that the question of whether the Plaintiff possessed a property interest in the manuscript is determined by *Sandin v. Conner*, 515 U.S. 472 (1995); that is, the Plaintiff enjoys a property interest in the manuscript only to the extent that its deprivation would constitute an "atypical and significant hardship" when compared to the ordinary incidents of prison life. They go on to argued that if the Plaintiff can establish that he had a property interest in the manuscript, a due process claim might lie if he shows that he did not receive the type of process mandated by *Matthews v. Eldridge*, 424 U.S. 319 (1976). *Citing Gillihan v. Shillinger*, 872 F.2d 935, 940 (10th Cir. 1989).

The Defendants are correct that *Sandin* provides the analysis by which the Court determines whether the Plaintiff had a property interest in the manuscript. In *Clark v. Wilson*, 625 F.3d 686, 690-91 (10th Cir. 2010), an inmate sought to bring a due process claim against

prison officials who froze the funds in his inmate trust account, without notice, in response to a garnishment against the inmate.  In finding that the inmate enjoyed a property interest in the funds, the District Court applied *Gillihan*, which assessed the existence of a property interest by examining whether mandatory language in prison policies created a "legitimate expectation" that the inmate would retain the funds at the conclusion of his sentence.  The 10th Circuit reversed, finding that *Gillihan*'s "legitimate expectations" approach to assessing the existence of prisoner property interests did not survive *Sandin*.  *Id.* at 691.  Rather, the Court of Appeals instructed, inmate claims of liberty or property interests must be evaluated according to *Sandin*'s "atypical and significant hardship" analysis.  *Id., citing Cosco v. Uphoff*, 195 F.3d 1221, 1223-24 (10th Cir. 1999) *and Steffey v. Orman*, 461 F.3d 1218, 1221 (10th Cir. 2006) (inmate had no property interest in proceeds of money order, sent by parents of another inmate and thus seized as contraband by prison officials).

Thus, the Court begins its examination of whether the Plaintiff enjoyed a property interest in the manuscript by examining whether the deprivation of that manuscript would present "an atypical and significant hardship" on the Plaintiff "in relation to the ordinary incidents of prison life."  In doing so, the Court draws significant guidance from *Cosco*.  There, inmates had been permitted to possess "hobby" materials in their cells, until the murder of a corrections officer prompted the prison to change its policy, deeming hobby materials to be contraband property subject to confiscation.[7]  Inmates sued, contending that the confiscation of the hobby materials constituted a deprivation of property without due process.  Affirming the

---

[7]As here, the prison policy in *Cosco* provided that prisoners could request, within 90 days of confiscation, that the confiscated hobby materials be shipped out of the prison.

trial court's dismissal of that claim, the 10th Circuit acknowledged that *Sandin* provided the analysis by which it would be determined if the inmates had a property interest in the hobby materials.  It noted that "[t]he regulation of type and quantity of individual possession in cells is typical of the kinds of prison conditions that the Court has declared to be subject to the new analysis set forth in *Sandin*," and that "we cannot say that the new regulations promulgated in this case present the type of atypical, significant deprivation of their existing cell property privileges in which a State might create a property interest." *Id.* at 1224.

A similar result is warranted here.  As *Sandin* instructs, the Court determines whether the Plaintiff had a property interest in the manuscript by examining whether depriving the Plaintiff of the possession of that property – whether by confiscation and storage of that property or by confiscation and destruction of it – constitutes an "atypical and significant hardship" compared to the "ordinary incidents" of prison life.  As cases like *Cosco* make clear, prison officials are granted broad discretion in deciding how much and what kinds of personal property inmates can possess, and in the absence of evidence that the BOP's policies applicable to the Plaintiff are so extreme and parsimonious that they fall outside the scope of typical prison property rules, the inquiry ends there.  Here, the Defendants have submitted evidence showing that ADX policies provided for inmates to possess one cubic foot of personal papers.  The Plaintiff – who ultimately bears the burden of proving that this policy poses an "atypical and significant hardship" – has offered no evidence indicating that the "one cubic foot" restriction is atypical of property restrictions found in other high-security institutions, nor does he offer any particular evidence showing that such a restriction poses an unusual hardship for inmates.  Under these circumstances, the Plaintiff has failed to demonstrate that he enjoyed a property right in the

manuscript, and no further consideration of the due process claim is necessary.[8]

Accordingly, the Defendants are entitled to summary judgment on the Plaintiff's due process claim premised on the destruction of his manuscript.

### 3. Removal from step-down program

The final remaining claim concerns the Plaintiff's allegations that he was improperly removed from the step-down program in or about 2008. The Court understands this claim to have two components: (i) that the Plaintiff was removed from the step-down program in retaliation for his exercise of his First Amendment rights – *i.e.* because he protested the destruction of his manuscript two years earlier; and (ii) that the Defendants' decision not to deem

---

[8]Nevertheless, the Court takes the opportunity to briefly address two arguments raised by the Plaintiff.

First, the Court notes that the Plaintiff is especially vehement that the manuscript constituted "religious property" that was somehow exempt from the ADX's personal property requirements or otherwise entitled to special treatment. The Defendants have supplied an Institutional Supplement that specifically describes what types of inmate personal property are permitted at ADX. With regard to religious property, the pertinent provisions allow inmates to posses 8 religious pamphlets or brochures, and to possess religious books that are counted as part of the inmate's limit of 8 books in total. It is not clear that the Plaintiff's self-created manuscript, even if religious in nature, could be deemed to fit in either of these categories. The Supplement also explains that the Religious Services department will "make the final determination concerning authorized items" (and that items "utilized for other than their intended purpose" will be deemed unauthorized, even if used for religious purposes). The Plaintiff has not come forward with any evidence that the Religious Services department had deemed his manuscript to be permitted, and indeed, he has not indicated that he specifically requested to have the Religious Services department make such a determination.

Second, the Plaintiff argues extensively that certain individuals made representations to him that he could keep his manuscript if he disposed of specified quantities of other personal papers. Even assuming such representations were made, the fact that staffers made promises to the Plaintiff that he could keep the manuscript under certain conditions would have been relevant under the now-abrogated *Gillihan* analysis – which focuses on whether an inmate had a legitimate expectation that he could keep the property – but is not relevant to the currently-applicable *Sandin* analysis, which focuses solely on the extent to which the deprivation is atypical and burdensome.

him eligible for the program violated his due process rights, insofar as he contends that he satisfied all of the objective program criteria.

The record reflects that the full step-down program takes a period of 36 months to complete: inmates must successfully spend 12 months in a general population unit, then 6 months in an intermediate (J-Unit) assignment, then 6 months in a transitional (K-Unit) assignment, and finally, complete 12 months in the Pre-Transfer Unit (D/B-Units). "Success," in each instance, is partially defined by the inmate having no disciplinary write-ups during the relevant time.  The Plaintiff was assigned to the J-Unit (intermediate) on August 9, 2006, but was removed from that unit (and thus, from the step-down program) a week later when he was found guilty of a disciplinary violation – namely, refusing to leave the common area and return to his cell, requiring a use of force team to finally secure his compliance.[9]  The Plaintiff was then housed alternatively in a general population unit or, as he continued to commit disciplinary infractions, in the Special Housing Unit.

The Plaintiff successfully completed a 12-month period of clean conduct in a general population unit in April 2008, but was not placed into the step-down program.  When he inquired as to why, he was informed by Mr. Wiley that "the factors that led to his previous removal" from the program "had not been sufficiently mitigated."  He was told that if he continued to remain free of disciplinary convictions, he would be considered for the step-down program in six months.  The Plaintiff then incurred additional disciplinary violations in July 2008, again forestalling his step-down eligibility.

---

[9]The Plaintiff did not dispute engaging in conduct violating disciplinary rules, but stated that he did so to protest the destruction of his manuscript.

In October 2009, having again completed 12 months of discipline-free conduct in a general population unit (and having satisfied certain other requirements), he was again admitted to the step-down program and placed in the intermediate unit.  On April 13, 2010, he was approved for advancement to the transitional K-Unit.

The Plaintiff's response to the summary judgment motion does not materially dispute these facts, other than to note that he had complied with the requirement of remaining discipline-free for 12 months by April 2008, yet was excluded from the step-down program because of his prior disciplinary incident in August 2006 – *i.e.* that he had not "sufficiently mitigated" his prior conduct.

As noted above, the Court construes the Plaintiff to assert two types of claims with regard to his exclusion from the step-down program – one sounding in First Amendment retaliation, and one sounding in a deprivation of due process.

The First Amendment claim can be quickly addressed.  The Court understands the crux of this claim to be the Plaintiff's contention that his August 2006 refusal to return to his cell, as a protest against the destruction of his religious property, was conduct protected by the First Amendment, and thus, his removal from the step-down program based on that conduct was retaliatory.  The Court's March 30, 2010 Opinion previously rejected any argument that the August 2006 conduct enjoyed First Amendment protection because it was in violation of the facility's disciplinary rules, and unlawful conduct never enjoys First Amendment protection.  *See Docket* # 810 at 21-22.  This same reasoning is sufficient to dispose of any First Amendment claim relating to the Plaintiff's removal from the step-down program.

The remaining claim sounds in due process.  Once again, to establish a due process

claim, the Plaintiff must show: (i) that he was deprived of a protected liberty or property right, and (ii) that deprivation occurred in circumstances in which sufficient due process protections were not followed.  *Swarthout*, 131 S.Ct. at 861; *Wilkinson*, 545 U.S. at 221.  As noted above, the inquiry into whether an inmate enjoys a liberty or property interest in a particular thing is whether the deprivation of that thing constitutes an "atypical and significant hardship" in relation to the ordinary incidents of prison life.  *Sandin*, *supra*.   For purposes of this discussion, the thing being assessed are the conditions of confinement in a general population unit in ADX; if those conditions present an "atypical and significant hardship," the Plaintiff would have a liberty interest in procedures that would eventually lead him to a transfer to a less-restrictive prison.

The Court's March 30, 2010 Opinion previously addressed the conditions of confinement in an ADX general population unit, and concluded that those conditions do not rise to the level of an "atypical and significant hardship."  *Docket* # 810 at 22-28.  That discussion is deemed incorporated herein.  The Court supplements its prior discussion by noting a wealth of additional caselaw that uniformly concludes that the conditions of confinement at ADX general population units (*i.e.* those imposed on inmates who are excluded from the step-down program) do not give rise to a liberty interest.  *See generally Matthews v. Wiley,* ___ F.Supp.2d ___, 2010 WL 3703357 at *8 (D. Colo. Sept. 13, 2010); *Bradshaw v. Lappin,* 738 F.Supp.2d 1143, 1155 (D. Colo. 2010), *citing Muhammad v. Hood*, 100 Fed.Appx. 782, 783 (10th Cir.2004) (unpublished); *see also Ajaj v. U.S.*, 293 Fed.Appx. 575, 586 (10th Cir. 2008) (unpublished) (noting that, as of that decision in September 2008, "we have never held the conditions, duration or restrictions of the detentions presented on appeal created a liberty interest").  Accordingly, the Court finds that the Plaintiff has not demonstrated that his participation in or exclusion from the step-down

program implicates a liberty interest, and thus, cannot assert a due process claim resulting therefrom.[10]

Accordingly, the Defendants' second motion for summary judgment is granted.  The sole claim remaining for future consideration is the Plaintiff's Equal Protection claim, as discussed above.

### C. Reconsideration

The Plaintiff moves **(# 820)** for reconsideration of "misunderstandings and factual errors" in the Court's March 30, 2010 Order.  Specifically, he states: (i) that he submitted evidence showing that "Muslims . . . with worse instant and past offenses were sent to the ADX with Plaintiff and were transferred [to less restrictive institutions] when he was [not]"; (ii) that he had submitted an affidavit of David Duncan, Associate Warden of ADX that declared, "based on nothing but Plaintiff's extensive religious writing . . . that Plaintiff holds the most heinous views," which the Plaintiff considers to be "direct proof of discrimination"; (iii) he had submitted evidence that "there is no distinction between [general population] units and [the

---

[10]Even if the Court were to conclude that participation in the step-down program gave rise to a liberty interest, the Court would find that the Plaintiff's claim nevertheless failed.  As the Court understands it, the procedural defect cited by the Plaintiff was Mr. Wiley's refusal in April 2008 to admit him to the step-down program, notwithstanding the fact that the Plaintiff had remained free of discipline for a 12-month period.  The Court finds that step-down eligibility entails both objective and subjective factors, including consideration of such subjective criteria as "the inmate's behavior and conduct towards, and interaction with, staff and other inmates," "the inmate's overall institution adjustment, personal hygiene, and cell sanitation," and "the inmate's overall adjustment during his history of confinement."  Because program eligibility is significantly affected by subjective factors calling for ADX staff to exercise discretion, and this Court is particularly unwilling to substitute its judgment for that of ADX officials, the Court would find that Mr. Wiley's decision to exclude the Plaintiff from step-down participation in April 2008, even if that decision was based on conduct from August 2006, was not so arbitrary and capricious that the Court could conclude that that decision deprived the Plaintiff of substantive due process.

Control Unit]" and that in another case, the Defendants "admitted that [the Control Unit] is

protected by *Wilkinson*"; (iv) that the Plaintiff pointed out his mental and physical deterioration

"only to re[but] Defendants' admission that ADX [general population units] are not typical"; (v)

that BOP Program Statements "required Plaintiff to be transferred in 2003" and that the

discussion of custody scores "was merely to show how egregious noncompliance was in this

case"; (vi) contrary to the Court's statement, the Plaintiff did not "abandon" an excessive force

claim arising from the use of four-point restraints against him for an extended period of time,

that the Defendants "have never denied this claim," and that the Plaintiff is "on tape submitting

to restraints and is on record not resisting for up to 48 hours when regulation allows 4 hours";

(vii) that "religious property has special status and may only be destroyed with the approval of a

Chaplain," a rule which was violated by the Defendants here; (viii) that the BOP has purchased

"airport scanning equipment" that is "superior to X-ray" in order to scan incoming books; and

(ix) that the Plaintiff "sought and received a continuance for experts and thus his relevant

motions were timely."

The Court treats this motion, made within 10 days of the March 30, 2010 Opinion, as

being made pursuant to Fed. R. Civ. P. 59(e). Reconsideration of a prior Order under Rule 59(e)

is an appropriate means to review newly-discovered evidence, to correct clear error, or prevent

manifest injustice. *Major v. Benton*, 647 F.2d 110, 112 (10th Cir.1981).  Relief under this theory

is reserved for extraordinary circumstances, such as where the Court has obviously

misapprehended a party's position on the facts or the law, or the Court has mistakenly decided

issues outside of those the parties presented for determination.  *See e.g.  Servants of Paraclete v.*

*Does*, 204 F.3d 1005, 1012 (10th Cir. 2000); *Adams v. Reliance Standard Life Ins. Co.*, 225 F.3d

1179, 1186 n. 5 (10th Cir. 2000); *Sithon Maritime Co. v. Holiday Mansion,* 177 F.R.D. 504, 505 (D.Kan.1998).  However, it is not a tool to re-raise issues that were or could have been raised in prior briefing.  *Van Skiver v. United States*, 952 F.2d 1241, 1243 (10th Cir.1991). With these standards in mind, the Court will address each of the Plaintiff's contentions.

The request concerning the Muslim inmates necessarily relates solely to the Equal Protection claim, and is essentially rendered moot by the discovery rulings to date.  The Magistrate Judge has determined that only four of the Muslim inmates identified by the Plaintiff were sent to the Control Unit at the same time as the Plaintiff, and thus, only evidence relating to those four inmates is relevant as to the Equal Protection claim.

The matter concerning the affidavit of Mr. Duncan is not a proper subject for reconsideration.  The Plaintiff did not submit that affidavit, which is dated 2003, with his responses to the Defendants' summary judgment motion.  Because the affidavit could – and indeed, should – have been raised by the Plaintiff in response to the Defendants' motion, it is not a proper ground for reconsideration.  (In any event, the Court finds that the affidavit is irrelevant to the Plaintiff's claim that his classification was influenced by discrimination against his religion.  As the Court noted, classification scores did not include any mechanism to score inmate religious beliefs, and thus, whether Mr. Duncan harbored misperceptions about the Plaintiff's religion is irrelevant to the Court's conclusion.)

The Plaintiff's contention that he has submitted evidence showing that the Control Unit and general population units are identical misstates the evidence he relies upon.  The affidavit of Diana Krist highlights several ways in which inmates in the general population units enjoy more benefits that inmates in the Control Unit: they are subject to less-severe restraints when being

24

removed from the housing unit, they receive 3 more hours of out-of-cell recreation per week, and they receive an extra social phone call per month, among other things. The Court is not aware of what the Plaintiff refers to when speaking of "the latest *Jordan* case,"[11] nor is the Court aware of any "admi[ssion]" by the Defendants that the Control Unit at ADX presents "atypical and significant hardships" under *Wilkinson*. The Plaintiffs' failure to submit evidence reflecting such an admission is a sufficient basis to deny the requested reconsideration.

The Plaintiff's clarification as to his purpose in discussing his health conditions and his classification scores does not assert that the Court's reasoning in its March 30, 2010 Opinion is incorrect, and thus, these are not proper subjects for reconsideration.

The Plaintiff's contention that he did not intend to "abandon" an excessive force claim premised on the extended use of four-point restraints is without merit. The Defendants sought dismissal of the Plaintiff's excessive force claim in its entirety, and the Plaintiff did not come forward with evidence in response. Indeed, even in the motion for reconsideration, the Plaintiff cites to no evidence in support of his contention. He claims that there is evidence "on tape" and "on record," but does not provide it. Under these circumstances, the Plaintiff has failed to carry his burden of showing that he is entitled to reconsideration of the Court's ruling.

The contention that the approval of a Chaplain is required before disposing of religious

---

[11]Presumably, the Plaintiff is referring to former ADX inmate Mark Jordan. Mr. Jordan's most recent case in this Court, *Jordan v. Fed. Bureau of Prisons*, D.C. Colo. Case No. 08-cv-02678-WYD-KLM was dismissed by stipulation of the parties on February 16, 2010. That stipulation noted that Mr. Jordan's anticipation completion of his Control Unit term might render his claims moot. The Court sees nothing in the docket of that case constituting an admission by the Defendants of the type claimed by the Plaintiff here.
    The next most recent case filed by Mr. Jordan was a *habeas* petition pursuant to 28 U.S.C. § 2255, having nothing to do with his incarceration at ADX.

property does not warrant reconsideration.  The Court expressly declined to reach this claim in its March 30, 2010 Opinion, and has addressed it in this Opinion.

The Plaintiff's contention concerning the BOP's purchase of "airport scanning equipment" is without merit for several reasons.  First, it is unsupported.  The Plaintiff's motion for reconsideration points to: (i) a 1994 publication of Proposed Rules by the BOP, in which the BOP proposed to change its policies to permit inmates to receive books and publications only from commercial sellers, rather than from any source, 52 FR 2668-01 (Jan. 18, 1994); and (ii) a 2002 publication of the BOP's final rules governing incoming publications, 67 FR 77161-01 (Dec. 17, 2002).  The latter notes that the BOP currently uses x-ray machines to scan incoming mail, but neither document makes reference to "airport scanning equipment" nor mentions any technical solution that the BOP considered "superior to x-ray."  Second, it is clear that the Plaintiff could have raised these arguments in his summary judgment response, and his failure to do so makes this an inappropriate subject for reconsideration.  Finally, the Court finds that a contention that less-restrictive alternatives (*e.g.* "airport scanning equipment") to the BOP's approach (*i.e.* a ban on publications from non-commercial sources) is irrelevant, as the BOP is only required to show that its regulations are rationally related to legitimate penological interests, not necessarily that they are the optimal solution.

Finally, the Plaintiff's reference to having obtained "a continuance for experts" and his motions being "timely" seems to relate to the Court's denial of his motion at Docket # 781.  That motion, as construed by the Court, was a notification of the Plaintiff's intent to present expert opinion testimony, and the Court found that proffer to be untimely.  The Plaintiff does not point to the orders in the record that extended his time to disclose these experts and, in any event, the

Court finds that the proffered expert testimony is irrelevant to the sole claim remaining in this case: whether the Plaintiff was treated differently from the Muslim inmates regarding transfer out of ADX.

Accordingly, the Plaintiff's motion for reconsideration is denied in its entirety.

### D.  Remaining motions

The Court briefly addresses the remaining motions by the Plaintiff.

The Plaintiff has filed a Motion to Disallow Irrelevant Evidence (**# 845**) relating to disciplinary infractions that he received.  The Court understands this motion to essentially be an argument, tendered in pre-emptive response to a contention by the Defendants that the Plaintiff's disciplinary record rendered him differently-situated from the Muslim inmates.  As such, the Plaintiff can present this argument as part of his response should the Defendants move for summary judgment on the Equal Protection claim.  To the extent the motion seeks a ruling *in limine* regarding the admissibility of trial evidence, it is denied as premature.

The Plaintiff has filed a Motion to Disallow Hearsay Evidence (**# 846**). This motion complains that the affidavit of Mr. Locke, purporting to refer to the thinking of the members of the Control Unit Executive Panel, is hearsay.  This motion, too, is a pre-emptive response to a summary judgment that has not yet been filed, and is resolved in the same manner as the motion above.

The Plaintiff moves to "remove prisoners not allowed to join this action as Plaintiffs from the list of persons who receive copies of court orders."  The Court's docket appears to indicate that certain individuals purporting to be "Interested Parties" remain active on the docket, notwithstanding the fact that the Court has denied their requests to participate in this case.

Accordingly, the Clerk of the Court shall terminate Interested Parties Casey Bernard Rodriguez, Richard Leverich, George A. Scalf, and Ralph Gambina.

Finally, the Plaintiff moves for an order directing the BOP to "collect PLRA payments" owed by the Plaintiff as filing fees for several actions in various courts pursuant to 28 U.S.C. § 1915(b)(1) "sequentially." He states that he is subject to four separate filing fee obligations, and that as a result, the BOP withdraws 80% (20% pursuant to § 1915(b)(1) x 4 cases) of his inmate account balance each month. He argues that courts have concluded that "multiple PLRA fees [must] be collected sequentially, rather than simultaneously." *Citing Whitfield v. Scully*, 241 F.3d 264, 275-77 (2d Cir. 2001). However, the very case that the Plaintiff cites acknowledges a split of authority on the question of whether multiple filing fee obligations should be assessed simultaneously or sequentially. *See Newlin v. Helman*, 123 F.3d 429, 436 (7th Cir. 1997) (finding simultaneous payment required by statute).

The 10th Circuit expressly addressed this question in *Christensen v. Big Horn County*, 374 Fed.Appx. 821, 829-33 (10th Cir. 2010) (unpublished). The court found that "the limited deduction for fees specified in § 1915(b)(2) is triggered by each action or appeal pursued, allowing here for the cumulative deduction" of 20% of the inmate's balance multiplied by the number of outstanding obligations). Although unpublished decisions of the 10th Circuit are not given precedential value, this Court finds the reasoning in *Christensen* persuasive and adopts it here. Accordingly, the Plaintiff's motion is denied.

## CONCLUSION

For the foregoing reasons, the Plaintiff's Motion to Alter Judgment **(# 820)** is **DENIED**. The Defendants' Second Motion for Summary Judgment **(# 824)** is **GRANTED**, and the

Defendants are entitled to judgment on the Plaintiff's claims relating to destruction of his personal property and his exclusion from the step-down program; the sole remaining claim concerns whether the Plaintiff was denied Equal Protection based on his religion when other allegedly similarly-situated inmates of different religions were transferred from ADX earlier than he was.   The Defendants' Objections **(# 844)** are **OVERRULED** and the Magistrate Judge's May 27, 2010 Orders **(# 840, 841)** are **AFFIRMED**, except insofar as the parties have agreed that the Defendants shall answer the questions posed by means of a written interrogatory responses rather than via an oral deposition. The Plaintiff's Motion to Disallow Irrelevant Evidence **(# 845)** and the Plaintiff's Motion to Disallow Hearsay Evidence **(# 846)** are **DENIED**, as premature.   The Plaintiff's Motion to Remove Nonparties **(# 848)** is **GRANTED**, and the Clerk of the Court shall terminate the status of Interested Parties Casey Bernard Rodriguez, Richard Leverich, George A. Scalf, and Ralph Gambina.   The Plaintiff's Motion to Order the Bureau of Prisons to Collect PLRA Payments Sequentially **(# 856)** is **DENIED**.

Dated this 16th day of March, 2011

**BY THE COURT:**

Marcia S. Krieger
United States District Judge